**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL TYSON, an individual, RICHARD FLIEHR, an individual, CARMA HOLDCO, INC., a Delaware limited liability company, and LGNDS LLC, a Wyoming limited liability company, <br><br> *Plaintiffs*, <br><br> v. <br><br> CHAD BRONSTEIN, ADAM WILKS, NICOLE COSBY, and JAMES CASE, <br><br> *Defendants*. | Civil Action No. <br><br> Judge: <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs MICHAEL TYSON ("Mike Tyson" or "Tyson"), RICHARD FLIEHR ("Ric Flair" or "Flair"), CARMA HOLDCO, INC. ("CARMA"), and LGNDS LLC ("LGNDS") (collectively, the "Plaintiffs"), by and through their undersigned counsel WILLKIE FARR & GALLAGHER LLP, allege the following against Defendants CHAD BRONSTEIN ("Bronstein"), ADAM WILKS ("Wilks"), NICOLE COSBY ("Cosby"), and JAMES CASE ("Case") (collectively, the "Defendants"), and state as follows:

### INTRODUCTION

1.      Plaintiff Mike Tyson and his co-plaintiffs bring this civil action to hold Chad Bronstein, Adam Wilks, and their co-defendants accountable for their participation in a brazen RICO conspiracy involving criminal wire fraud, embezzlement, money laundering, and extortion,

1

as well as securities fraud and shameless self-dealing that enriched the Defendants to the tune of tens of millions of dollars.

2.     At the heart of this action is CARMA, a global branding company formed in Chicago that specializes in licensing celebrity brands.  Beginning in 2021, Bronstein served as CARMA's Chairman of the Board, and later as CARMA's President, while Wilks was the company's Chief Executive Officer.  Defendant Cosby served on CARMA's Board of Directors from around its inception until she began her employment as CARMA's Chief Legal and Licensing Officer.  James Case is a shareholder in CARMA, who received his shares, free of charge, based on his role as a long-time associate of Defendant Bronstein.  Throughout their time at CARMA, Bronstein and Wilks treated CARMA as their own personal piggy bank, using more than $1 million to pay for unauthorized personal travel on private jets, costs associated with Bronstein's personal yacht, renovations to Bronstein's personal residence, a mortgage payment for Wilks' personal residence, and lavish entertainment expenditures for Wilks, including exorbitantly priced meals and travel expenditures, as well as excessive and unapproved compensation and bonuses. What's more, Bronstein and Wilks entered into unauthorized agreements on CARMA's behalf with third parties, which resulted in financial losses and liabilities to CARMA but lined the Defendants' pockets.  For example, beginning no later than December 2021, Wilks and an executive at vape manufacturer DomPen entered into an undisclosed kickback agreement under which Wilks received concealed payments in exchange for turning a blind eye to DomPen's unauthorized use of CARMA's intellectual property.

3.     Bronstein, Wilks, and the other Defendants' RICO conspiracy included repeated deception and fraud on CARMA's business partners, including Mike Tyson, Ric Flair, musical artist Nayvadius DeMun Cash, professionally known as Future ("Future"), and LGNDS LLC.  For

example, CARMA, through Bronstein, entered into written licensing agreements with Tyson, Flair, and Future under which CARMA was authorized to sell certain licensing rights to third parties. But Bronstein, with the knowing participation and assistance of Defendant Nicole Cosby, in fact sold licensing rights to Plaintiff LGNDS and others that were not authorized by Tyson, Flair, or Future. Tyson's contracts with CARMA prohibited committing Tyson to appearances without his express approval. Yet, Wilks entered into contracts that obligated Tyson, without his knowledge or consent, to several appearances across the country. Defendants Bronstein, Wilks, and Case also required that CARMA's business partners provide things of value to each of them personally as a precondition for doing business with CARMA. Indeed, Bronstein, and later Wilks, demanded that the principal of LGNDS purchase Rolex watches worth at least $50,000 or else they would cancel LGNDS' contracts with CARMA. On another occasion, Wilks received an identical Rolex watch worth in excess of $50,000 from the owner of an Amsterdam-based coffee shop which received a license to use Tyson's likeness without having to pay CARMA's customary $250,000 upfront licensing fee. Further, Bronstein and Defendant James Case—a longtime associate and co-conspirator of Bronstein—demanded that LGNDS give Case a 10% ownership interest in LGNDS, free of charge, as a precondition for LGNDS' licensing agreements with CARMA.

4. Bronstein, Wilks, and their co-Defendants' RICO conspiracy also included repeated fraud in connection with the purchase and sale of securities. Bronstein and Wilks caused CARMA to issue them hundreds of thousands of common shares in the company. While Bronstein and Wilks knew that CARMA's true valuation was $80 million, Bronstein and Wilks knowingly and intentionally misrepresented to investors that the company's valuation was in excess of $120 million and sold their CARMA shares to those investors for profits in excess of $1 million. On

another occasion, Bronstein required a CARMA investor to pay more than $4 million for Bronstein's shares in an unrelated company as a precondition for obtaining and retaining the investor's CARMA shares.  When certain individuals close to Bronstein began to take note of his conduct, he took measures to silence their criticism, including by using CARMA's funds to fund paychecks so the critics could hold "ghost jobs" at CARMA; these pseudo-jobs allowed Bronstein's would-be critics to collect a paycheck from CARMA without the expectation that they perform any work.

5.      Defendants' RICO conspiracy did not begin or end at CARMA—as detailed below, during the last decade the Defendants, led by Bronstein, have worked together to defraud several companies, their business partners, and their investors.  And now the Defendants have moved on to new ventures called Real American Beer and Real American Freestyle, where they have recently raised more than $20 million from unsuspecting investors.  Plaintiffs bring this action to expose their criminal conduct and seek damages, legal fees and costs in excess of $50 million.

## PARTIES

### Plaintiffs

6.      Plaintiff MICHAEL TYSON is a professional boxer and the current Chief Executive Officer of CARMA.  Tyson is domiciled in Palm Beach County, Florida.

7.      Plaintiff RICHARD FLIEHR is a former professional wrestler.  On information and belief, Ric Flair is domiciled in Hillsborough County, Florida.

8.      Plaintiff CARMA HOLDCO, INC. is a limited liability company organized and operating under the laws of Delaware.  During the relevant time period, CARMA maintained its principal place of business in Cook County, Illinois and in Clark County, Nevada.

4

9.      Plaintiff LGNDS LLC is a limited liability company organized and operating under the laws of Wyoming. LGNDS has one member who is domiciled in Broward County, Florida.

### Defendants

10.      Defendant CHAD BRONSTEIN is the former President and Chairman of CARMA.  During the relevant time period, Bronstein was domiciled in Cook County, Illinois.

11.      Defendant ADAM WILKS is the former Chief Executive Officer and Vice Chairman of the Board of CARMA.  Wilks is domiciled in Clark County, Nevada.

12.      Defendant NICOLE COSBY is the former Chief Legal and Licensing Officer of CARMA.  Cosby is domiciled in Washington, D.C.

13.      Defendant JAMES CASE is a shareholder in CARMA and a longtime business associate of Defendant Bronstein. On information and belief, Case is domiciled in Palm Beach County, Florida.

### JURISDICTION AND VENUE

14.      Plaintiffs bring their claims under the laws of the United States and the state of Illinois.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs have raised a question of federal law under 18 U.S.C. §§ 1956, 1957, 1962, and 1962(d), and under 15 U.S.C. § 78j. This Court additionally has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

15.      This Court has personal jurisdiction over Defendant Bronstein because, at the time the alleged events took place, Defendant Bronstein purposefully availed himself of the forum state by participating in the formation of CARMA and establishing CARMA's principal place of

5

business in Chicago, Illinois, as well as by serving as the Chairman of the Board and President of CARMA. Defendant Bronstein has sufficient minimum contacts with the forum state.

16. This Court has personal jurisdiction over Defendant Wilks because, at the time the alleged events took place, Defendant Wilks purposefully availed himself of the forum state by accepting a position as Chief Executive Officer of CARMA, which had its principal place of business in Chicago, Illinois. Defendant Wilks has sufficient minimum contacts with the forum state.

17. This Court has personal jurisdiction over Defendant Cosby because, at the time the alleged events took place, Defendant Cosby purposefully availed herself of the forum state by serving as a member of the CARMA board, and later as the Chief Legal and Licensing Officer of CARMA, which has its principal place of business in Chicago, Illinois. Defendant Cosby has sufficient minimum contacts with the forum state.

18. This Court has personal jurisdiction over Defendant Case because, at the time the alleged events took place, Defendant Case purposefully availed himself of the forum state by soliciting and accepting shares in CARMA, which had its principal place of business in Chicago, Illinois. Defendant Case has sufficient minimum contacts with the forum state.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

20. As detailed below, Defendants Bronstein, Wilks, Cosby, and Case, through a fraudulent association-in-fact enterprise formed for the purpose of defrauding dozens of investors,

celebrities, and business partners, have stolen or converted millions of dollars to which they were not entitled.

## I.     Bronstein's Past Business Endeavors and Misconduct

21.     Defendant Bronstein's fraudulent conduct did not begin with his time at CARMA. For years leading up to when CARMA was founded, Bronstein moved from company to company, misusing and abusing company funds to his own benefit.  During those years, Bronstein worked to create a close circle of business relationships who could help him further his misuse of company funds, including Defendants Cosby and Wilks.  Bronstein used these connections, along with his existing friendship with Defendant Case, to perpetrate fraud and engage in self-dealing.

22.     On information and belief, when communicating with Case, Cosby, Wilks, and others, Defendant Bronstein had a longstanding practice of ensuring that most conversations which evidenced potential fraud took place over the phone, rather than in email, text, or another form of writing.

23.     In September 2019, Bronstein launched marketing technology company Fyllo ("Fyllo")[1] alongside his co-founders (collectively, the "Fyllo Executive Team").

24.     The Fyllo Executive Team named Bronstein as the Chief Executive Officer of Fyllo.

25.     Fyllo is a marketing technology company that primarily provides digital marketing, data, and compliance services to businesses in highly regulated industries, including the cannabis industry.

---

[1] Fyllo was registered under Caster Holdings, LLC by Defendant Bronstein on August 21, 2020, and the company is still operating under the name of Fyllo.

26.     Fyllo has provided marketing, data, and compliance services to many widely known companies and brands, including Harley-Davidson Motor Company, Hamburger Helper, and Liquid Death, among others.

### a.   Unauthorized Conduct on the Board of Fyllo

27.     At Fyllo's inception, Defendant Bronstein and others on the Fyllo Executive Team raised approximately $18 million in funding from the sale of securities to investors.

28.     On information and belief, Bronstein caused Fyllo to issue a large volume of "founder shares" to himself and fellow enterprise members and associates, as well as to other Fyllo cofounders.

29.     In or around 2019, Bronstein hired Defendant Cosby as the Chief Compliance and Data Officer.

30.     On information and belief, Defendant Wilks was a significant investor in Fyllo.

31.     On information and belief, Bronstein caused the company to issue shares in Fyllo to his longtime associate Defendant Case, despite Case's lack of involvement at Fyllo.

32.     On information and belief, Defendants Bronstein and Case demanded that one of the co-founders of Fyllo give Case, free of charge, a large number of "founder's shares," totaling tens of thousands of dollars in value. This demand was not to provide Case with compensation for any services rendered to Fyllo, but rather as an extortionate "fee" for introducing Bronstein and the co-founder years earlier.

33.     On information and belief, Bronstein personally issued himself a check for approximately $750,000 from the initially raised $18 million in funding without prior approval from the Fyllo Executive Team.

8

34. On information and belief, Bronstein separately communicated with outside investors to raise additional capital—approximately $120 million between 2019 and 2021.

35. Fyllo's fundraising successes begot further capital raises and the company showed early signs of success. And so, Fyllo became a national competitor in the marketing space for highly regulated industries.

36. Instead of continuing to foster the company's growth, Bronstein leveraged his work of securing investors to engage in what would soon become a long pattern of misconduct and fraud.

37. Bronstein used company funds for his own personal expenses and professional advancement, as well as to court various celebrity connections.

38. For example, in or around 2020, Bronstein utilized company funds to remodel his home office without company approval. Bronstein misappropriated tens of thousands of dollars' worth of company funds to finance this project.

39. In late 2020 or early 2021, Bronstein used company funds to purchase a watch for Los Angeles Rams Head Coach Sean McVay ("McVay"). Unbeknownst to McVay, this purchase was completed without company approval. Bronstein misappropriated approximately $15,000 worth of company funds to purchase the watch.

40. Bronstein misused company funds for the purpose of securing a personal relationship with McVay.

41. On information and belief, in or around 2021, Fyllo's then Chief Financial Officer became aware that Bronstein had misappropriated Fyllo funds for his home office renovation and

9

for the watch. Bronstein subsequently induced the other members of the Fyllo Executive Team to oust the Chief Financial Officer, so as to divert attention from his misuse of company funds.

42. From its inception in 2019 to the end of Bronstein's tenure in 2023, Fyllo had four Chief Financial Officers (or an analogous role with a different title). On information and belief, each time the sitting Chief Financial Officer would raise suspicion or attempt to investigate Bronstein's lavish expenses, Bronstein attempted to terminate and replace that Chief Financial Officer with someone who Bronstein hoped would be more pliant.

43. Bronstein further misappropriated company assets for his own personal gain, including awarding himself lucrative compensation. For example, Bronstein single-handedly decided that his total compensation was nearly $1 million per year.

44. On November 19, 2023, the Fyllo Executive Board formally requested Bronstein's resignation.

### b. Unauthorized Conduct on the Board of Wesana

45. In 2020, Bronstein and a former professional hockey player Daniel Carcillo ("Carcillo") worked together to found Wesana Health ("Wesana").

46. Wesana was a life-sciences company that focused on securing Food and Drug Administration ("FDA") approval for proprietary psychedelic-assisted neurological therapy.

47. On information and belief, Bronstein raised capital for Wesana by leveraging the same network of outside investors as he had for Fyllo.

48. Once again, Bronstein leveraged his work of securing investors to engage in this continuing pattern of misconduct and fraud.

49.     On information and belief, like Fyllo, Defendant Wilks was a significant early investor in Wesana.

50.     On information and belief, Bronstein brought Cosby over from Fyllo and hired her as a board member and an advisor at Wesana.

51.     On information and belief, Bronstein caused Wesana to issue a large volume of "founder shares" to himself and others.

52.     On information and belief, Bronstein regularly misappropriated company funds to finance endeavors and projects that were outside of the scope of the company's mission and not in line with investor expectations.

53.     In November 2023, after Bronstein's series of both fraudulent and imprudent financial decisions, Carcillo launched an internal investigation to uncover Bronstein's history of misconduct.  The investigation revealed that Bronstein had consistently taken actions that devalued the company for his own benefit.

54.     On information and belief, Bronstein was removed from his roles at Wesana in 2022 or 2023.

## II.     Bronstein and Wilks Launch CARMA and Enter Intellectual Property Licensing Agreements

55.     Defendant Bronstein, Defendant Wilks, and Plaintiff Tyson, among others (collectively, the "CARMA Executive Team") co-founded CARMA HoldCo, Inc. ("CARMA"), also known as Tyson 2.0, in 2021.  CARMA is a global branding company founded in Chicago, Illinois, which specializes in licensing celebrity brands.  CARMA is engaged in the business of creating, acquiring, developing, licensing, and distributing various intellectual property assets and has worked with several celebrities to license their names and likenesses to a variety of other

companies for use on their products.  It is also in the business of selling cannabis pre-rolls, vape cartridges, and hemp gummies.

56.     From the company's inception, Bronstein was the Chairman of the CARMA Board, and he became CARMA's President shortly thereafter as well.

57.     Shortly following the company's inception, Wilks was hired as CARMA's Chief Executive Officer.

58.     From around the company's inception until June 8, 2022, Cosby was a member of the CARMA Board.  On or about June 8, 2022, CARMA and Cosby entered into an Executive Employment Agreement to hire Cosby as the Chief Legal and Licensing Officer, reporting to Bronstein.

59.     On information and belief, 50% of CARMA's initial common stock ownership was granted to investors in an earlier, unrelated Tyson venture.  The remaining 50% of common stock was granted to the founders of CARMA.

60.     In or about 2021, Defendant Bronstein induced Kirk Tovey ("Tovey"), a creditor to the prior Tyson venture, to enter into a secondary sale to purchase Bronstein's "founder shares" in Fyllo for $4 million.  This secondary sale far exceeded the 10% limitation of secondary stocks that an executive was permitted to sell at Fyllo.

61.     On information and belief, Bronstein conditioned the issuance of CARMA stock to Tovey, as an investor in the prior Tyson venture, on Tovey's purchase of Bronstein's shares in Fyllo.

62.     Tovey purchased Bronstein's "founder shares" in Fyllo for approximately $4 million.

63.     The secondary sale was motivated solely by Bronstein's own interests.   On information and belief, the proceeds from the secondary sale went to Bronstein personally and the sale did nothing to benefit CARMA.

64.     On information and belief, Bronstein also leveraged his relationship with Tovey to induce Tovey into investing $100,000 in Wesana.

65.     On information and belief, Bronstein raised the remaining capital of approximately $14 million by engaging with much of the same network of outside investors as he did for Fyllo and Wesana.

66.     CARMA's fundraising successes begot further capital gains, and introduced early signs of success.   CARMA quickly became a national competitor in the celebrity licensing industry, and secured lucrative partnerships with major celebrities, including Mike Tyson, Ric Flair, Hulk Hogan, and Future.

67.     Instead of continuing to foster the company's growth, Bronstein once again leveraged his work of securing investors to engage in misconduct, fraud, and—most egregiously— repeated abuses to harm the company's celebrity and licensing partners.  Bronstein continued to use company funds for his own personal expenses and advancement, as well as to strengthen personal connections and court relationships with celebrities.

68.     Indeed, Bronstein, Wilks, and Cosby entered into several Licensing Agreements by misrepresenting the nature of their rights under the agreements, to the detriment of Tyson, CARMA, Flair, and LGNDS. Bronstein and Wilks further used several of these agreements to leverage business relationships and line their own pockets with kickbacks from the unauthorized use of intellectual property owned by Tyson, Flair, Future, and CARMA.

### a. Licensing Agreements for Tyson 2.0

69.     Plaintiff CARMA has previously done business issuing intellectual property licensing agreements to other companies.  Importantly, it sold its licensing rights to LGNDS.

70.     Plaintiff LGNDS is a global hemp company based in Miami, Florida, which specializes in creating, licensing, and scaling nationally recognized brands.

71.     Defendant Bronstein leveraged CARMA's licensing agreement with LGNDS to gain personal favors.

72.     LGNDS, through its CEO, contracted with CARMA to purchase the licensing rights to Tyson 2.0 and trademarks associated with Plaintiff Tyson for $1.1 million.  On May 9, 2022, LGNDS and CARMA signed the Tyson 2.0 Trademark License Agreement.

73.     Pursuant to the Tyson 2.0 Trademark License Agreement, CARMA granted LGNDS the rights to manufacture various types of products pursuant to the brand and trademarks—i.e., hemp products, mushroom products, nicotine products, kava products, and other merchandise, such as shirts, pants, sweaters, and footwear.

74.     LGNDS subsequently began to produce, manufacture, and distribute various products pursuant to the Tyson 2.0 Trademark License Agreement, such as Mike Bites and the Tyson All-In-One Vape, among other products.

### b. Creation of Ric Flair Drip, Inc. and Related Licensing Agreements

75.     In 2022, Defendant Bronstein and Plaintiff Flair met because their boats were in neighboring slips in Tampa, Florida.

76.     Spotting an opportunity for grift, Bronstein asked Flair whether he owned the rights to license his collective intellectual property.  Flair confirmed that he did.

14

77.     Bronstein proposed to Flair that he enter into a business arrangement with Bronstein and Defendant Wilks, in an effort to license and profit from the licensing of said intellectual property.

78.     Flair agreed to the idea of building a licensing arrangement in principle, and trusting Bronstein and Wilks, allowed them to undergo what he believed was a consolidation of his intellectual property for his benefit.

79.     Bronstein quickly incorporated a new entity, called Ric Flair Drip Inc., which was assigned Flair's intellectual property rights.

80.     Ric Flair Drip, Inc. was a luxury cannabis and tobacco company, selling rolling trays, lighters, and pipes.

81.     Unbeknownst to Flair, Bronstein and Wilks did not make Flair the full, or even majority, owner of this new corporation which housed Flair's previously exclusively-held intellectual property.

82.     Under the corporate arrangement designed by Bronstein and Wilks, Flair held 48% of Ric Flair Drip, Inc.  Bronstein and Wilks each held 16% of Ric Flair Drip, Inc.  Flair was never informed of this ownership arrangement, and never understood he was assigning away the majority interest in his previously solely held intellectual property rights.

83.     In order to cash in their newly created interests in Flair's intellectual property, Bronstein and Wilks turned to their other frequent victim, Plaintiff CARMA.

84.     On information and belief, without disclosure of their ownership rights in Ric Flair Drip, Inc. to CARMA's Board of Directors, Bronstein and Wilks instructed CARMA to complete

a purchase of 30% of Ric Flair Drip, Inc..  On information and belief, CARMA completed this purchase.

85.    Flair did not know about this transaction.  Worse yet, Flair did not receive any of the funds from this transaction.

86.    Seeing their subterfuge had gone unnoticed, Bronstein and Wilks decided to stretch their self-dealing to the limit.  Bronstein and Wilks instructed CARMA to buy the remaining 70% interest in Ric Flair Drip, Inc.

87.    CARMA completed the purchase of Ric Flair Drip, Inc. on September 6, 2022. This time, instead of purchasing Ric Flair Drip, Inc. for cash, CARMA sold the owners of Ric Flair Drip, Inc. interest in CARMA itself, in the form of equity.

88.    Bronstein and Wilks, each as 16% owners of Ric Flair Drip, Inc., functionally reassigned themselves an extra interest in CARMA through instructing this purchase, without Board approval or disclosure to any authority, including Flair.  The chart below illustrates the impact that the purchase had on the parties' equity in CARMA.

| | Ric Flair Drip Shares | Ric Flair Drip Equity (Percentage) | CARMA Shares Gained from Purchase of Ric Flair Drip | Gained Equity in CARMA from Sale of Ric Flair Drip (Percentage) |
|---|---|---|---|---|
| *Plaintiff* Ric Flair | 1,600,000 | 48% | 422,554 | 3.19% |
| *Defendant* Chad Bronstein | 533,333 | 16% | 140,851 | 1.06% |
| *Defendant* Adam Wilks | 533,333 | 16% | 140,851 | 1.06% |

89.     Bronstein and Wilks justified this self-dealing as simply right-sizing their ownership of CARMA, as they felt they deserved compensation above what was approved by the Board of Directors.  Rather than accomplish this goal by a non-fraudulent mechanism, Bronstein and Wilks executed this scheme.

90.     As a result of Bronstein and Wilks' self-dealing, CARMA paid an exaggerated price for the initial 30% purchase of Ric Flair Drip, Inc., causing monetary damage to CARMA.

91.     As a result of Bronstein and Wilks' nondisclosure and self-dealing, Plaintiff Flair was robbed of any proceeds from the initial 30% purchase of Ric Flair Drip, Inc.

92.     Further, upon the eventual complete acquisition of Ric Flair Drip, Inc., Flair was shorted a significantly higher stake in CARMA than he was entitled to, due to Bronstein and Wilks' nondisclosure and self-dealing.

93.     Bronstein's fraudulent behavior with Ric Flair Drip, Inc. did not end there.

94.     After CARMA acquired Ric Flair Drip, Inc., Bronstein began selling the intellectual property rights it held.

95.     Plaintiff LGNDS, through its CEO, contracted with CARMA to purchase the licensing rights to Ric Flair Drip, Inc. for $400,000.  On August 2, 2022, LGNDS and CARMA signed the Ric Flair Drip Trademark License Agreement.

96.     Pursuant to the Ric Flair Drip Trademark License Agreement, CARMA granted LGNDS the rights to manufacture various types of products pursuant to the brand and trademarks—i.e., hemp products, mushroom products, nicotine products, kava products, smelling salts, beverages, and other merchandise, such as shirts, pants, sweaters, and footwear.

17

### c.   Licensing Agreements for EVOL by Future

97.      Finally, Plaintiff CARMA launched EVOL by Future.  EVOL by Future is incorporated in Florida and, by and through CARMA, has its principal place of business in Clark County, Nevada.

98.      EVOL by Future is a luxury cannabis company.

99.      LGNDS, through its CEO, contracted with CARMA to purchase the licensing rights to EVOL by Future for approximately $500,000.  On May 12, 2023, LGNDS and CARMA signed the EVOL by Future License Agreement.

100.     Pursuant to the EVOL by Future License Agreement, CARMA granted LGNDS the rights to manufacture various types of products pursuant to the brand and trademarks—i.e., hemp products, mushroom products, kava products, nicotine products, and tobacco products.

### III.    Defendants' Unauthorized Conduct on the CARMA Board

101.     Defendant Bronstein engaged in multiple forms of unauthorized conduct while on the Board of Directors at CARMA. This included large bonuses that Bronstein approved for himself, purported travel and entertainment expenses including installing a private home theater using CARMA's funds, using licensing agreements as leverage for extortion, and, when his conduct started to gain negative attention from others, creating pseudo-jobs to silence any further potential criticism.

102.     Bronstein further entered into several sponsorship agreements to line his own pockets using CARMA's company funds.

103.     Finally, Bronstein partook in granting licensing agreements for intellectual property that he did not have the rights to.

104.     Defendant Wilks also engaged in multiple forms of unauthorized conduct while on the Board of Directors at CARMA. Wilks entered several business ventures with other companies through CARMA which worked to his own benefit, particularly by allowing him to covertly receive equity and leverage his board positions in those other companies.

105.     Additionally, like Bronstein, Wilks engaged in granting licensing agreements for intellectual property that he did not have the rights to, and deliberately withheld information regarding several licensing agreements to the detriment of Tyson, CARMA, Flair, and LGNDS.

### a. Defendant Bronstein's Self-Approved Overcompensation

106.     On or about May 1, 2022, Plaintiff CARMA and Defendant Bronstein entered into an Executive Employment Agreement to hire Bronstein as the President and Chairman of the Board of Directors.

107.     According to his Executive Employment Agreement, Bronstein was entitled to earn $350,000 annually. He was also eligible to earn a discretionary bonus of up to $350,000 per fiscal year. The Agreement specified that the maximum bonus should be prorated for any partial fiscal year of employment.

108.     Bronstein was employed as President and Chairman of the Board of Directors from May 1, 2022 to November 24, 2023.

109.     During this time, Bronstein received over $800,000 in total bonuses. Bronstein himself approved and paid each bonus he was granted. This was over $150,000 more than the maximum amount of bonus compensation that he was eligible to earn on a discretionary basis. Bronstein abused his status as President and Chairman of the Board of Directors to approve and pay himself unauthorized bonuses.

### b. Defendant Bronstein's Unauthorized Expenses

110.     Bronstein's fraudulent self-overcompensation did not end with his bonuses. Indeed, Bronstein built a system of receiving reimbursements for expenses to which he was not actually entitled.

111.     Between 2022 and 2023, Bronstein expensed in excess of $610,000 in travel and entertainment spending with inadequate or missing receipts.

112.     On information and belief, dating back to his first executive role, Bronstein would instruct his longtime administrative assistant to submit reimbursement requests using the same fraudulent pattern:  Bronstein would provide his assistant a receipt, instruct her to select a name at random from a list of board members, investors, business partners, and clients of whichever company employed him at the time, and assert that he had spent the funds in an approved way to entertain whichever random name was selected.  In fact, Bronstein was spending these funds on himself, with no connection to a board member or client.

113.     On information and belief, Bronstein's assistant followed Bronstein each time he moved companies, and continued the practice of fraudulent expense reimbursements at Bronstein's direction, including while he was employed at Fyllo, Wesana, and CARMA.

114.     Bronstein's reimbursements were often outlandish.  He spent $11,339.00 to pay the interest on his personal credit card bills.  He spent $2,796.30 on an unspecified bill at luxury store Gucci.  He spent $6,364.00 on a theater system for his home in Tampa.  He spent at least $7,926.84 on docking fees at marinas used for his private boat. In 2023, he spent $38,519.63 on private jets.

115.    Bronstein expensed tens of thousands of dollars at different restaurants, oftentimes spending in excess of $1,000 on a single meal, despite a company policy limiting work-lunch reimbursement to $25 per person per occasion (or $50 per person per occasion, should a client join).

116.    Frequently, instead of asking his assistant to expense a certain receipt, Bronstein would simply not submit a receipt at all, and demand reimbursements be paid to him on his word alone.

117.    Bronstein's behavior did not go unnoticed.  Any time CARMA's legal or finance teams raised questions regarding Bronstein's spending, Bronstein would circumvent CARMA's internal systems and would unilaterally approve the expenses himself.

###    c. Defendant Bronstein's Extortionate Conduct

118.    On information and belief, Bronstein often sought to leverage business relationships for kickbacks or lavish gifts for him and his friends.

119.    For example, as a precursor to doing business with CARMA, Bronstein and Case demanded that the CEO of LGNDS transfer 10% of the equity in LGNDS to Case.

120.    Bronstein and Case did not have the legal right to do so—Case did not provide anything to LGNDS in return.  This exchange of equity also had nothing to do with LGNDS' contract with CARMA.

121.    In fear of facing economic consequences, LGNDS' CEO agreed and transferred the 10% equity to Case.

122.    LGNDS' CEO would not have given equity to Case, but for his fear of economic harm to the business.

123.     After LGNDS and CARMA entered into the licensing agreement for the Tyson 2.0 trademarks, Bronstein approached the CEO of LGNDS and a third-party company that LGNDS was entering into a sublicense with.  Bronstein demanded that LGNDS' CEO buy Defendant Bronstein a Gold Rolex Day-Date watch valued at approximately $50,000.  If LGNDS' CEO did not comply, Bronstein threatened that he would cancel their licensing contract.

124.     Feeling compelled to preserve the third-party company contract, LGNDS' CEO had no choice but to acquiesce to Bronstein's outlandish and contractually invalid demand, and purchased the watch for Bronstein.

### d. Defendant Bronstein's Use of Ghost Positions on CARMA Payroll to Silence Critics

125.     Bronstein's misuse of company funds for personal benefit did not end at his excessive and fraudulent reimbursement practices and personal expenditures.

126.     In 2022, Bronstein's Wesana business associate Carcillo became aware of Bronstein's aforementioned misconduct at Wesana.

127.     On information and belief, Carcillo was very upset that Bronstein had defrauded he and other Wesana shareholders.

128.     In response, Bronstein offered Carcillo an advisory position at CARMA, where Carcillo was paid approximately $100,000 annually.  Despite this salary, Carcillo was not required to complete any work.  The parameters for his employment were devoid of any responsibility, task, or routine expectation. In essence, his job was a ghost job.

129.     On information and belief, Bronstein used company funds to appease Carcillo, understanding that his payment of a salary would convince him to stop telling people about

Bronstein's misdeeds at Wesana. Carcillo's position was, functionally, a bribe. This bribe personally benefitted Bronstein alone, but was paid for by CARMA.

130. On information and belief, Defendant Wilks took a similar approach in negotiating with an executive at the Cannabist Company, a licensed multistate operator in the cannabis space and a former licensee partner of CARMA. Shortly prior to his termination, Wilks and the Cannabist Company executive (who was also Wilks' personal friend) had come to an agreement that the Cannabist Company executive would expand its license of Ric Flair Drip, Inc. to additional markets on the condition that Wilks pay the executive's wife $5,000 per month.

### e. Defendant Bronstein's Unauthorized Contractual Agreements

131. In addition to his other misuses of CARMA funds, Defendant Bronstein also abused company funds to develop individual relationships with celebrities for his personal career advancement, to the detriment of Plaintiff CARMA.

132. In 2023, Bronstein entered into over six sponsorship agreements, totaling a commitment exceeding $5.5 million.

133. These agreements exceeded Bronstein's unilateral authority as President. Contrary to Bronstein's explicitly stated authority, the agreements were not within general guidelines and budgets approved by the Board. The agreements were entered into without the authority to the detriment of CARMA.

134. These agreements, instead, were meant to foster Bronstein's connection with various celebrities.

135. For example, one such unapproved agreement with the Cleveland Cavaliers, allowed Bronstein to develop connections in the celebrity sports world without benefit to CARMA.

136. Bronstein further unilaterally negotiated multimillion-dollar sponsorships for Wooooo! Energy, including, but not limited to: a $2 million sponsorship agreement with the Cleveland Cavaliers, a $1.5 million sponsorship agreement with All Elite Wrestling League ("AEW"), a $187,000 sponsorship agreement with the Columbus Blue Jackets, a $100,000 sponsorship agreement with Ohio State University and the University of Michigan, and a $100,000 sponsorship agreement with DeFrancesco Racing.

137. In the $1.5 million sponsorship agreement with AEW, Bronstein also purported to bind LGNDS. However, LGNDS never signed or authorized the partnership.

138. Bronstein initially entered into the sponsorship agreement with AEW in an effort to build his own brand and personal interests. Bronstein used his sponsorship agreement to develop his relationship with AEW's owners Shahid Khan and his son Tony Khan, who are both successful businessmen with an extensive network in the world of sports and wrestling. Shahid Khan also owns the Jacksonville Jaguars.

139. Bronstein did not initially disclose to CARMA and LGNDS that he had entered them into the AEW sponsorship agreement.

140. Instead, several months after Bronstein entered the agreement, CARMA and LGNDS received a draft complaint on behalf of AEW, stating that CARMA and LGNDS would be sued if they did not pay the $1.5 million owed for AEW's performance of the contract. CARMA and LGNDS, despite never having authorized Bronstein to enter into the agreement in the first place, paid the $1.5 million to AEW.

141. In addition, the complaint alleged that CARMA had negotiated the terms for Flair's sponsorship. However, in reality, Bronstein had negotiated the terms of Flair's sponsorship

by falsely holding himself out as Flair's agent. Flair had never agreed to the terms of the sponsorship agreement.

142. In 2021, Bronstein became the agent for the well-known UFC fighter Julianna Peña bringing Defendant Bronstein into contact with a number of other celebrities, including other UFC fighters.

143. In an effort to continue a personal business relationship with Peña, and the celebrity circles she gave him access to, Bronstein began using CARMA's company funds to sponsor Peña in a variety of public-facing matters.

144. These sponsorship agreements were not beneficial to CARMA, but they financially benefitted Bronstein. As Peña's agent, he would personally receive a portion of the sponsorship funds.

145. Many of the sponsorship opportunities CARMA engaged in as they related to Peña were outside CARMA's scope and vision as a company—Bronstein was instead motivated by the idea that the overzealous sponsorship of Peña would cement his position in her circle, further expanding his personal business access to celebrity fighters.

146. On November 24, 2023, the CARMA Executive Team formally requested, and Bronstein subsequently submitted, his resignation from CARMA.

147. To this day, and even after Bronstein left employment with CARMA, Peña continues to be sponsored nearly exclusively by companies associated with Bronstein.

**f. Defendant Wilks' Unauthorized Conduct Following Bronstein's Departure**

148. On or about November 24, 2023, CARMA and Wilks entered into an Executive Employment Agreement to hire Wilks as the President and Vice Chairman of the Board of

Directors following Bronstein's resignation. From November 2023 until his termination, Wilks was also acting as CARMA's CEO.

149. In his positions as President, Vice Chairman, and CEO of CARMA, Wilks followed Bronstein's patterns of fraud and self-dealing. Acting in these three positions at once, Wilks consolidated significant power to carry out his schemes.

150. Wilks followed similar patterns to Bronstein, including routinely using company funds for personal expenditures. For example, Wilks once used CARMA funds to pay his mortgage in the amount of $3,000.

151. Additionally, Defendant Wilks withheld material information relating to several business ventures so that he could gain equity and favorable treatment from the companies involved in those ventures, to the detriment of Plaintiff CARMA.

152. Wilks also accepted gifts in connection with licensing agreements between CARMA and third parties. On information and belief, those who granted him the gifts received more favorable licensing conditions.

153. For example, on information and belief, in 2023, Wilks, on behalf of CARMA, was negotiating a licensing agreement for a Tyson 2.0-related coffee shop in Amsterdam. On information and belief, there was initially a demand that the Amsterdam coffee shop owner pay $250,000 in addition to royalties.

154. On information and belief, Wilks demanded that the owner of the coffee shop gift Wilks a $50,000 Gold Rolex Day-Date, seemingly the preferred watch of Bronstein and Wilks. On information and belief, the owner capitulated and bought the watch for Wilks. On information

and belief, the owner never paid the $250,000 fee for the Tyson 2.0-related coffee shop and the parties entered the agreement for much lower royalties than initially stipulated.

**Northern Emeralds**

155.    While Wilks was an executive at CARMA, he was also acting as the CEO for Captor Capital, an investor in the cannabis space, which he did not disclose to CARMA.

156.    Captor Capital was an investor in Northern Emeralds and in DomPen. On information and belief, Captor Capital was owned by Wilks' father-in-law. On information and belief, Wilks used his position at Captor Capital to gain investors in Northern Emeralds and DomPen.

157.    Although Wilks owed a fiduciary duty to CARMA at that time, he leveraged CARMA's resources to benefit other companies that he was associated with.

158.    Northern Emeralds is a cannabis cultivation, processing, and distribution company based in Humboldt County, California.

159.    At the time of CARMA's inception, Wilks was on the Northern Emeralds board.

160.    In emails between Wilks and Northern Emeralds, Northern Emeralds stated that board members bringing in licensing partners would receive equity in the company.

161.    On August 22, 2022, CARMA entered into a License and Packaging Purchase Agreement granting Northern Emeralds the rights to market and produce Tyson 2.0 prepackaged flower, flower pre-rolls, and infused pre-rolls, referred herein as the Northern Emeralds Tyson 2.0 Agreement. Pursuant to the agreement, Northern Emeralds was to pay a royalty of 12.5% of Northern Emeralds' gross revenue on the Tyson 2.0 products.

162.    On May 26, 2023, CARMA, by and through EVOL by Future, entered into a Trademark License Agreement with Northern Emeralds for the marketing, sale, production, and distribution of EVOL by Future cannabis products, including indoor premium flower, indoor premium pre-rolls, and Live Rosin, referred herein as the Northern Emeralds EVOL Agreement. Under the terms of the agreement, Northern Emeralds was to pay CARMA a 15% royalty on Northern Emeralds' gross revenue of the EVOL by Future cannabis products.

163.    On information and belief, Wilks directed CARMA to enter into both the Tyson 2.0 agreement and the EVOL agreement with Northern Emeralds (the "Northern Emeralds Agreements").

164.    On information and belief, Wilks received equity in Northern Emeralds in exchange for directing CARMA to enter the Northern Emeralds Agreements.

165.    Upon entering the Northern Emeralds Agreements, Northern Emeralds partnered with Kali Distribution, a now bankrupt company, to assist with the distribution of the licensed products in the Northern Emeralds Agreements.

166.    From 2022 to 2025, Northern Emeralds failed to pay CARMA more than $1.25 million pursuant to the agreement. These unpaid costs include unpaid royalties, payments to the CEO of Northern Emeralds, payments to the company for products from Kali Distribution, and loan payments for unpaid royalties.

167.    When Northern Emeralds failed to pay royalties on several occasions, Wilks, through CARMA, issued promissory notes as loans to Northern Emeralds. As of the date that this complaint was filed, Northern Emeralds has not paid back an outstanding loan amount of more than $140,000.

168.    In order to receive equity in Northern Emeralds, Defendant Wilks waived the payments totaling more than $1.25 million. In emails between Northern Emeralds and Wilks, Wilks told Northern Emeralds that if Wilks set aside Northern Emeralds' debt to CARMA, Wilks would receive equity in Northern Emeralds.

169.    Specifically, Wilks waived more than $370,000 in royalty invoices that were issued to Kali Distribution. Wilks further provided $315,000 to Northern Emeralds' CEO and $250,000 to Northern Emeralds for additional Kali Distribution products in California.

170.    Wilks never notified CARMA that he received equity from Northern Emeralds, nor that he was a board member for Northern Emeralds. Additionally, when prompted about waiving the debt payments, Wilks deliberately withheld information about those payments and avoided answering any related questions.

171.    This was not the only undisclosed board position that created a conflict of interest with Wilks' position at CARMA. On information and belief, Wilks, at all times relevant to this lawsuit, maintained a concurrent position as a member of the Board of Directors at DomPen.

**Mr. Charlie's**

172.    Mr. Charlie's is a fast food company that serves plant-based meals. Mr. Charlie's is owned by Sona Terra Inc. ("Sona Terra"), a company based in Beverly Hills, California.

173.    On October 3, 2024, CARMA entered a Subscription Agreement with Sona Terra to purchase 250 shares of Sona Terra's stock for a purchase price of $750,000, referred to herein as Mr. Charlie's Subscription Agreement. Under the terms of the agreement, CARMA would own and have the right to vote 25% of the outstanding shares of Sona Terra's stock.

29

174. The Subscription Agreement also granted CARMA the right to appoint one person to the Board of Directors of the Company, so long as CARMA held at least 10% of Sona Terra's stock.

175. This transaction was uncharacteristic of CARMA's usual business practice, as CARMA typically does not engage in entering investment agreements and does not have involvement in the fast food industry.

176. On information and belief, Wilks directed CARMA to enter into the Mr. Charlie's Subscription Agreement because he wanted to establish a relationship with the Chief Executive Officer of Sona Terra, who is a successful entrepreneur and investor.

177. On information and belief, Wilks also used the Mr. Charlie's Subscription Agreement to gain leverage over potential investors in CARMA, including Zachary Longo ("Longo"), an investor in Mr. Charlie's.

178. When Wilks was removed from CARMA, upon information and belief, his positive relationships with Mr. Charlie's that he forged using CARMA's funds ultimately landed him temporary employment at Mr. Charlie's.

**Green Success**

179. Green Success is a cannabis company based in Germany that distributes cannabis products, including Tyson 2.0 cannabis products. Defendant Wilks took advantage of a partnership with Green Success to profit personally.

180. On December 2, 2024, Wilks introduced Green Success as an investment opportunity for CARMA. In 2024, CARMA invested 500,000 euros in Green Success in exchange for 16,500 shares in the company.

30

181.    Wilks used Green Success in order to get kickbacks for his sister.  Unbeknownst to CARMA, Wilks' sister received 5% of CARMA's investment, or 25,000 euros in equity for Green Success.

182.    Wilks told Green Success that the only way CARMA would invest was if the company gave him personal equity in return.

183.    When CARMA discovered this, CARMA emailed Green Success, and Green Success confirmed that Wilks' sister had received thousands of dollars in equity.

**RadarZero**

184.    RadarZero is a technology and media company that operates in the gambling industry.  Wilks had a relationship with a director at RadarZero, who was also involved in Captor Capital, and Wilks abused this relationship and CARMA funds to profit himself while CARMA's investment suffered.

185.    On September 1, 2024, CARMA entered into an agreement with RadarZero to license Tyson's trademarks in connection with candles.

186.    In 2024, Wilks spearheaded a partnership with RadarZero to license Tyson's trademarks in connection with a gambling game, "Mike Tyson's Crash."

187.    On September 12, 2024, despite the fact that CARMA had no experience in the gambling space, Wilks proceeded to sign a Game Development Agreement with RadarZero.

188.    Both deals were poor business decisions for CARMA and failed to generate substantial revenue.

189.    Unbeknownst to CARMA, Wilks had come to an agreement with RadarZero that if he signed the agreement, he would receive a 5% equity stake in the company.  The agreement included monetary incentives for each deal he brought to RadarZero.

190.    Wilks used his position at CARMA to act in his own best interest, lining his own pockets instead of finding the best deal for CARMA.

### g.  Unauthorized Over-grants of Intellectual Property

191.    On information and belief, Defendants Wilks and Bronstein entered into agreements without the approval of CARMA's other board members.  Wilks and Bronstein falsely represented the nature and status of several of these agreements, often by withholding important information from Plaintiffs Tyson, Flair, Future, CARMA, and LGNDS.  Defendant Cosby drafted many of these agreements and used her legal advice and expertise to facilitate and conceal the scheme.  Several of these agreements were undisclosed and executed to the detriment of Tyson, Flair, Future, CARMA, and LGNDS.  Altogether, the unauthorized and undisclosed agreements were beneficial to Wilks, Bronstein, and Cosby, and were not in the best interest of CARMA.

## Mike Tyson

192.    On October 15, 2021, Tyson, by and through Tyrannic, LLC ("Tyrannic"), entered into an exclusive License Agreement with CARMA for various Tyson trademarks ("the Licensed Property") and licensed products, including the Tyson 2.0 licensed products.  This agreement (the "Tyrannic-CARMA Agreement") is attached as Ex. A.

193.    The Tyson 2.0 licensed products originally included CBD, hemp, and cannabis and cannabis-related products.  Ex. A, Tyrannic-CARMA Agreement.  The agreement was later amended to include nicotine products, pet products, mushrooms, kava and kratom, all merchandise

including Tyson 2.0 clothing, supplements, retail shops, skincare, and crash gambling games (collectively with all the amended licensed products, the "Tyson Licensed Products").

194.    The Tyrannic-CARMA Agreement grants CARMA the right to use the trademarks only as authorized in the contract.  Ex. A, Tyrannic-CARMA Agreement, Section 10(c)(vi).

195.    Under the terms of the Tyrannic-CARMA Agreement, CARMA may grant sublicenses to use the Licensed Property, but it may only do so in connection with the Tyson Licensed Products.  Ex. A, Tyrannic-CARMA Agreement, Section 3(a).

196.    Importantly, however, if CARMA uses any form of Tyson's name, likeness, or related indicia in any provision of a sublicense with a third party, CARMA must seek Tyrannic or any Tyrannic associate's approval for that provision first.  Ex. A, Tyrannic-CARMA Agreement, Section 5(d).

197.    In total, Wilks entered into dozens of sublicenses that extended beyond the rights granted to CARMA in the Tyrannic-CARMA Agreement (the "unauthorized Tyson 2.0 sublicenses").  More than 30 of those sublicenses included provisions regarding the Tyson name, likeness, or related indicia, which were not approved by Tyrannic or its affiliates.

198.    Wilks issued several unauthorized Tyson 2.0 sublicenses that falsely represented to the sublicensees that Tyson would make an in-person appearance or in-market visits to locations across the country.  Those sublicenses contain provisions stating that Tyson will make annual personal appearances to the sublicensees' retail locations, despite Tyson never agreeing to go to these multiple locations each year.  Under these unauthorized sublicenses, Tyson would be required to travel annually to states including Colorado, Maine, Mississippi, Washington, New

Jersey, and the Commonwealth of Puerto Rico. This use of the Tyson Licensed Products was not authorized by the Tyrannic-CARMA Agreement and was not approved by Tyson.

199.    Wilks issued other unauthorized Tyson 2.0 sublicenses that granted licenses for products that CARMA did not have rights to in the initial Tyrannic-CARMA Agreement or any of its amendments. On December 31, 2021, Wilks entered into a sublicensing agreement with Essential Coolers LLC for the manufacture of mini fridges bearing the Tyson 2.0 trademark. On June 1, 2022, Wilks, by and through Tyson 2.0 Inc., entered into a sublicensing agreement with Big League Pillows LLC, for pillow products bearing the Tyson 2.0 trademark.

200.    At no point did Wilks have the rights to sublicense the Tyson 2.0 trademark for products including the pillow products or mini fridges. Yet, over the course of several years, he entered into these agreements without disclosing the agreements to CARMA and without CARMA's authorization.

201.    Similarly, Wilks falsely represented to several companies that he had the rights to issue sublicenses for Tyson 2.0 products, including retail shops, before the Tyrannic-CARMA Agreement was amended to allow him to do so. Though CARMA eventually did have the rights to grant licenses for Tyson 2.0 retail shops pursuant to the amendment to the Tyrannic-CARMA Agreement on June 12, 2024, for example, Wilks entered into a licensing agreement on November 15, 2023 with PT ITS SIMPLY FLOWS, an Indonesian company, for retail cafes and coffeeshops that would sell Tyson 2.0 products.

202.    On May 10, 2022, CARMA, by and through Tyson 2.0 Inc., entered into an exclusive Trademark Licensing Agreement with LGNDS to manufacture, package, source, and supply Tyson Licensed Products. This agreement (the "LGNDS-Tyson 2.0 Agreement") is attached as Ex. B. The LGNDS-Tyson 2.0 Agreement was subsequently amended.

203.    As part of LGNDS' exclusive license under the terms of the LGNDS-Tyson 2.0 Agreement, LGNDS had the unique ability to sublicense the Licensed Products in the agreement.

204.    The LGNDS-Tyson 2.0 Licensing Agreement also included a provision where CARMA—at its own expense—would protect LGNDS' branding rights to Tyson 2.0 from any and all attempts by third parties to infringe upon LGNDS' exclusive trademark.  Ex. B, LGNDS-Tyson 2.0 Agreement, § 3.8 (July 7, 2023).

205.    Wilks entered into several sublicensing agreements which breached the terms of the exclusive license with LGNDS.  Specifically, Wilks entered into sublicensing agreements for Tyson 2.0 products including hemp-derived products, mushroom products, and nicotine products.

206.    Wilks falsely represented to LGNDS' CEO that these additional sublicense agreements were not for the Tyson Licensed Products and were therefore not in breach of the terms of the exclusive LGNDS-Tyson 2.0 Licensing Agreement.

207.    On information and belief, one such sublicense agreement licensed the Tyson 2.0 branding and trademarks for mushroom products, which were exclusively licensed to LGNDS, to Advanced Mycology, a company that specializes in creating and selling at-home psychedelic mushroom grow kits.

208.    Advanced Mycology entered into a partnership with Tyson 2.0 to sell at-home grow kits is called MIKEADELICS Tyson V3 HEAVYWEIGHT Mushroom Grow Bag ("MIKEADELICS").

209.    On information and belief, Wilks, by and through Tyson 2.0, maintained Tyson 2.0's social media marketing, including Tyson 2.0's Instagram—@itstyson20.

35

210.     Wilks, through the Tyson 2.0 brand, and in conjunction with Advanced Mycology, has posted multiple advertisements for Advanced Mycology's MIKEADELICS:

    a.  On July 25, 2024, they posted: "The mission at @advancedmyco / @shrumgarden is to improve access to the magic of mushrooms.  Partnering with @miketyson x @itstyson20 to amplify that mission is a dream come true."

    b.  On September 20, 2024, they posted: "Happy Ps!locyb!n Day! Check out the greatest teacher you can grow at home // The ALL NEW, all-in-one grow bag.  The game has changed @advancedmyco."

    c.  On November 27, 2024, they posted: "We are so thankful for you! Also for our incredible partners over at @itstyson20 and our whole crew working here at @advancedmyco and @shrumgarden."

    d.  On February 21, 2025, they posted: "Mikeadelics: your portal to homegrown magic @advancedmyco."

211.     On November 12, 2022, LGNDS entered into a sublicensing agreement (the "LGNDS Sublicense") with a distributor of Tyson 2.0 nicotine products (the "Sublicensee-Distributor").  Both the Tyrannic-CARMA Agreement and the LGNDS Sublicense include several quality control standards that state that CARMA must sample, sell, or otherwise dispose of the Tyson Licensed Products in a way that upholds the quality of the Licensed Property.  Ex. A, Tyrannic-CARMA Agreement, Section 5(b); Ex. B, LGNDS-Tyson 2.0 Agreement, Section 3.3(c).

212.    In 2023, the Sublicensee-Distributor began to distribute Tyson 2.0 nicotine products that did not meet quality control standards pursuant to the LGNDS Sublicense and the Tyrannic-CARMA Agreement.

213.    The Tyson 2.0 nicotine products did not adhere to public health protections, specifically Food and Drug Administration regulations, to the detriment of the reputation of the Tyson 2.0 trademark and the Tyson Licensed Products.

214.    The FDA requires nicotine products that do not have marketing orders to file a Premarket Tobacco Product Application ("PMTA"). 21 U.S.C. § 387j(b). The PMTA must provide scientific data that demonstrates a product is appropriate for the protection of public health. 21 U.S.C. § 387j(c)(2)(A).

215.    Wilks communicated with the Sublicensee-Distributors of his own accord, and falsely represented to CARMA that the PMTAs had been filed for the sale of the Tyson 2.0 nicotine vapes.

216.    On October 21, 2024, Tyrannic's counsel inquired about the status of the PMTAs for the Tyson 2.0 nicotine products and whether the PMTAs had been registered for those products.

217.    On October 21, 2024, Wilks wrote: "Confirming that our licensee has PMTA registration number for nicotine vapes."

218.    When Tyrannic's counsel further pressed about the application numbers for the Tyson 2.0 nicotine product PMTAs, Wilks falsely represented that the products had application numbers, and stated that those applications had been filed in September of 2024.

219. When asked to produce a copy of the PMTA for each product, Wilks did not produce these copies and did not further elaborate on his statement that the products had application numbers.

220. On December 19, 2024, the FDA issued a letter to the sublicensee-distributors to inform them that they had failed to file PMTAs for certain Tyson 2.0 nicotine vape products in violation of public health regulations. This revealed that Wilks had made misrepresentations to Tyrannic's counsel regarding the PMTA applications and registration process.

221. Wilks further falsely represented that Tyson 2.0 nicotine products at issue had been removed from online nicotine product retail websites after those products were found to be in violation of California regulations.

222. California's "flavor ban" law restricts retailer possession, distribution, and sale of flavored tobacco products. Cal. Health & Saf. §104559.5. The flavor ban applies to products with a "cooling sensation." Cal. Health & Saf. §104559.5(a).

223. On November 12, 2024, the Tobacco Unit of the California Department of Justice issued a Notice of Determination to Mike Tyson to advise that the marketing for the Licensed Product indicated that the Licensed Product was presumptively flavored under the "flavor ban" law, which was published publicly on the California Office of the Attorney General's website.

224. Several Tyson 2.0 nicotine products were marketed as unflavored, when in fact, they were described as having the "cooling sensation" banned by California regulations.

225. The California Department of Justice mailed a copy of the Notice of Determination to Wilks.

226. Tyrannic's counsel notified Wilks that the California products should be removed from the market.

227. On March 19, 2025, Wilks falsely represented to CARMA that he and the Sublicensee-Distributor had taken steps to ensure compliance with California law. Wilks falsely stated that the products, while still visible on the sublicensees' website, had been completely removed from California markets and were "regionally blocked."

228. On March 26, 2025, Tyrannic's counsel successfully purchased Tyson 2.0 nicotine vapes and they were successfully delivered to a California address, proving that Wilks' statements that the products were regionally blocked was untrue.

**Ric Flair Drip**

229. In May 2022, Defendants Bronstein, Wilks, and Cosby again began a fraudulent over-grant scheme, this time against Plaintiffs Flair, CARMA, and LGNDS.

230. In a licensing agreement dated May 1, 2022, Wilks, at Bronstein's direction and with Cosby writing the agreement, entered into a contract with Flair, granting CARMA the right to use certain "Licensed Property" in connection with "Business Operations." The agreement is attached as Ex. C, Flair-CARMA Agreement.

231. "Licensed Property" included licenses owned by Plaintiff Flair including "Ric Flair," "Ric Flair Drip," "Wooooo!," "Wooooo! Chews," and certain personality rights.

232. "Business Operations" included the production, sale, distribution, and advertising (among other operations) of CBD, hemp, cannabis, and cannabis-related products.

233. Bronstein, Wilks, and Cosby quickly abused this narrow licensing authority.

234. On July 7, 2023, acting as the middleman in the conveyance of rights, Bronstein and Wilks purported to grant LGNDS the authority to use Plaintiff Flair's brand "Ric Flair Drip" in the development of hemp, mushroom, kava/kratom, tobacco, nicotine, smelling salt, clothing, and beverage products. This, relevantly, included energy drinks.

235. Bronstein, Wilks, and Cosby purported to grant these rights for 10 years, until July 7, 2033.

236. This purported grant of authority to LGNDS to use Plaintiff Flair's likeness went far beyond what Plaintiff Flair was paid for. The laundry list of licensing options that LGNDS was sold was simply not CARMA's to sell.

237. LGNDS went on to develop an energy drink beverage called "Wooooo! Energy," using the intellectual property, name, and likeness of Flair. LGNDS' CEO believed at this time that LGNDS was the rightful licensor of the rights related to Flair, and justifiably relied on the contractual and oral assurance of Bronstein, Wilks, and Cosby that the licenses conveyed were valid.

238. These licenses were not valid. This significantly interrupted the course of LGNDS' business, threw their investments into doubt, and caused a renegotiation of the contracts all parties believed were settled.

239. Once caught in his self-dealing, Wilks signed a new agreement with Flair. In an amendment to the original licensing agreement, CARMA agreed to pay Flair an additional $5 million for the right to use his intellectual property and likeness in deals with third parties, including the deal that had already been struck with LGNDS.

240. The grants of purported authority do not end with LGNDS. A month after entering the Flair-CARMA Agreement, Bronstein and Wilks began sublicensing Flair's trademarks and personality rights to third parties that were outside the scope of the rights granted to CARMA pursuant to the agreement.

241. Under the terms of the Flair-CARMA Agreement, CARMA could only contract with third parties for products that CARMA was authorized to sublicense in the agreement.

242. In a licensing agreement dated June 1, 2022, Bronstein and Wilks granted trademark rights to Big League Pillows LLC for the use of Flair's trademarks and likeness in pillow products.

243. Pillow products were not part of the rights granted to CARMA in the Flair-CARMA Agreement, and Bronstein and Wilks did not own the rights to Ric Flair's trademarks for use in pillow products.

244. Yet again, Bronstein and Wilks gave away what was not theirs through unauthorized licensing agreements, without disclosing those agreements to CARMA or Flair.

245. Due to Bronstein, Wilks, and Cosby's fraudulent behavior, CARMA incurred a significant sum in damages in disadvantaged negotiations and brand damage.

246. Due to Bronstein's fraudulent behavior, LGNDS incurred a significant sum in damages in additional licensing fees, breaches of third-party contracts, business stoppages, and brand damage from these flurried renegotiations.

247. Due to Bronstein's fraudulent behavior, Flair's likeness was used for nearly half a year without any benefit conferred to Flair, causing monetary damage.

**EVOL by Future**

248.    Future, EVOL, and Plaintiff CARMA, by and through Wizard Holding Group LLC, entered into a licensing agreement for the rights to Future's intellectual property for certain licensed products on February 6, 2023.

249.    The Future-EVOL-CARMA Agreement granted CARMA the licensing rights for a range of cannabis and cannabis-related products.

250.    Despite only having rights to Future's cannabis and cannabis-related products, Defendants Bronstein, Wilks, and Cosby granted rights to LGNDS that extended beyond those products.

251.    On May 12, 2023, CARMA, through Wizard Holding Group LLC, entered into an agreement with FTR LGNDS LLC.  The agreement gave Plaintiff LGNDS the rights to licensed products that were not granted in the original Future-EVOL-CARMA Agreement, and is referred to herein as the EVOL-FTR LGNDS Agreement.  Those licensed products included all cannabis-derived products, but also hemp-derived products, mushroom-related products, kava and kratom, tobacco-derived products, all Future smoking paraphernalia, and all nicotine-derived products (the "EVOL Licensed Products").

252.    In entering into the EVOL-FTR LGNDS Agreement, Bronstein, Wilks, and Cosby falsely represented to LGNDS' CEO that CARMA had the ability to license products outside of the rights to the cannabis-derived products issued in the Future-EVOL-CARMA Agreement.

**DomPen: Mike Tyson and EVOL by Future**

253.     Defendant Wilks continued to over-grant intellectual property rights, but did not stop there.  Wilks also took steps to ensure he was personally profiting from the over-grants, including ongoing kickbacks in exchange for the license to rights he did not own.

254.     Clearview Management Solutions LLC, also known as DomPen, is a cannabis company that distributes cannabis disposable vapes and is based in California.

255.     CARMA entered into two separate agreements with DomPen: one related to EVOL by Future and one related to Tyson.

256.     CARMA entered into a sublicense agreement with Clearview Management Solutions LLC, or DomPen, for the Tyson 2.0 Licensed Products (the "Tyson 2.0 DomPen Agreement") on December 20, 2021.

257.     CARMA entered into a separate sublicense agreement for the production, manufacturing, distributing, and marketing of disposable vape cartridges and vape products (the "EVOL DomPen Agreement," and together with the Tyson 2.0 DomPen Agreement, the "DomPen Agreements") on May 10, 2023.

258.     The Tyson 2.0 DomPen Agreement stated that DomPen could only manufacture and sell the Tyson 2.0 Licensed Products in Nevada and California.

259.     In 2024, the parties reiterated over email that DomPen would distribute Tyson 2.0 Licensed Products in California and Nevada.

260.     The DomPen Agreements specified the territories in which DomPen could distribute the EVOL Licensed Products and the Tyson Licensed Products.  For the EVOL DomPen Agreement, the rights to distribute the EVOL Licensed Products extended to California,

Massachusetts, New York, and New Mexico. For the Tyson 2.0 DomPen Agreement, the rights to the Tyson 2.0 Licensed Products extended to Nevada and California.

261.    In 2024, the parties reiterated over email that EVOL Licensed Products would be distributed in California, Massachusetts, New York, and New Mexico pursuant to the original agreement, and additionally stipulated that the products would be distributed in Ohio.

262.    DomPen began selling products outside of the states that were authorized in the contract.  CARMA emailed DomPen's President at that time, requesting that DomPen halt those operations unless CARMA approved additional formal sublicensing agreements.

263.    Wilks falsely represented to CARMA that DomPen would stop operations in states besides those stipulated in the DomPen Agreements and the amendments to the Agreements.

264.    In reality, Wilks was aware that DomPen continued to sell those products in other states without CARMA's authorization.

265.    On information and belief, Wilks received ongoing kickbacks from DomPen's president for allowing the sales of the products in other states without disclosing or authorizing those sales to CARMA.  Wilks received those kickbacks for his own benefit, and CARMA did not receive any benefits from the sale of the products in unauthorized states.

## IV.    Shareholder Fraud

266.    On information and belief, Defendants Bronstein and Wilks induced Longo and others to purchase their shares in CARMA at a premium by misrepresenting their value, the value of the company, and/or the availability of preferred shares.

267.    In May 2022, CARMA began raising capital for its Series A-1 round. The purpose of the round was to secure investors and funds for CARMA. However, Defendant Bronstein and

Defendant Wilks would proceed to abuse the system, diverting investments to sell their personal shares on the secondary market at inflated prices for massive profits.

268.    As part of the Series A-1 round, common shares were valued at $6.27 each based on company valuations.

269.    The Series A-1 round would last until October 31, 2022.

270.    On or about October 8, 2022, Defendant Wilks entered into a secondary common stock purchase agreement with Longo for 77,894 common shares in CARMA.

271.    Under the terms of each agreement, Longo purchased the shares for $9.63 each.

272.    Bronstein and Wilks each personally received $750,000 from these sales to Longo.

273.    On information and belief, Bronstein and Wilks misrepresented to Longo that he was taking part in an oversubscribed special offer where particular approved individuals had the opportunity to buy shares from the founders of CARMA. Bronstein and Wilks further misrepresented to Longo that he was being offered the shares at a discount.  On information and belief, Bronstein and Wilks also misrepresented to Longo that the shares he was purchasing were preferred shares, as opposed to common shares.

274.    In fact, at the time of the transactions, there were hundreds of thousands of Series A-1 shares still available at the lower price of $6.27 per share.

275.    On information and belief, Defendants Bronstein and Wilks also induced Longo to purchase their shares in CARMA at a premium by suggesting they would support Longo's other ventures using CARMA funds.

276.    Defendants Bronstein and Wilks sold to others on the secondary market at the inflated price of $9.63 per share.

45

277. On the same date, October 8, 2022, Bronstein also entered into a secondary common stock purchase agreement with RSN LLC for 10,385 common shares in CARMA.

278. Bronstein sold at the same inflated price: $9.63 per share, for a profit of approximately $100,000.

279. On information and belief, Defendants Bronstein and Wilks similarly misrepresented the value of the shares, their status as common shares, and the availability of preferred Series A-1 shares to RSN LLC.

280. In total, Bronstein and Wilks personally received approximately $1.6 million from these fraudulent secondary market transactions, to the detriment of both CARMA and the investors.

281. Defendants Bronstein and Wilks diverted investments in CARMA to themselves, creating inflated secondary sales from which they made massive profits.

**V. Fraud in Separation Agreements**

282. After discovering discrete elements of Defendant Bronstein's misconduct, Plaintiff CARMA requested his resignation in November 2023.

283. CARMA then prepared a separation agreement ("the Bronstein Separation Agreement"), providing Bronstein with payment after the termination of his employment as a courtesy and in consideration of his return of certain CARMA shares.

284. During the negotiation of the Bronstein Separation Agreement, Bronstein sought and the parties agreed to a provision releasing him of liability for his actions while employed at CARMA. While preparing the agreement, Bronstein had a fiduciary duty to disclose his self-

dealing to CARMA. However, while securing a release provision, Bronstein had not disclosed—and CARMA did not know about—the extent of his intentional and fraudulent misconduct.

285. Ultimately, on November 24, 2023, Bronstein signed the Bronstein Separation Agreement.

286. On behalf and to the detriment of CARMA, Wilks also signed the Bronstein Separation Agreement.

287. Bronstein demanded a similar release provision in an agreement executed the same day requiring Bronstein to return certain CARMA shares ("the Bronstein Stock Redemption Agreement"). While securing this additional general release provision, in violation of his fiduciary duty, Bronstein again failed to disclose—and CARMA did not know about—the extent of his intentional and fraudulent misconduct, including his role in the fraudulent over-grants of licensing authority discussed above. On behalf and to the detriment of CARMA, Wilks signed the Bronstein Stock Redemption Agreement.

288. In February 2024, CARMA decided to part ways with Defendant Cosby. In the process of preparing her separation agreement, Cosby had a fiduciary duty to disclose her self-dealing to CARMA. However, while insisting on a general release provision, Cosby had not disclosed—and CARMA did not know about—the extent of her intentional and fraudulent misconduct, including her role in the fraudulent over-grants of licensing authority discussed above.

289. On February 27, 2025, Cosby signed the Cosby Separation Agreement. On behalf and to the detriment of CARMA, Wilks also signed the Cosby Separation Agreement.

290.    On behalf and to the detriment of CARMA, Wilks also signed the Cosby Separation Agreement.

291.    Approximately one month later, CARMA's Board of Directors discovered certain aspects of Wilks' continued misconduct and his role in certain prior misconduct.

292.    On March 21, 2025, Wilks was put on administrative leave by CARMA's Board of Directors.

293.    On March 28, 2025, Wilks was officially terminated for cause by CARMA's Board of Directors.

294.    On information and belief, Wilks did not obtain a favorable separation agreement nor release like Bronstein and Cosby, due in large part to his own absence—that is, because CARMA's President and CEO were no longer acting to the detriment of CARMA, Wilks was terminated without a general release.

## CAUSES OF ACTION

### Count I
### 18 U.S.C. § 1962, Racketeer Influenced and Corrupt Organizations Act
### (Against Bronstein, Wilks, Cosby, and Case)

295.    Plaintiffs Tyson, Ric Flair, CARMA, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 294 as if fully set forth herein.

296.    Defendants Bronstein, Wilks, Cosby, and Case, among others, formed an enterprise (the "Enterprise").  The Enterprise traveled from company to company with the intent and purpose of raising millions of dollars in investor funding, with the further intent and purpose to abuse and misuse various companies' funds for the Enterprise's personal benefit.

297.    The same individuals were present, involved, and committing misconduct and fraud at Fyllo, Wesana, and CARMA.  The Enterprise devised the same or similar schemes at each company.

298.    The enterprise dates back to 2019, wherein Bronstein began Fyllo.  While forming Fyllo, Bronstein recruited individuals, such as Cosby, among others.  Bronstein then recruited several others to join the Enterprise, including Defendants Wilks and Case.

299.    Each individual knew one another sufficiently well to form relationships among the Enterprise, and sufficiently well to effectuate the Enterprise's purpose to abuse and misuse company funds.

300.    Each individual understood the Enterprise's purpose and each had a separate role in originating, facilitating, approving, or covering up the fraud, misconduct, and abuse of the company funds.

301.    The Enterprise had a chain of command.  Bronstein was at the top, and his closest confidants next in line.

302.    Bronstein directed individuals, such as Cosby, to handle various logistics. Bronstein further directed individuals, such as Wilks and Case, to obtain information to be used by the Enterprise, or to originate new schemes.

303.    When individuals in the Enterprise inevitably confronted Bronstein or repudiated the Enterprise's illegal purpose, Bronstein, acting on behalf of himself and through the others in the Enterprise, would take steps to remove these individuals from the companies and impair their credibility.

49

304.     Bronstein, Wilks, Case, and Cosby directly participated in the conduct of the Enterprise.  The Defendants not only operated and managed the Enterprise—they created it.  These individuals would act both independently and at Bronstein's direction to further the Enterprise's purpose of fraud and misconduct.

305.     Bronstein, Wilks, Case, and Cosby all played an important role and were essential to the Enterprise.  Defendants held the C-Suite executive level positions, and infiltrated board positions for each company.  Ultimately, they hijacked the companies as vessels to enrich themselves.

306.     The Defendants, acting through the Enterprise, committed a number of offenses that constitute a pattern of racketeering activity, including violations of 18 U.S.C. §§ 1956, 1957, 18 U.S.C. § 1343, and 18 U.S.C. § 1951 on numerous occasions.

**Count II**
**18 U.S.C. § 1962(d), RICO Conspiracy**
**(Against Bronstein, Wilks, Case, and Cosby)**

307.     Plaintiffs Tyson, Flair, CARMA, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 306 as if fully set forth herein.

308.     Under 18 U.S.C. § 1962(d), it is unlawful to conspire to violate the Act. Defendants Bronstein, Wilks, Case, and Cosby knew and agreed to join the Enterprise with the intent to further the Enterprise's purpose to abuse and misuse company funds.

309.     Bronstein, upon his creation of Fyllo, began the Enterprise with the purpose of abusing and misusing company funds for the Enterprise's benefit.  Wilks, Case, and Cosby eventually agreed to join the Enterprise with the intent to misappropriate company funds to benefit the Enterprise instead of the company.

50

310. Wilks had a longstanding relationship with Bronstein, and knew of Bronstein's business practices. When he heard of the creation of Fyllo, he agreed to join the Enterprise with the intent to help the Enterprise by enabling Bronstein's ideas for unlawfully directing company funds to the Enterprise, and with the additional intent to devise plans of his own to aid the Enterprise. Wilks agreed to provide support through approval on boards of directors and as an executive.

311. Case had a longstanding relationship with Bronstein, and facilitated Bronstein's connections to investors and others who enabled the initial success of the companies. In the process of facilitating the launch of the companies, Case agreed to join the Enterprise where Case and Bronstein would personally benefit from money that belonged to the shareholders. When he further saw Bronstein's success in raising capital for companies like Fyllo, Wesana, and CARMA, Case's intent was to misuse the capital.

312. Cosby had a longstanding relationship with Bronstein from his prior employment. When Bronstein was looking for legal help with facilitating and concealing unlawful transactions, he recruited Cosby. Cosby, with knowledge of Bronstein's practices and the intent behind the Enterprise he had formed, agreed to aid the Enterprise, using her legal expertise for the purpose of directing company funds to the Enterprise under the guise of legality.

313. Bronstein, Wilks, Case, and Cosby were aware of the Enterprise's purpose and its actions to effectuate its purpose. In many instances, Bronstein devised a scheme, but did not carry out the logistics. Wilks, Case, and Cosby would, in turn, facilitate the unlawful transactions with the knowledge that they would improperly benefit the Enterprise as opposed to CARMA.

314. As a direct and proximate result of the acts committed by Bronstein, Wilks, Case, and Cosby, CARMA was injured in an amount to be determined at trial.

## Count III
## 18 U.S.C. §§ 1956-1957, Money Laundering
## (Against Bronstein, Wilks, Cosby, and Case)

315.     Plaintiffs Tyson, Ric Flair, CARMA, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 314 as if fully set forth herein.

316.     The Enterprise knowingly caused the transportation, transmission, and transfer of funds in financial transactions, which represent the proceeds of unlawful misconduct.

317.     As part of their scheme, Defendants all received payments as a result and by the design of the Enterprise through its fraudulent purpose of abusing company funds.

318.     Defendants, by and through the Enterprise, knew that the proceeds were fraudulent.  They all possessed extensive business experience and expertise, and used such expertise to conceal the nature of the transactions to the shareholders and business partners.

319.     The Defendants, in receipt of the criminally derived money, engaged in transactions in interstate commerce which exceeded $10,000.

320.     For example, Defendant Bronstein routinely received kickbacks from DomPen in exchange for Defendant Bronstein's role in facilitating a third-party contract.  These payments were in furtherance of the Enterprise with the intent to continue the unlawful activity, and the nature of the transaction was hidden and concealed.

321.     In other such instances, Bronstein, Wilks, and Case directed business partners to purchase watches for them as a requirement of continuing a business relationship.

322.     In other such instances, Bronstein and Wilks fraudulently granted intellectual property rights they did not own.  Cosby prepared the agreements.  Defendants used the proceeds for their own personal enjoyment.

52

323.     In other instances, Defendants purchased gifts and entered into agreements to entice celebrities and further their personal relationships.  Such gifts and agreements were paid for using company funds without board approval.

324.     In one such instance, Wilks forgave debt owed to CARMA to advance his own competing interest in the debtor company.

325.     In many other such instances, Defendants have directed money to the Enterprise in the course of fraudulent and concealed activity, with the amount of damages to be proven at trial.

**Count IV**
**18 U.S.C. § 1343, Wire Fraud**
**(Against Bronstein, Wilks, Cosby, and Case)**

326.     Plaintiffs Tyson, Flair, CARMA, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 325 as if fully set forth herein.

327.     Defendants Bronstein, Wilks, Case, and Cosby devised a scheme or artifice to defraud and used wire transmission to further their scheme.  The Enterprise relied primarily on wire communications to further their fraudulent purpose of abusing company funds for personal enjoyment and advancement.

328.     Bronstein, in an effort to conceal his communications, relied primarily on phone calls as opposed to written communication.  Bronstein therefore attempted to conceal his fraudulent activity through the use of wire transmission.

329.     On or about June 7 and June 8, 2022, Cosby facilitated unauthorized licensing agreements by means of wire transmission, more specifically electronic mail. In her emails, Cosby

circulated licensing agreement drafts for the use of trademarks in connection with pillow products, a right that CARMA did not own.

330.     On or about May 26, 2023, Bronstein solicited unauthorized licensing agreements by means of wire transmission, more specifically electronic mail.  In his email, Bronstein made plans for a business partnership to sell rights that he did not own.

331.     On or about July 11, 2023, Bronstein approved an unauthorized expenditure by means of wire transmission, more specifically electronic mail.  In his email, Bronstein directed CARMA funds in excess of $70,000 to be used for a private jet, a frequent practice for Bronstein in an effort to abuse CARMA funds for his personal benefit.

332.     In January 2024, Wilks spoke with two business associates over the phone regarding equity incentives for individuals on the board of Northern Emeralds who brought in licensing agreements.  Wilks used such an equity incentive scheme to benefit himself by binding CARMA to a licensing agreement with Northern Emeralds, and therefore personally obtaining equity in Northern Emeralds.  Defendant Wilks used wire transmission to set up the fraudulent scheme by which he would defraud CARMA.

333.     On or about December 4, 2024, Wilks, by means of wire transmission, more specifically electronic mail, directed a fraudulent kickback from Green Success to be paid in the form of a consultancy agreement in his sister's name.  This and the surrounding wire communications resulted in Wilks, through his sister, receiving equity in Green Success in exchange for using CARMA funds to invest in the company.

334.     In other such instances, Defendants used wire transmission to further their fraudulent purpose, damaging CARMA in an amount to be proven at trial.

## Count V
## 18 U.S.C. § 1951, Extortion
## (CARMA and LGNDS Against Bronstein and Case)

335.     Plaintiffs CARMA and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 334 as if fully set forth herein.

336.     Defendants Bronstein and Case violated the Hobbs Act, 18 U.S.C. § 1951 by extorting Plaintiff LGNDS to the detriment of LGNDS and Plaintiff CARMA.

337.     The Hobbs Act states that it is unlawful to affect commerce by way of extortion.  Extortion is defined as obtaining property with consent by wrongfully using force, violence, or fear.

338.     On multiple occasions, Bronstein and Case wrongfully used the fear of economic loss to obtain property from LGNDS.

339.     As a precursor to doing business with CARMA, Bronstein and Case demanded that the CEO of LGNDS transfer 10% of the equity in LGNDS to Case.  Bronstein and Case did not have the legal right to do so—Case did not provide anything to LGNDS in return.

340.     In response, with the consent of LGNDS' CEO, Case received the equity.  LGNDS' CEO would not have given equity to Case, but for his fear of economic harm to the business.  Bronstein and Case weaponized this fear to obtain the equity for Case.

341.     Additionally, after a business relationship had already been formed, Bronstein approached LGNDS' CEO yet again and demanded that he buy Bronstein a Rolex brand watch.  Bronstein threatened that if the CEO did not buy the watch, Bronstein would cancel their existing licensing contract.  Bronstein did not have the right to cancel the existing licensing contract.

342.     In response, LGNDS' CEO bought the watch, worth over $50,000.  He would not have bought the watch for Bronstein and his fear of economic harm to his business.  Bronstein weaponized this fear to obtain the watch.

343.     The equity transfer and watch purchase affected interstate commerce.

344.     Bronstein and Case violated the Hobbs Act by means of extortion to advance the purpose of the Enterprise: abusing CARMA by profiting from their business relationships.  To the detriment of CARMA and LGNDS, Bronstein and Case personally benefitted by wrongfully and unlawfully using fear of economic harm to personally obtain valuable property.

**Count VI**
**Fraud**
**(CARMA Against Bronstein)**

345.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 344 as if fully set forth herein.

346.     When Defendant Bronstein accepted his position as CARMA's President and Chairman of the Board, he accepted clear terms regarding his compensation.  However, on information and belief, Bronstein misrepresented to CARMA the full extent of his compensation, including his bonuses.

347.     Bronstein's acceptance of such annual compensation was material in nature because it was memorialized in his Executive Employment Agreement, dated May 1, 2022, with CARMA.

348.     However, Bronstein lied about the compensation that he would award himself as President of CARMA.

349.     Despite Bronstein's previous assertions regarding his compensation, Bronstein repeatedly and secretly paid himself hundreds of thousands of dollars in discretionary bonuses—approximately $800,000 in total by the end of his tenure.  As Chairman of the Board of CARMA, Bronstein would unilaterally approve his unauthorized bonuses.

350.     CARMA was not aware of these secret, discretionary bonuses that he awarded himself, and CARMA relied on Bronstein's assertions that everything involving his compensation was above board.

351.     Defendant Bronstein made these misrepresentations to the company for the sole purpose of inducing CARMA to continue to employ him, so that he could continue to misappropriate and abuse company funds for his own purposes.

352.     As a direct and proximate cause of Bronstein's false representations, Plaintiff CARMA has suffered extensive monetary damages in an amount to be proven at trial.

### Count VII
### Fraud
### (CARMA Against Bronstein)

353.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 352 as if fully set forth herein.

354.     When Defendant Bronstein accepted his position as CARMA's President and Chairman of the Board, Bronstein accepted clear terms regarding CARMA's expenditure and reimbursement policies.  Bronstein agreed to submit for reimbursement only expenditures that were necessary to achieve a benefit to CARMA.

355.     Bronstein's acceptance of such annual compensation was material in nature because it was memorialized in his acceptance of continued employment with CARMA after

reviewing CARMA's employee handbook, and as memorialized in his Executive Employment Agreement, dated May 1, 2022, with CARMA.

356.     However, Bronstein lied about the expense reports he would submit to CARMA.

357.     Bronstein routinely expensed frivolous and personal expenses for his own enjoyment, including but not limited to the payment of private jet rides, personal entertainment while both at home and on trips, home enhancement projects, and the purchase of luxury goods and services for personal use.

358.     CARMA was not aware of the extent of Bronstein's frivolous expenditure, and CARMA relied on Bronstein's assertions that each expenditure was submitted for a legitimate business purpose.

359.     Bronstein represented these falsehoods to the company for the sole purpose of inducing CARMA to pay his personal and non-business-related expenses, so that he could continue to misappropriate and abuse company funds for his own purposes.

360.     As a direct and proximate cause of Bronstein's false representations, Plaintiff CARMA has suffered extensive monetary damages in an amount to be proven at trial.

**Count VIII**
**Fraud**
**(CARMA Against Bronstein)**

361.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 360 as if fully set forth herein.

362.     In 2022, when Daniel Carcillo discovered Defendant Bronstein's misconduct, Bronstein offered Carcillo a job as a consultant at CARMA.  It was Bronstein's understanding that Carcillo would not be performing any work at CARMA.  Instead, the position was, functionally,

a bribe to keep Carcillo from raising concerns about Bronstein's fraudulent conduct at his previous employer, Wesana.

363.    Bronstein hired Daniel Carcillo, at the approximate yearly cost to CARMA of $100,000, to silence him.

364.    CARMA was not aware of the salary Carcillo was being paid, or that Carcillo was not performing any work. CARMA relied on Defendant Bronstein's assertions that his hiring practices were undertaken solely for CARMA's benefit.

365.    Bronstein represented these falsehoods and omissions to the company for the sole purpose of inducing CARMA to pay Daniel Carcillo a salary which in reality functioned as a personal bribe solely benefiting Bronstein.

366.    As a direct and proximate cause of Bronstein's false representations, Plaintiff CARMA has suffered extensive monetary damages in an amount to be proven at trial.

**Count IX**
**Fraud**
**(LGNDS and Flair Against Bronstein and Cosby)**

367.    Plaintiffs LGNDS and Flair reassert and incorporate by reference all allegations contained in Paragraphs 1 through 366 as if fully set forth herein.

368.    In the RFD License Agreement, Defendant Bronstein, by and through Plaintiff CARMA, asserted that he owned, controlled, and possessed the rights to the brands and trademarks relating to Ric Flair Drip, and that it owned a license to manufacture various products—i.e., hemp products, mushroom products, nicotine products, kava products, smelling salts, beverages, and other merchandise, such as shirts, pants, sweaters, and footwear.

369.     At the time of the RFD License Agreement's execution, Bronstein knew that CARMA only owned the license to manufacture *hemp* products pursuant to the Ric Flair Drip brand and trademark.

370.     Bronstein—despite knowing that he did not own a license to manufacture mushroom products, nicotine products, kava products, smelling salts, beverages, and other merchandise, such as shirts, pants, sweaters, and footwear—still represented that CARMA owned the licensing rights to all of these products to RFD LGNDS, so as to induce RFD LGNDS to enter into a $450,000 contract.

371.     On information and belief, Defendant Cosby drafted the RFD License Agreement, knowing that LGNDS did not have those rights and with the intent to induce LGNDS to enter into the RFD Licensing Agreement.

372.     RFD LGNDS—relying on CARMA's assertion that it owned the licensing rights to produce mushroom products, nicotine products, kava products, smelling salts, beverages, and other merchandise—signed the RFD Licensing Agreement, and created Wooooo! Energy.

373.     As a direct and proximate cause of Bronstein and Cosby's false representations, LGNDS has suffered monetary damages, including lost profits and settlement costs.

374.     As a direct and proximate cause of Bronstein and Cosby's false representations, Flair has suffered damages to his exclusive trademarks, which has resulted in monetary damages.

375.     Because of these injuries, Plaintiffs LGNDS and Flair are entitled to damages in an amount to be proven at trial.

**Count X**
**Fraud**
**(CARMA and LGNDS Against Bronstein)**

376.     Plaintiff LGNDS reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 375 as if fully set forth herein.

377.     Bronstein unilaterally entered into the AEW sponsorship agreement on behalf of CARMA and LGNDS, and he withheld from CARMA and LGNDS that he had entered this agreement on their behalf.

378.     Bronstein knew that CARMA and LGNDS were unaware that he had entered into the AEW sponsorship agreement on their behalf.  On information and belief, Bronstein withheld this information with the intent to induce CARMA and LGNDS to pay $1.5 million for AEW's performance of the contract.

379.     CARMA and LGNDS reasonably relied on Bronstein's failure to disclose that they had entered into the AEW sponsorship agreement, and as a result, they paid more than a million dollars for a contract they never agreed to enter in the first place.

380.     As a direct and proximate cause of Bronstein and Cosby's false representations, CARMA and LGNDS have suffered monetary damages.

381.     Because of these injuries, Plaintiff LGNDS is entitled to damages in an amount to be proven at trial.

**Count XI**
**Fraud**
**(Tyson, CARMA, and LGNDS Against Wilks)**

382.     Plaintiffs Tyson, CARMA, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 381 as if fully set forth herein.

383.    Defendant Wilks knew that pursuant to the terms of the LGNDS-Tyson 2.0 Agreement, LGNDS held the exclusive right to sublicense Tyson 2.0 mushroom products.

384.    Despite this knowledge and having entered into the exclusive Tyson 2.0 Licensing Agreement with LGNDS, Wilks falsely represented that CARMA could sublicense mushroom products to third parties besides LGNDS.  Specifically, Wilks entered into separate sublicensing agreements for Tyson 2.0 products with Advanced Mycology.

385.    Wilks issued the sublicense to Advanced Mycology with the intent to induce Tyson, CARMA, and LGNDS to continue doing business with them and to allow Wilks to continue to profit from additional licensing agreements that were exclusively designated for LGNDS.

386.    In addition, Wilks communicated separately with the Sublicensee-Distributor in the LGNDS Sublicense agreement without LGNDS' knowledge, and falsely represented to Tyson, CARMA, and LGNDS that the Sublicensee-Distributor had adequately complied with federal and state public health regulations.

387.    Wilks knew that the Sublicensee-Distributor in the LGNDS Sublicense continued to violate federal and state law, and he withheld that information from Tyson, CARMA, and LGNDS nonetheless, in order to induce Tyson, CARMA, and LGNDS to continue doing business with the sublicensee-distributor.

388.    Wilks intentionally failed to disclose material information regarding Advanced Mycology and LGNDS' Sublicensee-Distributors, and Tyson, CARMA, and LGNDS relied on Wilks' misrepresentation and continued doing business with sublicensees who were engaging in the unauthorized use of the Tyson 2.0 Licensed Products.

389.     As a direct and proximate cause of Wilks and Cosby's false representations, Tyson, CARMA, and LGNDS have suffered monetary damages, including lost profits, in an amount to be proven at trial.

390.     As a direct and proximate cause of Wilks' false representations, Tyson has suffered damages to his exclusive trademarks, which has resulted in monetary damages in an amount to be proven at trial.

**Count XII**
**Fraud**
**(CARMA, Tyson, and LGNDS Against Bronstein, Wilks and Cosby)**

391.     Plaintiffs CARMA, Tyson, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 390 as if fully set forth herein.

392.     In the EVOL-FTR LGNDS Agreement, Defendants Bronstein and Wilks falsely represented to LGNDS that CARMA owned, controlled, and possessed the rights to the trademarks and licensed products relating to the Future-EVOL-CARMA Agreement—i.e., hemp-derived products, mushroom-related products, kava and kratom, tobacco-derived products, all Future smoking paraphernalia, and all nicotine-derived products.

393.     At the time of the EVOL-FTR LGNDS Agreement's execution, Bronstein and Wilks knew that CARMA only owned the license to manufacture *cannabis* products using the Future brand and trademark.

394.     Bronstein and Wilks—despite knowing that CARMA did not own a license to manufacture the non-cannabis or cannabis-related products—still represented that they had the licensing rights for these products to LGNDS, so as to induce LGNDS to enter into the EVOL-FTR LGNDS Agreement.

395. On information and belief, Cosby drafted the EVOL-FTR LGNDS Agreement—knowing that CARMA did not have rights to non-cannabis products—so as to induce LGNDS to enter into the EVOL-FTR LGNDS Agreement.

396. LGNDS—relying on Bronstein, Wilks, and Cosby's assertion that CARMA had the rights to the non-cannabis products—signed the EVOL-FTR LGNDS Agreement.

397. As a direct and proximate cause of Wilks' false representations LGNDS has suffered monetary damages, including lost profits, in an amount to be determined at trial.

**Count XIII**
**Fraud**
**(CARMA Against Wilks)**

398. Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 397 as if fully set forth herein.

399. Wilks falsely represented to CARMA that DomPen would cease operations in states that extended beyond the terms of the DomPen Agreements when, in fact, he continued to receive kickbacks from DomPen for unauthorized sales of Tyson 2.0 Licensed Products and EVOL Licensed Products in those states.

400. CARMA notified Wilks that the Tyson 2.0 Licensed Products and the EVOL Licensed Products could not be sold outside of the states stipulated in the DomPen Agreements.

401. Wilks knew that the sales outside of those states persisted after that, and withheld that information from CARMA so as to induce CARMA to continue to remain in those contracts while Wilks profited at CARMA's expense.

402.     CARMA relied on Wilks' assertion that DomPen would cease sales outside of the states agreed to by the parties in the DomPen Agreements and remained in those contracts while DomPen and Wilks used those contracts in ways that were not authorized under the agreement.

403.     As a direct and proximate cause of Wilks' false representations, CARMA has suffered monetary damages, including lost profits, in an amount to be determined at trial.

**Count XIV**
**Fraud**
**(CARMA Against Wilks)**

404.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 403 as if fully set forth herein.

405.     Defendant Wilks withheld material information from CARMA regarding his numerous business ventures, including Northern Emeralds, DomPen, Green Success, and RadarZero.  Each instance of his involvement in these ventures conflicted with his position on the Board of Directors for CARMA.

406.     As a favor to Northern Emeralds, Wilks waived Northern Emeralds' debts, totaling more than $1.25 million, and knowingly withheld from CARMA that he did so.

407.     Wilks received equity in Northern Emeralds and received equity for his sister in Green Success, and knowingly withheld both instances of ownership in those companies from CARMA.

408.     Wilks held board positions at Northern Emeralds, Captor Capital, and DomPen, and he knowingly withheld this information from CARMA.

409.     Wilks knew that waiving Northern Emeralds' debt, gaining equity in companies doing business with CARMA, and holding other board positions were material information for

CARMA.  Yet, he still withheld this information from CARMA, with the intent to induce CARMA into doing business with entities that would benefit Wilks.

410.     CARMA, relying on Wilks' assertion that Northern Emeralds' debts were paid and that he was not receiving significant benefits from other companies involved with CARMA, continued doing business with Northern Emeralds, DomPen, Green Success, RadarZero, and other companies.  As a result, CARMA lost hundreds of thousands of dollars from their engagement with those companies.

411.     As a direct and proximate cause of Wilks's false representations, CARMA has suffered monetary damages, including lost profits, in an amount to be proven at trial.

**Count XV**
**Breach of Contract**
**(Tyson Against Bronstein and Wilks)**

412.     Plaintiff Tyson reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 411 as if fully set forth herein.

413.     On October 15, 2021, Plaintiff CARMA, by and through Defendants Bronstein and Wilks, entered into a valid and binding Trademark License Agreement with Mike Tyson. This Agreement provided for the marketing, sale, production, and distribution of intellectual property properly licensed to CARMA.

414.     Tyson granted his trademark rights for Tyson 2.0 products specifically referenced in the agreement, which did not include pillows, mini fridges, and before the agreement was amended, retail shops.

415.     Bronstein and Wilks subsequently breached this Tyson 2.0 License Agreement by entering into license agreements with distributors of products that were not licensed in the agreement, including pillows, mini fridges, and before the agreement was amended, retail shops.

416.     Additionally, the Tyson 2.0 License Agreement specifies that Tyson must approve of sublicenses that guarantee his in-person appearances.

417.     Bronstein and Wilks further breached the Tyson 2.0 License Agreement by falsely representing to several sublicensees that Tyson would make an in-person appearance or in-market visits to locations across the country.  Tyson never agreed to go to these locations, and the agreements would have required him to fly to multiple states across the country each year.

418.     Bronstein and Wilks caused damages to Tyson by using Tyson's marks and likeness in ways that were not authorized to him in the original license agreement, and profited from the use of those marks without paying royalties to Tyson.

419.     As a direct and proximate cause of Bronstein and Wilks' breach of contract, Tyson has suffered monetary damages, including losses in monthly gross revenue.

420.     As a direct and proximate cause of Bronstein and Wilks' breach of contract, Tyson's trademarks and likeness suffered reputational damage and lost profits.

421.     Because of these injuries, Tyson is entitled to damages in an amount to be proven at trial.

**Count XVI**
**Breach of Contract**
**(Flair Against Bronstein and Wilks)**

422.     Plaintiff Flair reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 421 as if fully set forth herein.

423.     On May 1, 2022, Plaintiff Flair entered into a valid and binding License Agreement with CARMA, by and through Tyrannic.  This Agreement granted CARMA the right to create certain products relating to Flair's trademarks and personality rights.  Those rights did not include the use of Flair's marks for pillow products.

424.     On June 1, 2022, Defendant Bronstein and Defendant Wilks, by and through Plaintiff CARMA, entered into a License Agreement with Big League Pillows LLC for use of the Flair trademarks on pillow products.  Bronstein, as the signatory in the initial Flair Licensing Agreement, knew that he did not have the rights to license pillow products.

425.     Flair properly licensed his trademarks and personality rights to Bronstein and Wilks, by and through CARMA.

426.     Bronstein and Wilks breached the Ric Flair Agreement by issuing sublicenses that were outside the scope of the original agreement.

427.     As a direct and proximate cause of Bronstein and Wilks's breach of contract, Flair has suffered monetary damages, including losses in monthly gross revenue.

428.     As a direct and proximate cause of Bronstein's breach of contract, Flair's trademarks suffered reputational damage and lost profits.

429.     Because of these injuries, Flair is entitled to damages in an amount to be proven at trial.

**Count XVII**
**Breach of Contract**
**(LGNDS Against Wilks)**

430.     Plaintiff LGNDS reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 429 as if fully set forth herein.

431.     The LGNDS-Tyson 2.0 Agreement is a valid and enforceable agreement.  In the agreement, CARMA provided the exclusive licensing rights for the Tyson 2.0 Licensed Products to Plaintiff LGNDS pursuant to the terms of each agreement.  CARMA, at its own expense, would protect LGNDS' branding rights to Tyson 2.0 from any and all attempts by third parties to infringe upon LGNDS' exclusive trademark.

432.     LGNDS began manufacturing and distributing Tyson 2.0 products pursuant to the agreement.

433.     Defendant Wilks breached the exclusive terms of the contract by entering into a sublicense with Advanced Mycology.  On information and belief, Wilks further breached the terms of the agreement by marketing Advanced Mycology's MIKEADELICS on social media platforms.

434.     As a direct and proximate cause of Wilks' breach of the agreement, LGNDS has suffered monetary damages, including losses in monthly gross revenue.

435.     Because of these injuries, LGNDS is entitled to damages in an amount to be proven at trial.

**Count XVIII**
**Breach of Fiduciary Duty**
**(CARMA Against Wilks)**

436.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 435 as if fully set forth herein.

437.     Beginning in 2021, Wilks was the Chief Executive Officer for CARMA. Due to his status as CEO, Wilks owed CARMA the fiduciary duties of loyalty and care, acting in CARMA's best interest.

438.     Wilks breached these fiduciary duties on multiple occasions, through a pattern of self-dealing and fraudulent behavior.

439.     On October 3, 2024, Wilks, acting as CEO, invested $750,000 in Sona Terra Inc. in exchange for shares, or 25% of Sona Terra, using funds belonging to CARMA.

440.     CARMA is not an investment firm, so making an investment is not aligned with CARMA's business model.  Additionally, Sona Terra operates and manages restaurants, which is also unrelated to CARMA's business.

441.     The investment in Sona Terra was not in the best interests of CARMA. In fact, the investment was to the detriment of CARMA, as Defendant Wilks diverted $750,000 of CARMA funds from legitimate business purposes aligned with CARMA's business.

442.     Wilks made the investment not in CARMA's interests, but because he wanted to establish a relationship with the Chief Executive Officer of Sona Terra.  Wilks used Plaintiff CARMA as a vehicle to further his own business network development.

443.     Wilks used CARMA's funds to shelter himself from his own personal ill-gotten gains, by gaining substantial investment to demand that Green Success pay his sister personally. As a result, Green Success awarded his sister tens of thousands of dollars in equity.

444.     Wilks further used CARMA's funds to gain equity and enrich himself when, unbeknownst to CARMA, he took a 5% equity stake in RadarZero in exchange for CARMA signing the RadarZero Agreement.

445.     Wilks signed the RadarZero Agreement because he himself would receive equity, not because it was in CARMA's best interests.  The RadarZero venture failed to generate revenue or advance CARMA's interests as a company.

446.     Wilks additionally facilitated a scheme forcing CARMA to purchase Ric Flair Drip, Inc., a company he personally had an equity interest in, enhancing his equity interest in CARMA without disinterested approval from CARMA's Board of Directors.

447.     By acting in his own best interests instead of CARMA's, in these incidents as well as others, Wilks breached his fiduciary duty.

448.     As a direct and proximate result of Wilks' breach, Plaintiff CARMA was harmed in an amount to be determined at trial.

**Count XIX**
**Breach of Fiduciary Duty**
**(CARMA Against Bronstein)**

449.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 448 as if fully set forth herein.

450.     Beginning in 2021, Bronstein served as Chairman of CARMA's Board of Directors.  Beginning on May 1, 2022, Bronstein also took the role of President of CARMA.

451.     Due to his role as Chairman of the Board and President, Defendant Bronstein owed CARMA the fiduciary duties of loyalty and care.

452.     Bronstein breached these fiduciary duties on multiple occasions, through a pattern of self-dealing and fraudulent behavior.

453.     Bronstein conditioned the issuance of a portion of CARMA's founding shares on an investor purchasing $4 million of Bronstein's shares in another company.  These funds went to Bronstein directly, not CARMA, despite CARMA not owing obligations to that investor, for no consideration in exchange.  Bronstein diverted part of the consideration for the investment in CARMA to himself, unjustly enriching himself to the detriment of CARMA.

454.     Bronstein concocted a scheme forcing CARMA to purchase Ric Flair Drip, Inc., a company he controlled as CEO and had an equity interest in, enhancing his equity interest in CARMA without disinterested approval from CARMA's Board of Directors.

455.     Bronstein jeopardized a valid and profitable contract between CARMA and LGNDS by demanding that the CEO of LGNDS give Bronstein a Rolex brand watch, solely to Bronstein's benefit.

456.     Bronstein agreed to professionally represent UFC Fighter Julianna Peña, who he frequently paid sponsorships (of which he would take a cut) issued by CARMA.  This self-dealing was yet another way that Bronstein would pad his own pockets from CARMA's coffers without benefit to CARMA.

457.     Bronstein overpaid himself beyond what CARMA's Board of Directors had approved, routinely giving himself unauthorized bonuses at CARMA's expense.

458.     By acting in his own best interests instead of CARMA's, in these instances as well as in others, Bronstein breached his fiduciary duty.

459.     As a direct and proximate result, CARMA was harmed in an amount to be determined at trial.

460.     Additionally, as a result of Bronstein's unjust enrichment, CARMA is entitled to restitution damages.

### Count XX
### Breach of Fiduciary Duty
### (CARMA Against Bronstein and Cosby)

461.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 460 as if fully set forth herein.

462.     Beginning in 2021, Defendant Bronstein served as Chairman of CARMA's Board of Directors.  Beginning on May 1, 2022, Bronstein also took the role of President of CARMA. Due to his role as Chairman of the Board and President, Bronstein owed CARMA the fiduciary duties of loyalty and care.

463.     Beginning on June 22, 2022, Defendant Cosby served as CARMA's Chief Legal and Licensing Officer. Due to her role as Chief Legal and Licensing Officer, Cosby owed CARMA the fiduciary duties of loyalty and care.

464.     Bronstein and Cosby breached these fiduciary duties by entering unauthorized sponsorship agreements to the detriment of CARMA.

465.     During their employment, Bronstein and Cosby entered into over six sponsorship agreements, totaling over $5.5 million in CARMA-funded obligations.  These agreements were not within the scope of Bronstein and Cosby's authority.  The multimillion dollar obligation to CARMA was not within general guidelines and budgets approved by the Board.

466.     Due to its revenue and business plan, CARMA was not in a position to commit to these extensive obligations.

467.     Bronstein and Cosby knew the contracts were not in CARMA's best interests. Instead, they used the contracts as a method of creating personal relationships with celebrities, for the purpose of their own personal brand and connections.

468.     Because they put their own interests above CARMA's, Bronstein and Cosby breached the duty of loyalty they owed the company.

469.     As a direct and proximate cause of the breach, CARMA suffered monetary and reputational damages, in an amount to be proven at trial.

## Count XXI
### Section 10(b) and Rule 10b-5, Securities Fraud
### (CARMA Against Chad Bronstein and Adam Wilks)

470.     Plaintiff CARMA reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 469 as if fully set forth herein.

471.     Defendants Bronstein and Wilks used and employed a manipulative device in contravention of 17 CFR § 240.10b-5 and 15 U.S.C. 78j.

472.     Bronstein and Wilks made untrue statements of material fact in connection with purchases and sales of securities.

473.     Bronstein and Wilks additionally engaged in courses of business which operated as fraudulent in connection with the purchases and sales of securities.

474.     Bronstein and Wilks acted with the intent to deceive, manipulate, and defraud not only buyers and sellers but also CARMA itself.

475.     Bronstein and Wilks engaged in the purchase and sale of CARMA shares with the intention of misappropriating the proceeds for their personal profit.

476.     In one such instance, Bronstein made the sale of his shares in Fyllo a condition of CARMA's decision to issue shares to Tovey.

477.     Bronstein, in doing so, hatched a scheme to defraud CARMA by acting to the detriment of CARMA, ensuring his personal profit through the sale of Fyllo shares.

478.     CARMA relied on Bronstein to act in their best interest as a fiduciary, yet Defendant Bronstein cut a fraudulent deal in connection with the issuance of CARMA shares.

479.     In another such instance, Bronstein misrepresented the value of CARMA shares in connection with a secondary sale during CARMA's Series A-1 round.

74

480. Despite internal company valuations being much lower, Bronstein sold shares to Longo at a price 50% higher than the valuation.

481. In doing so, Bronstein misrepresented the value of his shares and acted to the detriment of CARMA's monetary interest and business reputation.

482. CARMA relied on Bronstein to act in their best interest as a fiduciary, yet Defendant Bronstein conducted a fraudulent sale with the intent to personally profit.

483. In another such instance, Wilks misrepresented the value of CARMA shares in connection with a secondary sale during CARMA's Series A-1 round.

484. Despite internal company valuations being much lower, Wilks sold shares to Longo at a price 50% higher than the valuation.

485. In doing so, Wilks misrepresented the value of his shares and acted to the detriment of CARMA's monetary interest and business reputation.

486. CARMA relied on Wilks to act in their best interest as a fiduciary, yet Defendant Wilks conducted a fraudulent sale with the intent to personally profit.

487. In other such instances, Defendants Bronstein and Wilks violated § 10(b) and Rule 10b-5 to the detriment of CARMA, with the amount of monetary damages to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court to:

a. Award Plaintiffs a judgment against Defendants in the amount to be proven at trial;

b. Award Plaintiffs treble the actual damages and attorneys' fees, pursuant to 18 U.S.C. § 1964, for Defendants' violations of 18 U.S.C. § 1962;

75

c. Award equitable relief, including but not limited to disgorging all ill-gotten gains that Defendants obtained by conducting an Enterprise through a Pattern of Racketeering Activity, and disgorging all ill-gotten gains that Defendants obtained through their pattern of fraudulent conduct;

d. Award Plaintiffs prejudgment and postjudgment interest as permitted by any applicable law; and

e. Award Plaintiffs such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury of all triable matters.

Dated: December 19, 2025

*/s/ John D. Mitchell*

John D. Mitchell
LaRue Robinson
Rachel M. Kreager
Isabella Sabri
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL  60654-3406
Tel: (312) 728-9050
Fax: (312) 728-9199
jmitchell@willkie.com
lrobinson@willkie.com
rkreager@willkie.com
isabri@willkie.com

*Attorneys for Plaintiffs*