**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL TYSON, an individual, RICHARD FLIEHR, an individual, TYSON 2.0 INC., a Delaware corporation (f/k/a CARMA HoldCo Inc.), and LGNDS LLC, a Wyoming limited liability company,

*Plaintiffs*,

v.

CHAD BRONSTEIN, ADAM WILKS, NICOLE COSBY, JAMES CASE, and CHRISTOPHER VOLO,

*Defendants*.

Civil Action No. 25-CV-15462

Judge Elaine E. Bucklo

**JURY TRIAL DEMANDED**

**SECOND AMENDED COMPLAINT**[1]

Plaintiffs MICHAEL TYSON ("Mike Tyson" or "Tyson"), RICHARD FLIEHR ("Ric Flair" or "Flair"), TYSON 2.0 INC. (f/k/a CARMA HoldCo Inc.) ("Tyson 2.0"), and LGNDS LLC ("LGNDS") (collectively, the "Plaintiffs"), by and through their undersigned counsel, WILLKIE FARR & GALLAGHER LLP, allege the following against Defendants CHAD BRONSTEIN ("Bronstein"), ADAM WILKS ("Wilks"), NICOLE COSBY ("Cosby"), JAMES CASE ("Case"), and CHRISTOPHER VOLO ("Volo") (collectively, the "Defendants"), and state as follows:

[1] Over the course of the past few weeks, Plaintiffs' counsel has had the ability to further review company correspondence executed by the Defendants and conduct additional witness interviews, which has permitted Plaintiffs to eliminate certain "on information and belief" allegations.

## INTRODUCTION

1. Plaintiff Mike Tyson and his co-plaintiffs bring this civil action to hold Chad Bronstein, Adam Wilks, and their co-defendants accountable for their participation in a brazen RICO conspiracy involving criminal wire fraud, embezzlement, money laundering, trade secret theft, and extortion, as well as securities fraud and shameless self-dealing that enriched the Defendants to the tune of tens of millions of dollars.

2. At the heart of this action is Tyson 2.0, a global branding company formed in Chicago that specializes in licensing celebrity brands. Tyson 2.0 is merely one of a line of victims of Defendants' RICO enterprise. Defendants Bronstein, Wilks, Cosby, Case, and Volo, among others, formed an enterprise comprising a group of individuals associated-in-fact (the "Bronstein Enterprise"), which engaged in, and the activities of which impacted, interstate commerce. In 2019, the Bronstein Enterprise was formulated at Fyllo, a Chicago-based marketing technology company, before the Enterprise moved to a company called Wesana Health, and then to Tyson 2.0. Since its inception, the Bronstein Enterprise has followed a familiar pattern: Travel from company to company, raise millions of dollars from investors, stack the executive board with members and associates of the Enterprise, and then enrich Bronstein and other members of the Enterprise at the expense of the company, its investors, and its business partners.

3. Beginning in 2021, Bronstein served as Tyson 2.0's chairman of the board, and later as Tyson 2.0's president, while Wilks was the company's chief executive officer. Cosby served on Tyson 2.0's board of directors from around its inception until she began her employment as Tyson 2.0's chief legal and licensing officer. Case is a shareholder in Tyson 2.0, who received his shares based on his role as a long-time associate of Bronstein. Volo was Tyson 2.0's head of talent manager, a position that he utilized to steal and report back Tyson 2.0's trade secrets to Bronstein

and Cosby, after Bronstein and Cosby had left the company. Armed with this insider information and in violation of Volo's non-competition agreement with Tyson 2.0, Bronstein, Cosby, and Volo launched Real American Beer ("RAHM"). Throughout their time at Tyson 2.0, Bronstein and Wilks treated Tyson 2.0 as their own personal piggy bank, spending more than $1 million to pay for unauthorized personal travel on private jets, costs associated with Bronstein's personal boat, renovations to Bronstein's personal residence, a mortgage payment for Wilks' personal residence, and lavish entertainment expenditures for Wilks, including exorbitantly priced meals and travel expenditures, as well as excessive and unapproved compensation and bonuses. What's more, Bronstein and Wilks entered into unauthorized agreements on Tyson 2.0's behalf with third parties, which resulted in financial losses and liabilities to Tyson 2.0 but lined the Defendants' pockets. For example, beginning no later than December 2021, Wilks and an executive at vape manufacturer DomPen entered into an undisclosed kickback agreement under which Wilks—without the knowledge or consent of those outside the Bronstein Enterprise—received concealed payments in exchange for turning a blind eye to DomPen's unauthorized use of Tyson 2.0's intellectual property.

4. The Bronstein Enterprise instigated repeated deception and fraud on Tyson 2.0's business partners, including Mike Tyson, Ric Flair, musical artist Nayvadius DeMun Cash, professionally known as Future ("Future"), and LGNDS LLC. For example, Tyson 2.0, through Bronstein and Wilks, entered into written licensing agreements with multiple celebrities, such as Tyson, Flair, and Future under which Tyson 2.0 was authorized to sell certain licensing rights to third parties. But Bronstein and Wilks, with the knowing participation and assistance of Cosby, in fact sold licensing rights to Plaintiff LGNDS and others that were not authorized by Tyson, Flair, or Future. Tyson's contracts with Tyson 2.0 prohibited committing Tyson to appearances

without his express approval. Yet Wilks entered into contracts that obligated Tyson, without his knowledge or consent, to appearances across the country. Bronstein, Wilks, and Case also required that Tyson 2.0's business partners provide things of value to each of them personally as a precondition for doing business with Tyson 2.0. Indeed, Bronstein, and later Wilks, demanded that the principal of LGNDS purchase Rolex watches worth at least $48,000 or else they would cancel LGNDS' contracts with Tyson 2.0. On another occasion, Wilks received an identical Rolex watch worth in excess of $50,000 from the owner of an Amsterdam-based coffee shop which received a license to use Tyson's likeness without having to pay Tyson 2.0's customary $250,000 upfront licensing fee. Further, Bronstein and Case demanded that LGNDS give Case a 10% ownership interest in LGNDS, free of charge, as a precondition for LGNDS' licensing agreements with Tyson 2.0.

5. The Bronstein Enterprise also instigated repeated fraud in connection with the purchase and sale of securities. Bronstein and Wilks orchestrated Tyson 2.0's acquisition of Ric Flair Drip, Inc., a company that they knew to be worthless. Bronstein and Wilks were the sole board members of Ric Flair Drip, Inc. and each had 16% ownership of the company. Motivated by their own interests in increased Tyson 2.0 ownership, Bronstein and Wilks misrepresented to Tyson 2.0 that the company had a valuation of $10 million. Tyson 2.0, relying on Bronstein and Wilks, whom they believed had accurate knowledge about the company for which they were so deeply involved, moved forward with the acquisition and gave Bronstein, Wilks and others hundreds of thousands of Tyson 2.0 shares in exchange for worthless shares in Ric Flair Drip. As described below, Bronstein and Wilks also caused Tyson 2.0 to issue them hundreds of thousands of common

shares[2] in the company. Bronstein and Wilks made misrepresentations to investors, in breach of their fiduciary duties to Tyson 2.0, to divert funds from Tyson 2.0 to themselves. Indeed, Bronstein and Wilks knew that hundreds of thousands of shares of the Series A stock remained and were sold in the primary sale at a valuation of about $80 million, but they knowingly and intentionally misrepresented to investors that Series A was oversubscribed and that the company's valuation was in excess of $120 million. As a result of these misstatements, they were able to sell their Tyson 2.0 shares to those investors for profits in excess of $1.5 million. When certain individuals close to Bronstein began to take note of his conduct, he took measures to silence their criticism, including by using Tyson 2.0's funds to provide paychecks so the critics could hold so-called "ghost jobs" at Tyson 2.0; these pseudo-jobs allowed Bronstein's would-be critics to collect a paycheck from Tyson 2.0 without the expectation that they perform any work.

6. The Bronstein Enterprise did not end at Tyson 2.0: In breach of several separation agreements entered into when Tyson 2.0 fired Bronstein for cause, and fired Cosby alongside of him, and using trade secrets stolen from Tyson 2.0, the Bronstein Enterprise recently moved on to two new ventures, RAHM and Real American Freestyle ("RAF"), where they have raised more than $20 million from unsuspecting investors. Plaintiffs bring this action to expose their criminal conduct and seek damages, legal fees, and costs in excess of $50 million.

---

[2] Although Bronstein, Wilks, and Cosby all caused Tyson 2.0 to issue shares to them for very little consideration, they failed to pay even that small amount. Because the validity of the shares hinged on payment, the shares they purportedly own were and remain invalid.

## PARTIES

### Plaintiffs

7. Plaintiff MICHAEL TYSON is a professional boxer and the current chief executive officer of Tyson 2.0. Tyson is domiciled in Palm Beach County, Florida.

8. Plaintiff RICHARD FLIEHR is a former professional wrestler. On information and belief, Ric Flair is domiciled in Hillsborough County, Florida.

9. Plaintiff TYSON 2.0 INC. (f/k/a CARMA HoldCo, Inc.) is a corporation organized and operating under the laws of Delaware. During the relevant time period, Tyson 2.0 maintained its principal places of business in Cook County, Illinois and in Clark County, Nevada.

10. Plaintiff LGNDS LLC is a limited liability company organized and operating under the laws of Wyoming. LGNDS has one member who is domiciled in Broward County, Florida.

### Defendants

11. Defendant CHAD BRONSTEIN is the former president and chairman of Tyson 2.0 and is now the president of RAHM and the chief executive officer of RAF. During the relevant time period, Bronstein was domiciled in Cook County, Illinois.

12. Defendant ADAM WILKS is the former chief executive officer and vice chairman of the board of Tyson 2.0. Wilks is domiciled in Clark County, Nevada.

13. Defendant NICOLE COSBY is the former chief legal and licensing officer of Tyson 2.0 and is now the general counsel of both RAHM and RAF. Cosby is domiciled in Washington, D.C.

14. Defendant JAMES CASE was issued shares in Tyson 2.0 and is now the senior vice president of partnerships of RAHM. On information and belief, Case is domiciled in Palm Beach County, Florida.

15. Defendant CHRISTOPHER VOLO is the former head of talent manager of Tyson 2.0. Volo is now the chief of staff for wrestling league RAF. On information and belief, Volo is domiciled in Hillsborough County, Florida.

**JURISDICTION AND VENUE**

16. Plaintiffs bring their claims under the laws of the United States and the state of Illinois. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs have raised a question of federal law under 18 U.S.C. §§ 1962(c)–(d) and 15 U.S.C. § 78j. This Court additionally has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

17. This Court has personal jurisdiction over Defendant Bronstein because, at the time the alleged events took place, Defendant Bronstein purposefully availed himself of the forum state by participating in the formation of Tyson 2.0 and establishing Tyson 2.0's principal place of business in Chicago, Illinois, as well as by serving as the chairman of the board and president of Tyson 2.0. Defendant Bronstein has sufficient minimum contacts with the forum state.

18. This Court has personal jurisdiction over Defendant Wilks because, at the time the alleged events took place, Defendant Wilks purposefully availed himself of the forum state by accepting a position as chief executive officer of Tyson 2.0, which had its principal place of business in Chicago, Illinois. Defendant Wilks has sufficient minimum contacts with the forum state.

19. This Court has personal jurisdiction over Defendant Cosby because, at the time the alleged events took place, Defendant Cosby purposefully availed herself of the forum state by serving as a member of the Tyson 2.0 board, and later as the chief legal and licensing officer of Tyson 2.0, which has its principal place of business in Chicago, Illinois. Defendant Cosby has sufficient minimum contacts with the forum state.

20. This Court has personal jurisdiction over Defendant Case because, at the time the alleged events took place, Defendant Case purposefully availed himself of the forum state by soliciting and accepting shares in Tyson 2.0, which had its principal place of business in Chicago, Illinois. Defendant Case also participated in the execution of an extortion scheme in Chicago, Illinois by introducing Plaintiff LGNDS and Defendant Bronstein at a restaurant in the West Loop neighborhood of Chicago, and re-introducing them in April 2022 at Tyson 2.0's former office, which was located at 433 West Van Buren Street, Chicago, IL 60605. Defendant Case has sufficient minimum contacts with the forum state.

21. This Court has personal jurisdiction over Defendant Volo because, at the time the alleged events took place, Defendant Volo purposefully availed himself of the forum state by accepting an employment position with Tyson 2.0, which has its principal place of business in Chicago, Illinois. Defendant Volo has sufficient minimum contacts with the forum state.

22. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2)–(3) because Defendants are subject to this Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

23. As detailed below, Defendants Bronstein, Wilks, Cosby, Case, and Volo through a fraudulent association-in-fact enterprise, the Bronstein Enterprise, formed for the purpose of

defrauding dozens of investors, celebrities, and business partners, have stolen or converted millions of dollars to which they were not entitled.

## I. Bronstein's Past Business Endeavors and Misconduct

24. Defendant Bronstein's fraudulent conduct did not begin with his time at Tyson 2.0. For years leading up to when Tyson 2.0 was founded, Bronstein moved from company to company, misusing and abusing company funds to his own benefit. During those years, Bronstein worked to create a close circle of business relationships who could help him further his misuse of company funds, including Defendants Cosby and Wilks. Bronstein used these connections, along with his existing friendship with Defendant Case, to perpetrate fraud and engage in self-dealing.

25. When communicating with the Bronstein Enterprise, Bronstein had a longstanding practice of ensuring that most conversations which evidenced potential fraud took place over the phone, rather than in email, text, or another form of writing.

26. In September 2019, Bronstein launched marketing technology company Fyllo[3] alongside his co-founders (collectively, the "Fyllo Executive Team").

27. The Fyllo Executive Team named Bronstein as the chief executive officer of Fyllo.

28. Fyllo is a marketing technology company that primarily provides digital marketing, data, and compliance services to businesses in highly regulated industries, including the cannabis industry.

---

[3] Fyllo was registered under Casters Holdings, LLC by Bronstein on August 21, 2020, and the company is still operating under the name of Fyllo.

### a. Unauthorized Conduct on the Board of Fyllo

29. At Fyllo's inception, Defendant Bronstein and others on the Fyllo Executive Team raised approximately $18 million in funding from the sale of securities to investors.

30. Bronstein caused Fyllo to issue a large volume of "founder shares" to himself and fellow enterprise members and associates, as well as to other Fyllo co-founders.

31. In or around 2019, Bronstein hired Defendant Cosby as the chief compliance and data officer.

32. Defendant Wilks was a significant investor in Fyllo.

33. Bronstein caused the company to issue shares in Fyllo to his longtime associate and Bronstein Enterprise member Defendant Case, despite Case's lack of involvement at Fyllo.

34. Bronstein and Case demanded that one of the co-founders of Fyllo give Case, free of charge, a large number of "founder shares," totaling tens of thousands of dollars in value. This demand was not to provide Case with compensation for any services rendered to Fyllo. Instead, it was done for the benefit of the Bronstein Enterprise.

35. Bronstein personally issued himself a check for approximately $750,000 from the initially raised $18 million in funding without prior approval from the Fyllo Executive Team.

36. Bronstein separately communicated with outside investors to raise additional capital—approximately $120 million between 2019 and 2021.

37. Fyllo's fundraising successes begot further capital raises and the company showed early signs of success. And so, Fyllo became a national competitor in the marketing space for highly regulated industries.

38. Instead of continuing to foster the company's growth, Bronstein leveraged his work of securing investors to engage in what would soon become a long pattern of misconduct and fraud.

39. Bronstein used company funds for his own personal expenses and professional advancement, as well as to court various celebrity connections.

40. For example, in or around 2020, Bronstein utilized company funds to remodel his home office without company approval. Bronstein misappropriated tens of thousands of dollars' worth of company funds to finance this project.

41. In late 2020 or early 2021, Bronstein used company funds to purchase a watch for Los Angeles Rams Head Coach Sean McVay ("McVay"). Unbeknownst to McVay, this purchase was completed without company approval. Bronstein misappropriated approximately $15,000 worth of company funds to purchase the watch.

42. Bronstein misused company funds for the purpose of securing a personal relationship with McVay.

43. Bronstein intentionally concealed this purchase from the board, so as to conceal the unlawful nature of the transaction.

44. In or around 2021, Fyllo's then chief financial officer became aware that Bronstein had misappropriated Fyllo funds for his home office renovation and for the watch. Bronstein subsequently induced the other members of the Fyllo Executive Team to oust the chief financial officer, so as to divert attention from his misuse of company funds.

45. From its inception in 2019 to the end of Bronstein's tenure in 2023, Fyllo had four chief financial officers (or an analogous role with a different title). On information and belief, each time the sitting chief financial officer would raise suspicion or attempt to investigate Bronstein's lavish

expenses, Bronstein, with the assistance of Cosby and other members and associates of the Bronstein Enterprise, worked together to terminate and replace that chief financial officer with someone who Bronstein hoped would be more pliant.

46. Bronstein further misappropriated company assets for his own personal gain, including awarding himself lucrative compensation. For example, Bronstein single-handedly decided that his total compensation was nearly $1 million per year, knowing that the associates and members of the Bronstein Enterprise that he had placed in positions at Fyllo would turn a blind eye to his use of company funds to pay said compensation.

47. On November 19, 2023, two days after he was fired for cause from Tyson 2.0, the Fyllo Executive Board formally requested Bronstein's resignation.

**b. Unauthorized Conduct on the Board of Wesana**

48. In 2020, Bronstein and a former professional hockey player Daniel Carcillo ("Carcillo") worked together to found Wesana Health ("Wesana").

49. Wesana was a life-sciences company that focused on securing Food and Drug Administration ("FDA") approval for proprietary psychedelic-assisted neurological therapy.

50. Bronstein raised capital for Wesana by leveraging the same network of outside investors as he had for Fyllo.

51. Once again, Bronstein and the Bronstein Enterprise worked together to leverage Bronstein's work of securing investors to engage in a continuing pattern of misconduct and fraud at Wesana.

52. On information and belief, like Fyllo, Defendant Wilks was a significant early investor in Wesana.

53. Bronstein brought Cosby over from Fyllo and caused the company to install her as a board member and hire her as an advisor at Wesana, and on information and belief Bronstein caused the company to issue "founder shares" to Cosby and other members of the Bronstein Enterprise.

54. While at Wesana, Bronstein regularly misappropriated company funds to finance endeavors and projects that were outside of the scope of the company's mission and not in line with investor expectations.

55. In November 2023, after Bronstein's series of both fraudulent and imprudent financial decisions, Carcillo launched an internal investigation to uncover Bronstein's history of misconduct. The investigation revealed that Bronstein had consistently taken actions that devalued the company for his own benefit.

56. Bronstein was removed from his roles at Wesana in or about 2022 or 2023.

## II. The Bronstein Enterprise Launches Tyson 2.0 and Divert Capital to Themselves

57. In 2021, Defendant Bronstein, Defendant Wilks, [redacted] ("Whistleblower A")[4] and other members and associates of the Bronstein Enterprise, along with Plaintiff Tyson (collectively, the "Tyson 2.0 Executive Team") co-founded CARMA HoldCo, Inc., now known as Tyson 2.0 Inc. Tyson 2.0 is engaged in the business of creating, acquiring, developing, licensing, and distributing various intellectual property assets and has worked with several

---

[4] Plaintiffs have disclosed Whistleblower A's identity to the counsel for the Defendants, but based on Whistleblower A's reasonable fear of economic-based retaliation by members and associates of the Bronstein Enterprise, Plaintiffs have anonymized Whistleblower A's name throughout this Second Amended Complaint.

celebrities to license their names and likenesses to a variety of other companies for use on their products.

58. As Tyson 2.0 began raising capital to support its growth and operation, Bronstein, Wilks, and other members of the Bronstein Enterprise diverted shares of Tyson 2.0 stock to themselves, including by inducing Tyson 2.0 to acquire Ric Flair Drip, Inc.

**a. Tyson 2.0's Inception and Founder Shares**

59. From the company's inception, Bronstein was the chairman of the Tyson 2.0 board, and he became Tyson 2.0's president shortly thereafter as well.

60. While Whistleblower A was a co-founder of Tyson 2.0 and at different times held various roles at the company, Whistleblower A was referred to by Bronstein, Wilks and other members of the Bronstein Enterprise pejoratively as "Bronstein's Assistant," because Whistleblower A's primary responsibility at Tyson 2.0 was to carry out Bronstein's directives.

61. Shortly following the company's inception, Wilks was hired as Tyson 2.0's chief executive officer.

62. Bronstein caused Tyson 2.0 to bring on Cosby to various roles at Tyson 2.0. From around the company's inception until June 8, 2022, Cosby was a member of the Tyson 2.0 board. On or about June 8, 2022, Tyson 2.0 and Cosby entered into an executive employment agreement to hire Cosby as the chief legal and licensing officer, reporting to Bronstein.

63. Bronstein and other members of the Enterprise caused 50% of Tyson 2.0's initial common stock ownership to be granted to investors in an earlier, unrelated Tyson venture, and they caused the remaining 50% of common stock to be granted to the founders of Tyson 2.0.

64. On October 7, 2021, Cosby received 75,000 founder shares of Tyson 2.0 common stock as a reward, and a condition, of her future compliance with the Bronstein Enterprise.

65. In or about 2021, Bronstein induced Kirk Tovey ("Tovey"), a creditor to the prior Tyson venture, to enter into a secondary sale to purchase Bronstein's "founder shares" in Fyllo for $4 million. This secondary sale far exceeded the 10% limitation of secondary stocks that an executive was permitted to sell at Fyllo.

66. Bronstein conditioned the issuance of Tyson 2.0 stock to Tovey, as an investor in the prior Tyson venture, on Tovey's purchase of Bronstein's shares in Fyllo.

67. Fearing that Bronstein would follow through on his threat to block Tovey from having his shares from the prior Tyson venture converted to Tyson 2.0 shares, Tovey purchased Bronstein's "founder shares" in Fyllo for approximately $4 million.

68. The secondary sale was motivated solely by Bronstein's own interests. The sale did nothing to benefit Tyson 2.0, and instead, on information and belief, the proceeds from the secondary sale went to Bronstein personally.

69. Bronstein and Wilks, with the assistance of other members and associates of the Bronstein Enterprise, and with the assistance of Whistleblower A who acted at their direction, raised the remaining capital of approximately $14 million from various investors.

70. Instead of continuing to foster the company's growth, Bronstein and other members and associates of the Bronstein Enterprise leveraged Bronstein's work of securing investors to engage in misconduct, fraud, and repeated extortion and other abuses to harm the company's celebrity and licensing partners.

**b. Creation and Acquisition of Ric Flair Drip, Inc.**

71. In early 2022, Defendant Bronstein and Plaintiff Flair met because their boats were in neighboring slips in Tampa, Florida.

72. Spotting an opportunity for grift, Bronstein asked Flair whether he owned the rights to license his collective intellectual property. Flair confirmed that he did.

73. Bronstein proposed to Flair that he enter into a business arrangement with Bronstein and Defendant Wilks to license said intellectual property.

74. Flair agreed to building a licensing arrangement in principle, and trusting Bronstein and Wilks, allowed them to undergo what he believed was Tyson 2.0's common legal practice.

75. In April 2022, Bronstein and Wilks quickly worked to incorporate a new entity, called Ric Flair Drip, Inc., which was created as a joint venture to do business with Flair.

76. Bronstein and Wilks caused themselves to be the sole board members of the company.

77. On April 18, 2022, Bronstein, in his capacity as CEO of Ric Flair Drip, Inc., signed his own employment agreement for Ric Flair Drip, Inc., the only such employment agreement for the company.

78. It was common practice when doing business with celebrities for Tyson 2.0 to be given equity in the joint venture. But this time, instead of Tyson 2.0 acquiring (or obtaining) the equity, and unbeknownst to Flair, Bronstein diverted ownership to himself and others, including members of the Bronstein Enterprise, namely 16% of Ric Flair Drip, Inc. to Bronstein personally, 16% to Wilks, and 16% to Whistleblower A.

79. Using their newly created interests in Flair's intellectual property, Bronstein and Wilks began looking to cash in.

80. Bronstein and Wilks caused Tyson 2.0 to purchase a 30% interest in Ric Flair Drip, Inc., making Tyson 2.0 a minority shareholder of Ric Flair Drip, Inc.

81. Flair did not know about this transaction.

82. Seeing their subterfuge had gone unnoticed, Bronstein and Wilks decided to stretch their self-dealing to the limit for the benefit of the Bronstein Enterprise. Bronstein and Wilks used Tyson 2.0 to buy the remaining 70% interest in Ric Flair Drip, Inc. in exchange for more than 880,000 of Tyson 2.0 common shares.

83. Tyson 2.0 completed the purchase of Ric Flair Drip, Inc. on September 6, 2022. This time, instead of purchasing Ric Flair Drip, Inc. for cash, Tyson 2.0 sold the owners of Ric Flair Drip, Inc. interests in Tyson 2.0 itself, in the form of equity.

84. Bronstein and Wilks agreed that they would misrepresent Ric Flair Drip, Inc.'s value as $10 million—a valuation that Bronstein and Wilks knowingly fabricated without conducting any due diligence, and did so in complete disregard of the company holding negative assets. Bronstein personally authorized the transaction, signing on behalf of both Ric Flair Drip, Inc., as its CEO, and Tyson 2.0, as its president.

85. On August 4, 2022, Whistleblower A, at the direction of Bronstein and Wilks, sent an email to the Tyson 2.0 finance team and outside counsel stating that Ric Flair Drip, Inc. had a valuation of $10 million.

86. That email echoed the statements that Bronstein and Wilks made in or about August 2022 during a phone call with other Tyson 2.0 board members, who did not have any equity in Ric Flair Drip, Inc.

87. Soon after the acquisition of Ric Flair Drip, Inc., in or about September 2022, during an internal company meeting, the Tyson 2.0 finance team asked Bronstein for authority to conduct a financial audit of, among other things, the value of Ric Flair Drip, Inc. but Bronstein determined that a financial audit was unnecessary.

88. On November 1, 2022, Bronstein directed Whistleblower A to email an external accounting firm, copying Bronstein to the email, stating that the Ric Flair Drip, Inc. valuation was $10 million. When the accounting firm asked how those numbers were derived, Whistleblower A, again under the direction of Bronstein, avoided the question and provided other information instead.

89. Bronstein and Wilks, each as 16% owners of Ric Flair Drip, Inc., functionally reassigned themselves an extra interest in Tyson 2.0 through this purchase. The chart below illustrates the impact that the purchase had on the parties' equity in Tyson 2.0.

| | Ric Flair Drip Shares | Ric Flair Drip Equity (Percentage) | Tyson 2.0 Shares Gained from Purchase of Ric Flair Drip | Gained Equity in Tyson 2.0 from Sale of Ric Flair Drip (Percentage) |
|---|---|---|---|---|
| *Plaintiff* Ric Flair | 1,600,000 | 48% | 422,554 | 3.19% |
| *Defendant* Chad Bronstein | 533,333 | 16% | 140,851 | 1.06% |
| *Defendant* Adam Wilks | 533,333 | 16% | 140,851 | 1.06% |

90. Bronstein and Wilks justified this self-dealing as simply right-sizing their ownership of Tyson 2.0, as they felt they deserved compensation above what was approved by the board of

directors. Rather than accomplish this goal by a non-fraudulent mechanism, Bronstein and Wilks executed this scheme.

91. As a result of Bronstein and Wilks' self-dealing and fraudulent conduct, Tyson 2.0 to lose their full investment and acquire a worthless company, causing monetary damage to Tyson 2.0.

92. Further, as a result of Bronstein and Wilks' self-dealing and fraudulent conduct, Tyson 2.0 paid an exaggerated price for their acquisition of Ric Flair Drip, Inc., causing monetary damage to Tyson 2.0.

93. Eventually, Tyson 2.0 needed to write off $3.8 million in their financial statements because Tyson 2.0 had overpaid for Ric Flair Drip, Inc., to the benefit of Bronstein, Wilks, and other members of the Bronstein Enterprise.

**c. Diverted Tyson 2.0 Shares During Series A Fundraising**

94. In May 2022, Tyson 2.0 began raising capital for its Series A-1 round. The purpose of the round was to secure investors and funds for Tyson 2.0. However, Defendant Bronstein and Defendant Wilks would proceed to abuse the system, diverting investments to sell their personal shares on the secondary market at inflated prices for massive profits.

95. As part of the Series A-1 round, common shares were sold at $6.27 each based on company valuations.

96. The Series A-1 round would last until October 31, 2022.

97. During the selling period of Series A, Whistleblower A, under the direction and approval of Bronstein and Wilks, falsely told investors and potential investors that Series A was oversubscribed, in order to induce the investors to purchase secondary common shares from

primary purchasers. Instead of purchasing part of the many available Series A shares, Bronstein and Wilks, through Whistleblower A, led investors to believe they should purchase common shares. In doing so, Bronstein and Wilks diverted potential Series A investments to their own pockets, benefitting the Bronstein Enterprise as opposed to Tyson 2.0.

98. On October 8, 2022, Wilks and Bronstein each entered into separate secondary common stock purchase agreements with Longo for 77,894 common shares in Tyson 2.0.

99. Under the terms of each agreement, Longo purchased the shares for $9.63 each.

100. Bronstein and Wilks each personally received $750,000 from these sales to Longo.

101. Bronstein and Wilks directed Whistleblower A to send emails including several misrepresentations to Longo regarding the Series A shares.

102. Specifically, on September 16, 2022, Whistleblower A, acting under the direction of Bronstein and Wilks, sent an email copying Bronstein and Wilks which misrepresented to Longo that Longo was taking part in an oversubscribed special offer where particular approved individuals had the opportunity to buy shares from the founders of Tyson 2.0. In that same email, Whistleblower A, again under the direction of Bronstein and Wilks, further misrepresented to Longo that he was being offered the shares at a discount, from about $12 per share to $9.63 per share. Whistleblower A stated in the email that Bronstein and Wilks had notified him and others at Tyson 2.0 that they were "extending that courtesy discount valuation."[5]

[5] Longo would have found this information credible since a few months earlier, Bronstein did a media blitz flaunting a closed, oversubscribed, $9 million Series A financing round. Brian Roberts, *Mike Tyson, Chad Bronstein Raise $9 Million Series A for Tyson 2.0*, Forbes (June 30, 2022), https://www.forbes.com/sites/brianroberts/2022/06/30/mike-tyson-chad-bronstein-raise-9-million-series-a-for-tyson-20/.

103. At the time that the September 16, 2022 email was sent to Longo per Bronstein and Wilks' direction, Bronstein and Wilks were both aware that the true valuation of the stock was $0.04 per share.

104. The Series A Amended Stock Purchase Agreement stated that the company would sell an available $12 million worth of shares to investors, with a closing date of October 31, 2022. At the time that Bronstein and Wilks sold to Longo, there were millions of dollars in available Series A shares remaining.

105. Bronstein and Wilks sold to others on the secondary market at the inflated price of $9.63 per share.

106. On the same date, October 8, 2022, Bronstein also entered into a secondary common stock purchase agreement with RSN LLC for 10,385 common shares in Tyson 2.0.

107. Bronstein sold at the same inflated price: $9.63 per share, for a profit of approximately $100,000.

108. Bronstein and Wilks similarly directed Whistleblower A to make misrepresentations regarding the value of the shares and the availability of preferred Series A-1 shares to RSN LLC. In total, Bronstein and Wilks personally received approximately $1.6 million from these fraudulent secondary market transactions, to the detriment of both Tyson 2.0 and the investors.

109. Bronstein and Wilks diverted investments in Tyson 2.0 to themselves, creating inflated secondary sales from which they made massive profits.

### III. Defendants' Unauthorized Conduct on the Tyson 2.0 Board

110. Defendant Bronstein engaged in multiple forms of unauthorized conduct while on the Board of Directors at Tyson 2.0, which benefitted him while paving the way for, and requiring the cooperation of, others in the Bronstein Enterprise. This included large bonuses that Bronstein approved for himself, purported travel and entertainment expenses including installing a private home theater using Tyson 2.0's funds, using licensing agreements as leverage for extortion, and, when his conduct started to gain negative attention from others, creating pseudo-jobs to silence any further potential criticism.

111. Bronstein further entered into several sponsorship agreements to line his own pockets using Tyson 2.0's company funds.

112. Finally, Bronstein partook in granting licensing agreements for intellectual property that he did not have the rights to.

113. Defendant Wilks, learning from Bronstein, also engaged in multiple forms of unauthorized conduct while on the board of directors at Tyson 2.0. Wilks entered several business ventures with other companies through Tyson 2.0 which worked to his own benefit, particularly by allowing him to covertly receive equity and leverage his board positions in those other companies.

114. Additionally, like Bronstein, Wilks, engaged in granting licensing agreements for intellectual property that he did not have the rights to, and deliberately withheld information regarding several licensing agreements to the detriment of Tyson, Tyson 2.0, Flair, and LGNDS. Bronstein and Wilks were enabled in this endeavor by Cosby, the chief legal and licensing officer, who would frequently draft the fraudulent agreements.

**a. Defendant Bronstein's Self-Approved Overcompensation**

115. On or about May 1, 2022, Plaintiff Tyson 2.0 and Defendant Bronstein entered into an Executive Employment Agreement to hire Bronstein as the president and chairman of the Board of Directors.

116. According to his Executive Employment Agreement, Bronstein was entitled to earn $350,000 annually. He was also eligible to earn a discretionary bonus of up to $350,000 per fiscal year. The Agreement specified that the maximum bonus should be prorated for any partial fiscal year of employment.

117. Bronstein was employed as president and chairman of the board of directors from May 1, 2022 to November 24, 2023.

118. During this time, Bronstein received over $900,000 in total bonuses. Bronstein himself approved and paid each bonus he was granted. This was well over $250,000 more than the maximum amount of bonus compensation that he was eligible to earn on a discretionary basis. Bronstein abused his status as president and chairman of the board of directors to approve and pay himself unauthorized bonuses.

119. For example, on May 9, 2022, Bronstein unilaterally approved an additional $100,000 bonus for himself, on top of his annual bonus.

120. On July 27, 2022, Bronstein unilaterally approved an additional $50,000 bonus for himself, on top of his annual bonus.

121. On November 21, 2022, Bronstein unilaterally approved an additional $65,625 bonus for himself, on top of his annual bonus.

122. On January 20, 2023, Bronstein unilaterally approved an additional $87,500 bonus for himself, on top of his annual bonus.

**b. Defendant Bronstein's Unauthorized Expenses**

123. Bronstein's fraudulent self-overcompensation did not end with his bonuses. Indeed, Bronstein built a system of receiving reimbursements for expenses to which he was not actually entitled, often with the help of the Bronstein Enterprise.

124. Between 2022 and 2023, Bronstein expensed in excess of $610,000 in travel and entertainment spending with inadequate or missing receipts.

125. Dating back to his first executive role, Bronstein would instruct his longtime administrative assistant, Amy Pettigrew ("Pettigrew"), to submit reimbursement requests using the same fraudulent pattern: Bronstein would provide his assistant a receipt, instruct her to select a name at random from a list of board members, investors, business partners, and clients of whichever company employed him at the time, and assert that he had spent the funds in an approved way to entertain whichever random name was selected. In fact, Bronstein was spending these funds on himself, with no connection to a board member or client.

126. On information and belief, Bronstein's assistant followed Bronstein each time he moved companies, and continued the practice of fraudulent expense reimbursements at Bronstein's direction, including while he was employed at Fyllo, Wesana, and Tyson 2.0.

127. Bronstein's reimbursements were often outlandish. He spent $11,339.00 to pay the interest on his personal credit card bills. He spent $2,796.30 on an unspecified bill at luxury store Gucci. He spent $6,364.00 on a theater system for his home in Tampa. He spent at least

$7,926.84 on docking fees at marinas used for his private boat. In 2023, he spent $38,519.63 on private jets.

128. Bronstein expensed tens of thousands of dollars at different restaurants, oftentimes spending in excess of $1,000 on a single meal, despite a company policy limiting work-lunch reimbursement to $25 per person per occasion (or $50 per person per occasion, should a client join).

129. Bronstein used his role as president to approve his own fraudulent expenses, many of which were mislabeled to conceal his misuse of company funds.

130. On August 5, 2022, Whistleblower A—who was referred to by both Bronstein and Wilks as "Bronstein's assistant" and acted at their direction before eventually reporting their misuse of company funds to a major shareholder—knowingly assisted Bronstein in self-approving a laundry list of fraudulent reimbursements via wire transmission, including "hotel expenses," with Tyson 2.0's finance department.

131. However, those hotel expenses were falsely labeled to appear as legitimate business expenses, when in reality, they were personal boating expenses:

- Bronstein "Approved" a $1,827.50 reimbursement for the "Tampa Water Street Hotel" on "6/20 & 7/27." Bronstein did not actually stay at the Tampa Water Street Hotel on these nights. These were boating fees, and Whistleblower A knew as much.

132. Within that list of reimbursements, Bronstein self-approved reimbursements, which were plane tickets for Bronstein's wife and child:

- Bronstein self-approved a $460.00 reimbursement for his son, Chase Bronstein, to fly from Nashville, Tennessee to Chicago, Illinois.

- Bronstein self-approved a $460.00 reimbursement for his wife, Selina Bronstein, to fly from Nashville, Tennessee to Chicago, Illinois.

133. On one occasion in late 2021 or early 2022, Bronstein submitted a reimbursement request for his prior purchase of two luxury suitcases. When a Tyson 2.0 accountant asked why Bronstein was seeking reimbursement for the luxury suitcases, Bronstein misrepresented that he had purchased the luggage for Flair and Tyson.

134. Bronstein threatened to fire the accountant, stating that he had fired Fyllo's chief financial officer for the same thing: questioning reimbursements.

135. Frequently, instead of asking his assistant to expense a certain receipt, Bronstein would simply not submit a receipt at all, and demand reimbursements be paid to him on his word alone.

136. Bronstein's behavior did not go unnoticed. Any time Tyson 2.0's legal or finance teams raised questions regarding Bronstein's spending, Bronstein would circumvent Tyson 2.0's internal systems and would unilaterally approve the expenses himself, often with the help of Bronstein Enterprise members like Pettigrew and Whistleblower A.

**c. Defendant Bronstein's Extortionate Conduct**

137. On information and belief, Bronstein often sought to leverage business relationships for kickbacks or lavish gifts for him and his friends.

138. For example, in April 2022, as a precursor to doing business with Tyson 2.0, Bronstein and Case conspired together, and subsequently demanded that the CEO of LGNDS, Sozon Lyras ("Lyras"), transfer 10% of the equity in LGNDS to Case.

139. Bronstein and Case did not have the legal right to do so—Case did not provide anything to LGNDS in return. This exchange of equity also had nothing to do with LGNDS' contract with Tyson 2.0.

140. Instead, Bronstein solicited Lyras' consent through fear. Bronstein knew that LGNDS' entire business model, and the prosperity thereof, relied on the licensing contracts between LGNDS and Tyson 2.0.

141. Bronstein, knowing that LGNDS would ultimately fail without those contracts, threatened to retract all of the licensing agreements unless Lyras transferred the equity stake to Case.

142. In fear of facing economic consequences, LGNDS' CEO agreed and transferred the 10% equity to Case.

143. LGNDS' CEO would not have given equity to Case, but for his fear of economic harm to the business.

144. After LGNDS and Tyson 2.0 entered into the licensing agreement for the Tyson 2.0 trademarks, Lyras entered into multiple sub-licensing agreements with a third-party company called J Brands.

145. Soon after, Bronstein approached Lyras in the Summer of 2023.

146. This time, Bronstein demanded that Lyras purchase him a $48,000 Gold Rolex Day-Date. Again, knowing that LGNDS' entire economic model would collapse without its licensing contracts, Bronstein threatened to cancel the licensing contracts between LGNDS and Tyson 2.0 unless Lyras purchased the luxury watch.

147. Feeling compelled to preserve the third-party company contracts and his entire business model, Lyras had no choice but to acquiesce to Bronstein's outlandish and contractually invalid demand, and purchased the watch for Bronstein. Lyras delivered the $48,000 Gold Rolex to Bronstein at a conference in Miami, Florida in or about June 2023.

**d. Defendant Bronstein's Use of Ghost Positions on Tyson 2.0 Payroll to Silence Critics**

148. Bronstein's misuse of company funds for personal benefit did not end at his excessive and fraudulent reimbursement practices and personal expenditures.

149. In 2022, Bronstein's Wesana business associate Carcillo became aware of Bronstein's aforementioned misconduct at Wesana.

150. Carcillo was very upset that Bronstein had defrauded him and other Wesana shareholders.

151. In response, Bronstein, with the help of Whistleblower A, offered Carcillo an advisory position at Tyson 2.0, where Carcillo was paid approximately $100,000 annually. Despite this salary, Carcillo was not required to complete any work. The parameters for his employment were devoid of any responsibility, task, or routine expectation. In essence, his job was a ghost job.

152. Bronstein used company funds to appease Carcillo, understanding that his payment of a salary would convince him to stop telling people about Bronstein's, and the Bronstein Enterprise's, misdeeds at Wesana. Carcillo's position was, functionally, a bribe. This bribe benefitted just the Bronstein Enterprise, but was paid for by Tyson 2.0.

153. On information and belief, Defendant Wilks took a similar approach in negotiating with an executive at the Cannabist Company, a licensed multistate operator in the cannabis space

and a former licensee partner of Tyson 2.0. Shortly prior to his termination, Wilks and the Cannabist Company executive (who was also Wilks' personal friend) had come to an agreement that the Cannabist Company executive would expand its license of Ric Flair Drip, Inc. to additional markets on the condition that Wilks pay the executive's wife $5,000 per month.

**e. Defendant Bronstein's Unauthorized Contractual Agreements**

154. In 2021, Bronstein became the agent for the well-known UFC fighter Julianna Peña bringing Bronstein into contact with a number of other celebrities, including other UFC fighters.

155. In an effort to continue a personal business relationship with Peña, and the celebrity circles she gave him access to, Bronstein began using Tyson 2.0's company funds to sponsor Peña in a variety of public-facing matters.

156. These sponsorship agreements were not beneficial to Tyson 2.0, but they financially benefitted Bronstein. As Peña's agent, he would personally receive a portion of the sponsorship funds.

157. Many of the sponsorship opportunities Tyson 2.0 engaged in as they related to Peña were outside Tyson 2.0's scope and vision as a company—Bronstein was instead motivated by the idea that the overzealous sponsorship of Peña would cement his position in her circle, further expanding his personal business access to celebrity fighters.

158. On November 24, 2023, the Tyson 2.0 Executive Team formally requested, and Bronstein subsequently submitted, his resignation from Tyson 2.0.

159. To this day, and even after Bronstein left employment with Tyson 2.0, Peña continues to be sponsored nearly exclusively by companies associated with Bronstein.

**f. Defendant Wilks' Unauthorized Conduct Following Bronstein's Departure**

160. After Bronstein and Cosby's departure from Tyson 2.0, Wilks became the sole remaining officer as Tyson 2.0's CEO, treasurer, and secretary. From November 2023 until his termination, Wilks was acting as Tyson 2.0's CEO.

161. In his position of unchecked authority, Wilks followed Bronstein's patterns of fraud and self-dealing. Acting in these three positions at once, as well as his role on the board of directors, Wilks consolidated significant power to carry out his schemes.

162. Wilks followed similar patterns to Bronstein, including routinely using company funds for personal expenditures. For example, Wilks once used Tyson 2.0 funds to pay his mortgage in the amount of $3,000.

163. Additionally, Defendant Wilks withheld material information relating to several business ventures so that he could gain equity and favorable treatment from the companies involved in those ventures, to the detriment of Plaintiff Tyson 2.0.

164. Wilks also accepted gifts in connection with licensing agreements between Tyson 2.0 and third parties. On information and belief, those who granted him the gifts received more favorable licensing conditions.

165. For example, in 2023, Wilks, on behalf of Tyson 2.0, was negotiating a licensing agreement for a Tyson 2.0-related coffee shop in Amsterdam. There was initially a demand that the Amsterdam coffee shop owner, Mohamed (a/k/a Mo) Bahida ("Bahida"), pay $250,000 in addition to royalties.

166. In a sudden departure from their original negotiations, Wilks demanded that Bahida gift Wilks a $50,000 Gold Rolex Day-Date, seemingly the preferred watch of Bronstein and Wilks.

167. Bahida capitulated and bought the watch for Wilks. Bahida never paid the $250,000 fee for the Tyson 2.0-related coffee shop and the parties entered the agreement for much lower royalties than initially stipulated.

168. Wilks subsequently concealed the existence of this transaction from the rest of the company, knowing that it was unlawful.

**<u>Northern Emeralds</u>**

169. Northern Emeralds is a cannabis cultivation, processing, and distribution company based in Humboldt County, California.

170. At the time of Tyson 2.0's inception, Wilks was on the Northern Emeralds board.

171. While Wilks was an executive at Tyson 2.0, he was also acting as the CEO for Captor Capital, an investor in the cannabis space, which he did not disclose to Tyson 2.0.

172. Captor Capital was an investor in Northern Emeralds and in DomPen. On information and belief, Captor Capital was owned by Wilks' father-in-law. On information and belief, Wilks used his position at Captor Capital to gain investors in Northern Emeralds and DomPen.

173. Although Wilks owed a fiduciary duty to Tyson 2.0 at that time, he leveraged Tyson 2.0's resources to benefit other companies that he was associated with.

174. In emails between Wilks and Northern Emeralds, Northern Emeralds stated that board members bringing in licensing partners would receive equity in the company.

175. Wilks knowingly employed an equity scheme at Tyson 2.0, and bound Tyson 2.0 to licensing agreements with Northern Emeralds. Wilks knew that if he were to secure a successful licensing deal that generated a minimum average of $100,000 for Northern Emeralds, then he would be granted an additional .24% in equity.

176. On August 22, 2022, Tyson 2.0 entered into a licensing and packaging purchase agreement granting Northern Emeralds the rights to market and produce Tyson 2.0 prepackaged flower, flower pre-rolls, and infused pre-rolls, referred herein as the Northern Emeralds Tyson 2.0 Agreement. Pursuant to the agreement, Northern Emeralds was to pay a royalty of 12.5% of Northern Emeralds' gross revenue on the Tyson 2.0 products.

177. On May 26, 2023, Tyson 2.0, by and through EVOL by Future, entered into a trademark license agreement with Northern Emeralds for the marketing, sale, production, and distribution of EVOL by Future cannabis products, including indoor premium flower, indoor premium pre-rolls, and Live Rosin, referred herein as the Northern Emeralds EVOL Agreement. Under the terms of the agreement, Northern Emeralds was to pay Tyson 2.0 a 15% royalty on Northern Emeralds' gross revenue of the EVOL by Future cannabis products.

178. Wilks directed Tyson 2.0 to enter into both the Tyson 2.0 agreement and the EVOL agreement with Northern Emeralds (the "Northern Emeralds Agreements").

179. Wilks received equity in Northern Emeralds in exchange for directing Tyson 2.0 to enter the Northern Emeralds Agreements.

180. Upon entering the Northern Emeralds Agreements, Northern Emeralds partnered with Kali Distribution, a now bankrupt company, to assist with the distribution of the licensed products in the Northern Emeralds Agreements.

181. From 2022 to 2025, Northern Emeralds failed to pay Tyson 2.0 more than $1.25 million pursuant to the agreement. These unpaid costs include unpaid royalties, payments to the CEO of Northern Emeralds, payments to the company for products from Kali Distribution, and loan payments for unpaid royalties.

182. When Northern Emeralds failed to pay royalties on several occasions, Wilks, through Tyson 2.0, issued promissory notes as loans to Northern Emeralds. As of the date that this complaint was filed, Northern Emeralds has not paid back an outstanding loan amount of more than $140,000.

183. In order to receive equity in Northern Emeralds, Defendant Wilks waived the payments totaling more than $1.25 million. In emails between Northern Emeralds and Wilks, Wilks told Northern Emeralds that if Wilks set aside Northern Emeralds' debt to Tyson 2.0, Wilks would receive equity in Northern Emeralds.

184. Specifically, Wilks waived more than $370,000 in royalty invoices that were issued to Kali Distribution. Wilks further provided $315,000 to Northern Emeralds' CEO and $250,000 to Northern Emeralds for additional Kali Distribution products in California.

185. Wilks never notified Tyson 2.0 that he received equity from Northern Emeralds, nor that he was a board member for Northern Emeralds. Additionally, when prompted about waiving the debt payments, Wilks deliberately withheld information about those payments and avoided answering any related questions.

186. This was not the only undisclosed board position that created a conflict of interest with Wilks' position at Tyson 2.0. On information and belief, Wilks, at all times relevant to this lawsuit, maintained a concurrent position as a member of the board of directors at DomPen.

**Mr. Charlie's**

187. Mr. Charlie's is a fast food company that serves plant-based meals. Mr. Charlie's is owned by Sona Terra Inc. ("Sona Terra"), a company based in Beverly Hills, California.

188. On October 3, 2024, Tyson 2.0 entered a subscription agreement with Sona Terra to purchase 250 shares of Sona Terra's stock for a purchase price of $750,000, referred to herein as Mr. Charlie's Subscription Agreement. Under the terms of the agreement, Tyson 2.0 would own and have the right to vote 25% of the outstanding shares of Sona Terra's stock.

189. The Mr. Charlie's Subscription Agreement also granted Tyson 2.0 the right to appoint one person to the board of directors of the company, so long as Tyson 2.0 held at least 10% of Sona Terra's stock.

190. This transaction was uncharacteristic of Tyson 2.0's usual business practice, as Tyson 2.0 typically does not engage in entering investment agreements and does not have involvement in the fast food industry.

191. Wilks directed Tyson 2.0 to enter into the Mr. Charlie's Subscription Agreement because he wanted to establish a relationship with the chief executive officer of Sona Terra, who is a successful entrepreneur and investor.

192. When Wilks was removed from Tyson 2.0, upon information and belief, his positive relationships with Mr. Charlie's that he forged using Tyson 2.0's funds ultimately landed him temporary employment at Mr. Charlie's.

**Green Success**

193. Green Success is a cannabis company based in Germany that distributes cannabis products, including Tyson 2.0 cannabis products. Defendant Wilks took advantage of a partnership with Green Success to profit personally.

194. On December 2, 2024, Wilks introduced Green Success as an investment opportunity for Tyson 2.0. In 2024, Tyson 2.0 invested 500,000 euros in Green Success in exchange for 16,500 shares in the company.

195. Wilks used Green Success in order to get kickbacks for his sister. Unbeknownst to Tyson 2.0, Wilks' sister received 5% of Tyson 2.0's investment, or 25,000 euros in equity, for Green Success.

196. Wilks told Green Success that the only way Tyson 2.0 would invest was if the company gave him personal equity in return.

197. When Tyson 2.0 discovered this, Tyson 2.0 emailed Green Success, and Green Success confirmed that Wilks' sister had received thousands of dollars in equity.

**RadarZero**

198. RadarZero is a technology and media company that operates in the gambling industry. Wilks had a relationship with a director at RadarZero, who was also involved in Captor Capital, and Wilks abused this relationship and Tyson 2.0 funds to profit himself while Tyson 2.0's investment suffered.

199. On September 1, 2024, Tyson 2.0 entered into an agreement with RadarZero to license Tyson's trademarks in connection with candles.

200. In 2024, Wilks spearheaded a partnership with RadarZero to license Tyson's trademarks in connection with a gambling game, "Mike Tyson's Crash."

201. On September 12, 2024, despite the fact that Tyson 2.0 had no experience in the gambling space, Wilks proceeded to sign a game development agreement with RadarZero.

202. Both deals were poor business decisions for Tyson 2.0 and failed to generate substantial revenue.

203. Unbeknownst to Tyson 2.0, Wilks had come to an agreement with RadarZero that if he signed the agreement, he would receive a 5% equity stake in the company. The agreement included monetary incentives for each deal he brought to RadarZero.

204. Wilks used his position at Tyson 2.0 to act in his own best interest, lining his own pockets instead of finding the best deal for Tyson 2.0.

**g. Unauthorized Over-grants of Intellectual Property**

205. Defendants Bronstein, Wilks, and Cosby also entered into several Licensing Agreements by misrepresenting the nature of their rights under the agreements to the detriment of Tyson, Tyson 2.0, Flair, and LGNDS. Bronstein and Wilks further used several of these agreements to leverage business relationships and line their own pockets with kickbacks from the unauthorized use of intellectual property owned by Tyson, Flair, Future, and Tyson 2.0.

206. Wilks, Bronstein, and Cosby entered into agreements without the approval of Tyson 2.0's other board members. Wilks, Bronstein, and Cosby falsely represented the nature and status of several of these agreements, often by withholding important information from Plaintiffs Tyson, Flair, Future, Tyson 2.0, and LGNDS.

207. Defendant Cosby drafted many of these agreements and used her legal advice and expertise to facilitate and conceal the scheme. Several of these agreements were undisclosed and executed to the detriment of Tyson, Flair, Future, Tyson 2.0, and LGNDS. Altogether, the unauthorized and undisclosed agreements were beneficial to Wilks, Bronstein, and Cosby, they were not in the best interest of Tyson 2.0, thereby causing damage to the Plaintiffs.

**Mike Tyson**

208. On October 15, 2021, Tyson, by and through Tyrannic, LLC ("Tyrannic"), entered into an exclusive License Agreement with Tyson 2.0 for various Tyson trademarks ("the Licensed Property") and licensed products, including the Tyson 2.0 licensed products. This agreement (the "Tyrannic-Tyson 2.0 Agreement") is attached as Ex. 1.[6]

209. The Tyson 2.0 licensed products originally included CBD, hemp, and cannabis and cannabis-related products. Ex. 1, Tyrannic-Tyson 2.0 Agreement. The agreement was later amended to include nicotine products, pet products, mushrooms, kava and kratom, all merchandise including Tyson 2.0 clothing, supplements, retail shops, skincare, and crash gambling games (collectively with all the amended licensed products, the "Tyson Licensed Products").

210. The Tyrannic-Tyson 2.0 Agreement grants Tyson 2.0 the right to use the trademarks only as authorized in the contract. Ex. 1, Tyrannic-Tyson 2.0 Agreement, Section 10(c)(vi).

---

[6] Plaintiffs previously moved to file exhibits under seal for their original complaint pursuant to Local Rule 26.2. Dkt. 5. The Court granted the motion to seal. Dkt. 16. Plaintiffs now file the same exhibits under seal and move to file additional information under seal.

211. Under the terms of the Tyrannic-Tyson 2.0 Agreement, Tyson 2.0 may grant sublicenses to use the Licensed Property, but it may only do so in connection with the Tyson Licensed Products. Ex. 1, Tyrannic-Tyson 2.0 Agreement, Section 3(a).

212. Importantly, however, if Tyson 2.0 uses any form of Tyson's name, likeness, or related indicia in any provision of a sublicense with a third party, Tyson 2.0 must seek Tyrannic or any Tyrannic associate's approval for that provision first. Ex. 1, Tyrannic-Tyson 2.0 Agreement, Section 5(d).

213. In total, Wilks entered into dozens of sublicenses that extended beyond the rights granted to Tyson 2.0 in the Tyrannic-Tyson 2.0 Agreement (the "unauthorized Tyson 2.0 sublicenses"). More than 30 of those sublicenses included provisions regarding the Tyson name, likeness, or related indicia, which were not approved by Tyrannic or its affiliates.

214. Wilks issued several unauthorized Tyson 2.0 sublicenses that falsely represented to the sublicensees that Tyson would make an in-person appearance or in-market visits to locations across the country. Those sublicenses contain provisions stating that Tyson will make annual personal appearances to the sublicensees' retail locations, despite Tyson never agreeing to go to these multiple locations each year. Under these unauthorized sublicenses, Tyson would be required to travel annually to states including Colorado, Maine, Mississippi, Washington, New Jersey, and the Commonwealth of Puerto Rico. This use of the Tyson Licensed Products was not authorized by the Tyrannic-Tyson 2.0 Agreement and was not approved by Tyson.

215. Wilks issued other unauthorized Tyson 2.0 sublicenses that granted licenses for products that Tyson 2.0 did not have rights to in the initial Tyrannic-Tyson 2.0 Agreement or any of its amendments. On December 31, 2021, Wilks entered into a sublicensing agreement with Essential Coolers LLC for the manufacture of mini fridges bearing the Tyson 2.0 trademark. On

June 1, 2022, Wilks, by and through Tyson 2.0 Inc., entered into a sublicensing agreement with Big League Pillows LLC, for pillow products bearing the Tyson 2.0 trademark.

216. At no point did Wilks have the rights to sublicense the Tyson 2.0 trademark for products including the pillow products or mini fridges. Yet, over the course of several years, he entered into these agreements without disclosing the agreements to Tyson 2.0 and without Tyson 2.0's authorization.

217. Similarly, Wilks falsely represented to several companies that he had the rights to issue sublicenses for Tyson 2.0 products, including retail shops, before the Tyrannic-Tyson 2.0 Agreement was amended to allow him to do so. Though Tyson 2.0 eventually did have the rights to grant licenses for Tyson 2.0 retail shops pursuant to the amendment to the Tyrannic-Tyson 2.0 Agreement on June 12, 2024, for example, Wilks entered into a licensing agreement on November 15, 2023 with PT ITS SIMPLY FLOWS, an Indonesian company, for retail cafes and coffeeshops that would sell Tyson 2.0 products.

218. Plaintiff LGNDS is a global hemp company based in Miami, Florida, which specializes in creating, licensing, and scaling nationally recognized brands.

219. Bronstein leveraged Tyson 2.0's licensing agreements with LGNDS to gain personal favors for his own benefit and the benefit of the Bronstein Enterprise and to the detriment of Tyson 2.0 and its shareholders.

220. In an effort to expand their market-reach, Case brokered an initial meeting, which resulted in an eventual partnership, between Tyson 2.0 and LGNDS. On May 10, 2022, Tyson 2.0 entered into an exclusive Trademark Licensing Agreement with LGNDS to manufacture, package, source, and supply Tyson Licensed Products. This agreement (the "LGNDS-Tyson 2.0

Agreement") is attached as Ex. 2. In exchange for the licensing rights, LGNDS paid Tyson 2.0 $1.1 million. Pursuant to the LGNDS-Tyson 2.0 Agreement, Bronstein, through Tyson 2.0, purported to grant LGNDS the rights to manufacture various types of products pursuant to the brand and trademarks—i.e., hemp products, mushroom products, nicotine products, kava products, and other merchandise, such as shirts, pants, sweaters, and footwear. The LGNDS-Tyson 2.0 Agreement was subsequently amended.

221. That same day, Bronstein granted Case a $10,000 reward via electronic mail for his role in facilitating the partnership between Tyson 2.0 and LGNDS. The day prior, Case had requested this reward by sending Whistleblower A, who resided in Illinois, his bank information.

222. As part of LGNDS' exclusive license under the terms of the LGNDS-Tyson 2.0 Agreement, LGNDS had the unique ability to sublicense the Licensed Products in the agreement. LGNDS subsequently began to produce, manufacture, and distribute various products pursuant to the LGNDS-Tyson 2.0 Agreement, such as Mike Bites and the Tyson All-In-One Vape, among other products.

223. The LGNDS-Tyson 2.0 Licensing Agreement also included a provision where Tyson 2.0—at its own expense—would protect LGNDS' branding rights to Tyson 2.0 from any and all attempts by third parties to infringe upon LGNDS' exclusive trademark. Ex. 2, LGNDS-Tyson 2.0 Agreement, § 3.8 (July 7, 2023). Wilks entered into several sublicensing agreements which breached the terms of the exclusive license with LGNDS. Specifically, Wilks entered into sublicensing agreements for Tyson 2.0 products including mushroom products and nicotine products.

224. Wilks falsely represented to LGNDS' CEO that these additional sublicense agreements were not for the Tyson Licensed Products and were therefore not in breach of the terms of the exclusive LGNDS-Tyson 2.0 Licensing Agreement.

225. For example, on September 16, 2022, Cosby, Bronstein, and Wilks, through Tyson 2.0, entered into a sublicense agreement with Green Tank, a Canadian corporation, that granted exclusive use of several Tyson trademarks for use with cartridges and disposable pens. The exclusive rights granted to the Green Tank overlapped with exclusive rights previously granted to LGNDS. The agreement was eventually terminated, causing significant financial loss to Tyson 2.0.

226. One such sublicense agreement licensed the Tyson 2.0 branding and trademarks for mushroom products, which were exclusively licensed to LGNDS, to Advanced Mycology, a company that specializes in creating and selling at-home psychedelic mushroom grow kits.

227. Advanced Mycology entered into a partnership with Tyson 2.0 to sell at-home grow kits called MIKEADELICS Tyson V3 HEAVYWEIGHT Mushroom Grow Bag ("MIKEADELICS").

228. Tyson 2.0, in conjunction with Advanced Mycology, has posted multiple advertisements for Advanced Mycology's MIKEADELICS:

a. On July 25, 2024, they posted: "The mission at @advancedmyco / @shrumgarden is to improve access to the magic of mushrooms. Partnering with @miketyson x @itstyson20 to amplify that mission is a dream come true."

b. On September 20, 2024, they posted: "Happy Ps!locyb!n Day! Check out the greatest teacher you can grow at home // The ALL NEW, all-in-one grow bag. The game has changed @advancedmyco."

c. On November 27, 2024, they posted: "We are so thankful for you! Also for our incredible partners over at @itstyson20 and our whole crew working here at @advancedmyco and @shrumgarden."

d. On February 21, 2025, they posted: "Mikeadelics: your portal to homegrown magic @advancedmyco."

229. On November 12, 2022, LGNDS entered into a sublicensing agreement (the "LGNDS Sublicense") with a distributor of Tyson 2.0 nicotine products (the "Sublicensee-Distributor"). Both the Tyrannic-Tyson 2.0 Agreement and the LGNDS Sublicense include several quality control standards that state that Tyson 2.0 must sample, sell, or otherwise dispose of the Tyson Licensed Products in a way that upholds the quality of the Licensed Property. Ex. 1, Tyrannic-Tyson 2.0 Agreement, Section 5(b); Ex. 2, LGNDS-Tyson 2.0 Agreement, Section 3.3(c).

230. In 2023, the Sublicensee-Distributor began to distribute Tyson 2.0 nicotine products that did not meet quality control standards pursuant to the LGNDS Sublicense and the Tyrannic-Tyson 2.0 Agreement.

231. The Tyson 2.0 nicotine products did not adhere to public health protections, specifically Food and Drug Administration regulations, to the detriment of the reputation of the Tyson 2.0 trademark and the Tyson Licensed Products.

232. The FDA requires nicotine products that do not have marketing orders to file a Premarket Tobacco Product Application ("PMTA"). 21 U.S.C. § 387j(b). The PMTA must provide scientific data that demonstrates a product is appropriate for the protection of public health. 21 U.S.C. § 387j(c)(2)(A).

233. Wilks communicated with the Sublicensee-Distributors, J Brands, of his own accord, and falsely represented to Tyson 2.0 that the PMTAs had been filed for the sale of the Tyson 2.0 nicotine vapes.

234. On October 21, 2024, Tyrannic's counsel inquired about the status of the PMTAs for the Tyson 2.0 nicotine products and whether the PMTAs had been registered for those products.

235. On October 21, 2024, Wilks wrote: "Confirming that our licensee has PMTA registration number for nicotine vapes."

236. When Tyrannic's counsel further pressed about the application numbers for the Tyson 2.0 nicotine product PMTAs, Wilks falsely represented that the products had application numbers, and stated that those applications had been filed in September of 2024.

237. When asked to produce a copy of the PMTA for each product, Wilks did not produce these copies and did not further elaborate on his statement that the products had application numbers.

238. On December 19, 2024, the FDA issued a letter to the sublicensee-distributors to inform them that they had failed to file PMTAs for certain Tyson 2.0 nicotine vape products in violation of public health regulations. This revealed that Wilks had made misrepresentations to Tyrannic's counsel regarding the PMTA applications and registration process.

239. Wilks further falsely represented that Tyson 2.0 nicotine products at issue had been removed from online nicotine product retail websites after those products were found to be in violation of California regulations.

240. California's "flavor ban" law restricts retailer possession, distribution, and sale of flavored tobacco products. Cal. Health & Saf. §104559.5. The flavor ban applies to products with a "cooling sensation." Cal. Health & Saf. §104559.5(a).

241. On November 12, 2024, the Tobacco Unit of the California Department of Justice issued a Notice of Determination to Mike Tyson to advise that the marketing for the Licensed Product indicated that the Licensed Product was presumptively flavored under the "flavor ban" law, which was published publicly on the California Office of the Attorney General's website.

242. Several Tyson 2.0 nicotine products were marketed as unflavored, when in fact, they were described as having the "cooling sensation" banned by California regulations.

243. The California Department of Justice mailed a copy of the Notice of Determination to Wilks.

244. Tyrannic's counsel notified Wilks that the California products should be removed from the market.

245. On March 19, 2025, Wilks falsely represented to Tyson 2.0 that he and the Sublicensee-Distributor had taken steps to ensure compliance with California law. Wilks falsely stated that the products, while still visible on the sublicensees' website, had been completely removed from California markets and were "regionally blocked."

246. On March 26, 2025, Tyrannic's counsel successfully purchased Tyson 2.0 nicotine vapes and they were successfully delivered to a California address, proving that Wilks' statements that the products were regionally blocked was untrue.

**Ric Flair Drip, Wooooo! Energy, and All Elite Wrestling**

247. In May 2022, Defendants Bronstein, Wilks, and Cosby again began a fraudulent over-grant scheme, this time against Plaintiffs Flair, Tyson 2.0, and LGNDS.

248. In a licensing agreement dated May 1, 2022, Wilks, at Bronstein's direction and with Cosby writing the agreement, entered into a contract with Flair, granting Tyson 2.0 the right to use certain "Licensed Property" in connection with "Business Operations." The agreement is attached as Ex. 3, Flair-Tyson 2.0 Agreement.

249. "Licensed Property" included licenses owned by Plaintiff Flair including "Ric Flair," "Ric Flair Drip," "Wooooo!," "Wooooo! Chews," and certain personality rights.

250. "Business Operations" included the production, sale, distribution, and advertising (among other operations) of CBD, hemp, cannabis, and cannabis-related products.

251. Bronstein, Wilks, and Cosby quickly abused this narrow licensing authority.

252. LGNDS, through its CEO, purchased the licensing rights to the Ric Flair Drip trademark for $400,000.

253. On August 2, 2022, LGNDS and Ric Flair Drip, Inc., through Bronstein, signed the Ric Flair Drip Trademark License Agreement.

254. The Ric Flair Drip Trademark License Agreement granted LGNDS the rights to manufacture various types of products pursuant to the brand and trademarks—i.e., hemp products,

mushroom products, nicotine products, kava products, smelling salts, beverages, and other merchandise, such as shirts, pants, sweaters, and footwear.

255. On July 7, 2023, acting as the middleman in the conveyance of rights, Bronstein and Wilks purported to again grant LGNDS the authority to use Flair's brand "Ric Flair Drip" in the development of hemp, mushroom, kava/kratom, tobacco, nicotine, smelling salt, clothing, and beverage products. This, relevantly, included mushroom-based energy drinks.

256. Bronstein, Wilks, and Cosby purported to grant these rights for 10 years, until July 7, 2033.

257. This purported grant of authority to LGNDS to use Flair's likeness went far beyond what Plaintiff Flair was paid for. The laundry list of licensing options that LGNDS was sold was simply not Tyson 2.0's to sell.

258. LGNDS went on to develop a mushroom-based energy drink beverage called "Wooooo! Energy," using the intellectual property, name, and likeness of Flair. LGNDS' CEO believed at this time that LGNDS was the rightful licensor of the rights related to Flair, and justifiably relied on the contractual and oral assurance of Bronstein, Wilks, and Cosby that the licenses conveyed were valid.

259. In 2023, Bronstein entered into over six sponsorship agreements, totaling a commitment exceeding $5.5 million, for Wooooo! Energy. These agreements were meant to foster Bronstein's connections with various celebrities.

260. For example, one such agreement was with the Cleveland Cavaliers, which allowed Bronstein to develop connections in the celebrity sports world without any benefit to Tyson 2.0 or LGNDS.

261. Bronstein further negotiated multimillion-dollar sponsorships for Wooooo! Energy, including, but not limited to: a $2 million sponsorship agreement with All Elite Wrestling League ("AEW"), an over $350,000 sponsorship agreement with the Columbus Blue Jackets, and a $75,000 sponsorship agreement with Ohio State University and the University of Michigan.

262. Bronstein initially entered into the sponsorship agreement with AEW in an effort to build his own brand and personal interests. Bronstein used the sponsorship agreement to develop his relationship with AEW's owners Shahid Khan and his son Tony Khan, who are both successful businessmen with an extensive network in the world of sports and wrestling. Shahid Khan also owns the Jacksonville Jaguars.

263. However, Tyson 2.0 and LGNDS could not fulfill their obligations pursuant to the sponsorship agreements. This is because Bronstein, by and through Tyson 2.0, purported to sell to LGNDS the licensing rights to manufacture mushroom-based products pursuant to Flair's branding and likeness.

264. But these licenses were not valid because Flair never contracted with Tyson 2.0 to sell those licensing rights.

265. The fraudulent agreements significantly interrupted the course of LGNDS' business, threw their investments into doubt, and caused a renegotiation of the contracts all parties believed were settled.

266. For example, several months after discovering the fraudulent sale of intellectual property, LGNDS promptly notified AEW of their intention to terminate the sponsorship agreement.

267. Soon after, Tyson 2.0 and LGNDS received a draft complaint on behalf of AEW, stating that Tyson 2.0 and LGNDS would be sued if they did not pay the $1.5 million owed for AEW's performance of the contract.

268. In addition, the complaint alleged that Tyson 2.0 had negotiated the terms for Flair's sponsorship. However, in reality, Bronstein had negotiated the terms of Flair's sponsorship by falsely holding himself out as Flair's agent. Flair had never agreed to the terms of the sponsorship agreement.

269. In fact, entering into all of these agreements ultimately exceeded Bronstein's unilateral authority as President. Contrary to Bronstein's explicitly stated authority, the agreements were not within the licensing rights owned by the company. The agreements were entered into to the detriment of Tyson 2.0.

270. Caught in their self-dealing, Wilks signed a new agreement with Flair. In an amendment to the original licensing agreement, Tyson 2.0 agreed to pay Flair an additional $5 million for the right to use his intellectual property and likeness in deals with third parties, including the deal that had already been struck with LGNDS.

271. The grants of purported authority do not end with LGNDS. A month after entering the Flair-Tyson 2.0 Agreement, Bronstein and Wilks began sublicensing Flair's trademarks and personality rights to third parties that were outside the scope of the rights granted to Tyson 2.0 pursuant to the agreement.

272. Under the terms of the Flair-Tyson 2.0 Agreement, Tyson 2.0 could only contract with third parties for products that Tyson 2.0 was authorized to sublicense in the agreement.

273. In a licensing agreement dated June 1, 2022, and drafted by Cosby, Bronstein and Wilks sent a fraudulent licensing agreement granting licensing rights to Big League Pillows LLC for the use of Flair's trademarks and likeness in pillow products via wire transmission.

274. Pillow products were not part of the rights granted to Tyson 2.0 in the Flair-Tyson 2.0 Agreement, and Bronstein and Wilks did not own the rights to Ric Flair's trademarks for use in pillow products.

275. Yet again, Bronstein and Wilks gave away rights that they did not own through unauthorized licensing agreements, without disclosing those agreements to Tyson 2.0 or Flair.

276. Due to Bronstein, Wilks, and Cosby's fraudulent behavior, Tyson 2.0 incurred a significant sum in damages in disadvantaged negotiations and brand damage.

277. Due to Bronstein's fraudulent behavior, LGNDS incurred a significant sum in damages in additional licensing fees, breaches of third-party contracts, business stoppages, and brand damage from these flurried renegotiations.

278. Due to Bronstein's fraudulent behavior, Flair's likeness was used for nearly half a year without any benefit conferred to Flair, causing monetary damage.

**EVOL by Future**

279. Future, EVOL, and Plaintiff Tyson 2.0, by and through Wizard Holding Group LLC, entered into a licensing agreement for the rights to Future's intellectual property for certain licensed products on February 6, 2023.

280. Together, they launched EVOL by Future ("EVOL"). EVOL is incorporated in Florida, and by and through Tyson 2.0, has its principal place of business in Clark County, Nevada.

281. EVOL is a luxury cannabis company.

282. The Future-EVOL-Tyson 2.0 Agreement granted Tyson 2.0 the licensing rights for a range of cannabis and cannabis-related products.

283. Despite only having rights to Future's cannabis and cannabis-related products, Defendants Bronstein, Wilks, and Cosby granted rights to LGNDS that extended beyond those products.

284. On May 12, 2023, Tyson 2.0, through Wizard Holding Group LLC, entered into an agreement with FTR LGNDS LLC. The agreement gave Plaintiff LGNDS the rights to licensed products that were not granted in the original Future-EVOL-Tyson 2.0 Agreement, and is referred to herein as the EVOL-FTR LGNDS Agreement, in exchange for $500,000. Those licensed products included all cannabis-derived products, but also hemp-derived products, mushroom-related products, kava and kratom, tobacco-derived products, all Future smoking paraphernalia, and all nicotine-derived products (the "EVOL Licensed Products").

285. In entering into the EVOL-FTR LGNDS Agreement, Bronstein, Wilks, and Cosby falsely represented to LGNDS' CEO that Tyson 2.0 had the ability to license products outside of the rights to the cannabis-derived products issued in the Future-EVOL-Tyson 2.0 Agreement.

**DomPen: Mike Tyson and EVOL by Future**

286. Defendant Wilks continued to over-grant intellectual property rights, but did not stop there. Wilks also took steps to ensure he was personally profiting from the over-grants, including ongoing kickbacks in exchange for the license to rights he did not own.

287. Clearview Management Solutions LLC, also known as DomPen, is a cannabis company that distributes cannabis disposable vapes and is based in California.

288. Tyson 2.0 entered into two separate agreements with DomPen: one related to EVOL by Future and one related to Tyson.

289. Tyson 2.0 entered into a sublicense agreement with Clearview Management Solutions LLC, or DomPen, for the Tyson 2.0 Licensed Products (the "Tyson 2.0 DomPen Agreement") on December 20, 2021.

290. Tyson 2.0 entered into a separate sublicense agreement for the production, manufacturing, distributing, and marketing of disposable vape cartridges and vape products (the "EVOL DomPen Agreement," and together with the Tyson 2.0 DomPen Agreement, the "DomPen Agreements") on May 10, 2023.

291. The Tyson 2.0 DomPen Agreement stated that DomPen could only manufacture and sell the Tyson 2.0 Licensed Products in Nevada and California.

292. In 2024, the parties reiterated over email that DomPen would distribute Tyson 2.0 Licensed Products in California and Nevada.

293. The DomPen Agreements specified the territories in which DomPen could distribute the EVOL Licensed Products and the Tyson Licensed Products. For the EVOL DomPen Agreement, the rights to distribute the EVOL Licensed Products extended to California, Massachusetts, New York, and New Mexico. For the Tyson 2.0 DomPen Agreement, the rights to the Tyson 2.0 Licensed Products extended to Nevada and California.

294. In 2024, the parties reiterated over email that EVOL Licensed Products would be distributed in California, Massachusetts, New York, and New Mexico pursuant to the original agreement, and additionally stipulated that the products would be distributed in Ohio.

295. DomPen began selling products outside of the states that were authorized in the contract. Tyson 2.0 emailed DomPen's President at that time, requesting that DomPen halt those operations unless Tyson 2.0 approved additional formal sublicensing agreements.

296. Wilks falsely represented to Tyson 2.0 that DomPen would stop operations in states besides those stipulated in the DomPen Agreements and the amendments to the Agreements.

297. In reality, Wilks was aware that DomPen continued to sell those products in other states without Tyson 2.0's authorization.

298. Wilks received ongoing kickbacks from DomPen's president for allowing the sales of the products in other states without disclosing or authorizing those sales to Tyson 2.0. Wilks received those kickbacks for his own benefit, and Tyson 2.0 did not receive any benefits from the sale of the products in unauthorized states.

#### h. The Bronstein Enterprise's Budding Relationship with Hulk Hogan

299. Simultaneous with the fraudulent licensing agreements, Defendant Volo entered the fold. In or about February 2023, a third party introduced Hulk Hogan ("Hogan") and senior leadership at Tyson 2.0, namely Bronstein. At this time, Volo was Hogan's business manager. As Hogan's manager, Volo was integral to the discussions that occurred at the meetings between Hogan and Tyson 2.0's executives.

300. In May 2023, Tyson 2.0 and Hogan memorialized a formal licensing agreement between the parties. As part of their ongoing relationship, Tyson 2.0 and Hogan entered into multiple agreements with each other, including creating a joint venture and an ambassadorial agreement.

301. During this budding business relationship, Bronstein and Volo began to deepen their relationship. On July 17, 2023, Bronstein caused Tyson 2.0 to bring on Volo to operate as Tyson 2.0's head of talent manager. As the head of talent manager, Volo reported to Bronstein, and was instructed to ensure that Hogan was compliant throughout all business ventures. Within the year, Volo had conspired with the Bronstein Enterprise, and stole Tyson 2.0's trade secrets to launch new business ventures.

302. In or about February 2023, a third party introduced Hulk Hogan and senior leadership at Tyson 2.0, including Defendant Bronstein. Given Tyson 2.0's experience in licensing celebrity images to consumer products, Bronstein and other senior leadership at Tyson 2.0 were interested in a business relationship with Hogan, whose image and potential markets matched Tyson 2.0's existing portfolio of celebrities.

303. Following the introduction, in or about February 2023, Hogan and Tyson 2.0's executive leadership team participated in a series of meetings regarding mutual collaboration. During these meetings, Tyson 2.0 executives discussed licensing Hogan's image to a wide variety of products, including cannabis and cannabis-related merchandise, apparel, soft beverages, and beer.

304. At this time, Defendant Christopher Volo was Hogan's business manager. As Hogan's manager, Volo was integral to the discussions occurring in these meetings with Tyson 2.0 and Tyson 2.0's executives.

305. In May 2023, Tyson 2.0 and Hogan executed contracts memorializing an ongoing licensing relationship. On May 8, 2023, Tyson 2.0 and TGB Entertainment, LLC ("TGB Entertainment"), a company owned by Hogan to house his intellectual property, created a joint

venture called Running Wilde LLC ("Running Wilde"). Tyson 2.0 owned a 51% stake in Running Wilde, and TGB Entertainment owned a 49% stake.

306. Bronstein was anointed the chief executive officer of Running Wilde.

307. Under the terms of the Running Wilde LLC Agreement (the "LLC Agreement"), the primary purpose of Running Wilde was to produce, manufacture, distribute, market, and sell a broad range of cannabis, hemp, mushroom, and other related consumer products.

308. As part of the LLC Agreement, Tyson 2.0 agreed to provide an initial capital contribution of at least $250,000 to Running Wilde. Tyson 2.0 further agreed to provide additional capital contributions, as "reasonable and necessary," up to $1 million per calendar year and $5 million in the aggregate.

309. On May 5, 2023, Tyson 2.0 and Hogan, through TGB Entertainment, entered an Ambassadorial Services Agreement. Under the Agreement, TGB Entertainment granted Running Wilde the right to use Hogan-related trademarks and intellectual property.

310. Additionally, the Ambassadorial Services Agreement placed Hogan under a contractual obligation to promote the products Tyson 2.0 developed using Hogan's licensed image with their brand partners.

311. Under the terms of the Ambassadorial Services Agreement, Hogan agreed to attend events, shoot photographic and video promotional content, post promotional content on social media, and provide quotes advertising the products to which his likeness was licensed, among other obligations.

312. Pursuant to the Ambassadorial Services Agreement, Tyson 2.0 paid TGB Entertainment in excess of $200,000.

313. Pursuant to the two agreements, Tyson 2.0, as majority shareholder of Running Wilde, proceeded to enter into multiple sublicensing agreements with third parties relating to Hogan's trademarks and licensing.

314. On July 17, 2023, Tyson 2.0 retained Volo as their head of talent manager. Tyson 2.0 hired Volo, in part, to be a liaison between Tyson 2.0 and Hogan, and to assist with travel and other matters, especially as they pertained to Hogan.

315. Bronstein, as president of Tyson 2.0 and CEO of Running Wilde; Cosby, as chief legal and licensing officer of Tyson 2.0; and Volo, as Tyson 2.0's head of talent manager, were intimately involved in the solicitation, execution, and management of the Running Wilde initiative and the corresponding sublicensing agreements.

316. During the summer of 2023, Bronstein and others on the Tyson 2.0 team, along with Hogan and August and Billy Busch (the "Busch Team"), members of the Busch family and the founders of the Anheuser-Busch brand, worked together to develop the concept of a beer brand, including branding and business plans.

317. As part of the concept development, Tyson 2.0 devoted resources to developing the concept, including financial resources and employee time. For example, Tyson 2.0 hired a designer on or about August 15, 2023, to create beer can designs for "The Real American" brand by Hulk Hogan.

318. Tyson 2.0's CEO instructed the retained designer to focus on All-American beer with themes including guns, American flags, and Hulk Hogan.

319. The design options, developed with Tyson 2.0's resources and for its sole benefit, included themes that encapsulated Hogan's "American" ethos. The art featured red, white, and

blue designs, American flags, eagles, stars, Hulk Hogan's image, and prominent use of the words "patriot" and "American."

320. The retained designer moved forward on proposed designs for two beer concepts: Hulk Hogan's All-American Lager and Hulk Hogan's Patriot Pilsner, and on or about September 26, 2023, the designer provided Tyson 2.0 with design options.

321. In or about October 2023, Tyson 2.0 moved forward with plans to release the beer with the Busch Team.

322. Among other conversations, on or about November 2, 2023, Bronstein spoke on the phone with the Busch Team, discussing concrete plans for the Hogan beer partnership, including operating and partnership agreements for the brand, strategies for branding and marketing, and a plan for attracting investors.

323. Bronstein, Cosby, and Volo were all intimately involved with the initiative pursuant to their employment with Tyson 2.0. They were responsible for managing potential partnerships, overseeing the business structure of the arrangement, and making plans for marketing and rolling out the beer. They were aware that the beer would encapsulate the concepts of America, patriotism, and Hogan's brand identity.

## IV. Separation Agreements

324. In November 2023, the Tyson 2.0 Board suspected that Defendant Bronstein had engaged in financial improprieties regarding reimbursements. Bronstein, on multiple occasions, submitted lucrative personal expenses for reimbursement under the guise of said purchases being genuine company expenses.

325. After making this discovery, Bronstein was terminated from Tyson 2.0 for cause.

326. Defendants Cosby and Wilks were aware of the full extent of Bronstein's financial and fraudulent misconduct.

327. Wilks reviewed and cleared a separation agreement (the "Bronstein Separation Agreement"), which provided for the terms of Bronstein's resignation, including a severance payment in exchange for his return of certain company shares. Ex. 4, Bronstein Separation Agreement.

328. The Bronstein Separation Agreement's initial draft released Tyson 2.0 from Bronstein's potential legal claims regarding the circumstances of his termination.

329. Defendant Wilks (Tyson 2.0's newly anointed chief executive officer, treasurer, *and* secretary) participated in the negotiation of the terms of Bronstein's release on behalf of Tyson 2.0.

330. During the negotiations, Bronstein demanded an additional provision, which released him from any and all, known and unknown, claims that Tyson 2.0 could bring against him in court.

331. Wilks, a member of the conspiracy, approved the incorporation of this disproportionately expansive release provision with his signature on behalf of, and to the detriment of, Tyson 2.0. In doing so, Wilks released his co-conspirator and co-tortfeasor from millions of dollars in potential liability, prioritizing the Bronstein Enterprise as opposed to Tyson 2.0.

332. The additional release provision was incorporated with no additional consideration.

333. Besides the Bronstein Enterprise's members, the remaining board members and shareholders were unaware of the extent and pervasive nature of Bronstein's intentional and fraudulent misconduct, including his actions in defrauding many of the company's shareholders.

334. The release provision not only purported to bind the company from bringing any and all, known or unknown, legal claims against him, but purported to bar "[a]ny current or former officer, director, owner, member, trustee, agent, employee, shareholder, representative, insurer, investor or employee benefit or welfare program or plan" from doing so as well. Ex. 4, Bronstein Separation Agreement.

335. Wilks, knowing that Bronstein had defrauded the company's shareholders, sought to effectively bar each of the victims of Bronstein's misrepresentations from bringing direct and derivative suits against him for his fraudulent wrongdoing.

336. On November 24, 2023, Bronstein signed the Bronstein Separation Agreement.

337. Bronstein knew that Wilks was not acting in the interest of Tyson 2.0—and was acting in the interest of the Bronstein Enterprise instead—when the parties signed the release. On information and belief, Bronstein was aware that Wilks knew of the extent of Bronstein's misconduct while at Tyson 2.0.

338. Wilks subsequently signed the Bronstein Separation Agreement on behalf of, and to the detriment of, Tyson 2.0.

339. Simultaneously, Bronstein and Tyson 2.0 prepared a stock redemption agreement (the "Bronstein Stock Redemption Agreement"), which provided for the terms of Bronstein's turnover of company stock. Ex. 5, Bronstein Stock Redemption Agreement.

340. The initial draft of the Bronstein Stock Redemption Agreement included a provision about Bronstein's material compliance with all applicable laws. However, Bronstein revised the initial draft and removed this provision from the Agreement.

341. Like the Bronstein Separation Agreement, Wilks approved the incorporation of another disproportionately expansive release provision with his signature on behalf of, and to the detriment of, Tyson 2.0. Wilks padded his co-conspirator and co-tortfeasor with an additional cushion to insulate Bronstein from millions of dollars in potential liability.

342. Wilks subsequently signed the Bronstein Stock Redemption Agreement on behalf of, and to the detriment of, Tyson 2.0.

343. On November 24, 2023, Bronstein also signed the Bronstein Stock Redemption Agreement.

344. As with the Separation Agreement, Bronstein knew that in signing the release in the Bronstein Stock Redemption Agreement, Wilks was abandoning his fiduciary duties to act in the best interest of the company.

345. As more and more misconduct stemming from the conspiracy came to light, Bronstein's co-conspirators and co-tortfeasors could no longer escape being incriminated.

346. On the same day, Tyson 2.0 decided to cut all ties with Cosby as well.

347. Signed a few months later, Cosby's separation agreement (the "Cosby Separation Agreement") was substantially similar to the Bronstein Separation Agreement, disproportionately expansive release provision and all. Ex. 6, Cosby Separation Agreement.

348. Besides her fellow co-conspirators, the remaining board members and shareholders were unaware of the extent of Cosby's intentional and fraudulent misconduct against the company.

349. On February 27, 2024, Cosby signed the Cosby Separation Agreement.

350. Cosby knew that when Wilks approved the expansive release provision in the Separation Agreement despite his knowledge of Cosby's conduct, Wilks did not act in the best interest of Tyson 2.0 and instead acted in the interests of the Bronstein Enterprise.

351. As he had repeatedly done before, Wilks subsequently signed the Cosby Separation Agreement on behalf of, and to the detriment of, Tyson 2.0. In doing so, Wilks released another one of his co-conspirators and co-tortfeasors from $50 million in liability.[7]

352. In 2025, the Tyson 2.0 Board of Directors inevitably discovered Wilks' role in the pervasive financial and fraudulent misconduct that had harmed the company.

353. On March 21, 2025, Tyson 2.0 placed Wilks on administrative leave.

354. On March 28, 2025, Tyson 2.0 terminated Wilks for cause.

355. Unlike Bronstein and Cosby, Wilks did not receive the same favorable separation agreement that absolved him from any and all, known and unknown, legal liability for his misconduct and wrongdoing. In fact, Wilks was terminated without any legal release provision at all.

356. On information and belief, Wilks did not receive such a favorable release provision because there were no longer any remaining officers that were members of the conspiracy.

---

[7] Both the Bronstein Separation Agreement and the Cosby Separation Agreement purport to release claims on behalf of any Tyson 2.0 "officer, director, owner, member, trustee, agent, employee, shareholder, representative, insurer … " Ex. 5, Bronstein Separation Agreement § 1(b); Ex. 6, Cosby Separation Agreement § 1(b). This release does not bar claims brought here by Plaintiffs Tyson and Flair in their individual capacities. And even so, Tyson and Flair had no knowledge and did not consent to such a release.

357. Wilks breached his fiduciary duties to the company when he attempted to release his fellow co-conspirators and co-tortfeasors from any and all, known or unknown, legal liability, and Bronstein and Cosby were aware of and complicit in Wilks' fiduciary duty breach.[8]

358. Despite the concerningly expansive release agreements, Bronstein and Cosby proceeded to materially breach the non-solicitation provision of their release agreements.

359. Both Bronstein's and Cosby's separation agreements included a non-solicitation provision in which Bronstein and Cosby each agreed to refrain from soliciting employees, customers, and other business relations.

360. These non-solicitation provisions provided that Bronstein and Cosby would not "directly or indirectly solicit, induce or influence" any Tyson 2.0 employee to leave Tyson 2.0, nor would they "directly or indirectly, contact or solicit" customers of Tyson 2.0, for two years following the date of employment termination, particularly for the "purpose of delivering, selling, promoting, or otherwise offering a product or service" that is similar to that of a Tyson 2.0 business venture.

361. As detailed below, any provision that did not suit their fancy was brazenly thrown to the wind in their effort to kick-start their latest business ventures: Real American Beer and Real American Freestyle.

---

[8] "[C]onsiderations of equity militate against allowing an unscrupulous fiduciary to double down on a breach by taking the additional step of validly insulating its third-party co-conspirator from any liability for the breach." *Ramiro Aviles v. S & P Global, Inc.*, 380 F. Supp. 3d 221, 301–02 (S.D.N.Y. 2019); *see also In re Platinum-Beechwood Litig.*, 694 F. Supp. 3d 304, 315 (S.D.N.Y. 2023) ("Such a release is inherently permeated by self-dealing because the releasing party was . . . controlled by the same set of individuals that were being released from liability").

## V. Bronstein's Ongoing Business Ventures

362. Defendants Bronstein, Cosby, Case, and Volo, through their fraudulent association-in-fact enterprise, have moved onto new business ventures to continue defrauding dozens of investors, celebrities, and business partners. Not only does the conspiracy pose a very real risk to unsuspecting investors, celebrities, and business partners, but the enterprise continues to engage in fraudulent conduct against Tyson 2.0.

### a. Bronstein's Real American Beer Venture

363. After their departure from Tyson 2.0, Defendants Bronstein and Cosby habitually breached the non-solicitation provisions in their separation agreements. Bronstein and Cosby continued to solicit Defendant Volo in the months that he remained employed at Tyson 2.0, gaining access to information regarding TGB Entertainment/Hulk Hogan "Real American" brand, which belonged to Tyson 2.0.

364. Volo regularly reported the information he collected from within Tyson 2.0 back to Bronstein, updating him on the status of the beer venture with Hogan, the relationships Tyson 2.0 was building with vendors and other business partners, and the concepts which were under development.

365. Bronstein and Cosby officially launched RAHM on or around March 27, 2024.

366. Bronstein was and is a founder and shareholder of RAHM, and was and is the president and director of RAHM.

367. Cosby was and is a founder and shareholder of RAHM, and was and is the general counsel of RAHM.

368. Case was and is the senior vice president of partnerships of RAHM.

369. On or about June 10 or 11, 2024, RAHM filed trademark registration applications with the United States Patent and Trademark Office ("USPTO") for the following trademarks:

| Mark | Serial Number | Goods/Services |
|---|---|---|
| REAL AMERICAN BEER | 98594121 | **IC 021:** Non-electric portable coolers, beer mugs, bottle openers, bottles, bowls, buckets, pails, coin banks, cups, decanters, dishes, drinking bottles for sports, drinking glasses, drinking vessels, funnels, glasses being receptacles for drinking, ice buckets, ice pails, insulating sleeve holders made of neoprene or rubber for beverage cans or bottles, menu card holders, mugs, paper plates, place mats not of paper or textile, signboards of porcelain or glass, table mats not of paper or textile, tankards.<br><br>**IC 025:** Shirts, short-sleeve shirts, hats, bandanas, visors, swimsuits, bathing trunks, beach clothes, beach shoes, belts, boxer shorts, caps being headwear, embroidered clothing, headbands, headwear, jackets, jerseys, sandals, skull caps, socks, sports jerseys, tee-shirts, wall hanging of textile, tapestry of textile.<br><br>**IC 028:** Swimming floats for recreational use, balls for games, body-building apparatus, body-training apparatus, cornhole bags, cornhole game boards, |

| | | |
|---|---|---|
| | | cornhole game sets containing bags and boards, darts, flying discs, game tables, inflatable games for swimming pools, kites, masks, paddleboards, play balloons, playing balls, playing cards, plush toys, skateboards, stuffed toys, surfboards, swimming jackets, swimming pool air floats, teddy bears, toy figures, toy vehicles, weight lifting belts.<br><br>**IC 032:** Beer, beer-based cocktails, Non-alcoholic beer flavored beverages. |
| Real AMERICAN ★ BEER ★ | 98594268 | **IC 032:** Beer, beer-based cocktails, Non-alcoholic beer flavored beverages. |
| REAL AMERICAN | 98594090 | **IC 021:** Non-electric portable coolers, beer mugs, bottle openers, bottles, bowls, buckets, pails, coin banks, cups, decanters, dishes, drinking bottles for sports, drinking glasses, drinking vessels, funnels, glasses being receptacles for drinking, ice buckets, ice pails, insulating sleeve holders made of neoprene or rubber for beverage cans or bottles, menu card holders, mugs, paper plates, place mats not of paper or textile, signboards of porcelain or glass, tablemats not of paper or textile, tankards, water bottles sold empty, |

| | | |
|---|---|---|
| | | **IC 025:** Shirts, short-sleeve shirts, hats, bandanas, visors, swimsuits, bathing trunks, beach clothes, beach shoes, belts, boxer shorts, caps being headwear, embroidered clothing, headbands, headwear, jackets, jerseys, sandals, skull caps, socks, sports jerseys, tee-shirts, wall hanging of textile, tapestry of textile<br><br>**IC 028:** Swimming floats for recreational use, balls for games, body-building apparatus, body-training apparatus, cornhole bags, cornhole game boards, cornhole game sets containing bags and boards, darts, flying discs, game tables, inflatable games for swimming pools, kites, masks, paddleboards, play balloons, playing balls, playing cards, plush toys, skateboards, stuffed toys, surfboards, swimming jackets, swimming pool air floats, teddy bears, toy figures, toy vehicles, weight lifting belts<br><br>**IC 032:** Beer, beer-based cocktails, Non-alcoholic beer flavored beverages, non-alcoholic beverages, energy drinks, lemonades, water being a beverage<br><br>**IC 033:** Alcoholic beverages, except beer, alcoholic cocktails, gin, pre-mixed alcoholic beverages, other than beer-based, rum, spirits, |

| | | |
|---|---|---|
| | | being beverages, vodka and whiskey<br><br>**IC 035:** Advertising, marketing, promotional services, business management, business administration, office functions including online retail store management and administration, marketing, and promotional services |
| HULK HOGAN REAL AMERICAN BEER | 98594222 | **IC 032:** Beer; Beer-based cocktails; Non-alcoholic beer; Non-alcoholic beer flavored beverages |
| Real AMERICAN BEER | 98595122 | **IC 032:** Beer; Beer-based cocktails; Non-alcoholic beer; Non-alcoholic beer flavored beverages |

370. As of the date of filing, these applications remain live and under examination with the exception of Application Serial No. 98/594,222 (Applicant: RAHM, INC.) for the mark 'HULK HOGAN REAL AMERICAN BEER' (filed June 10, 2024) which was abandoned on or around June 30, 2025.

371. Bronstein, Cosby, and Case's Real American venture was nothing more than blatant misappropriation of Tyson 2.0's already developed concept: a beer brand with themes and motifs of patriotism, "American" identity, national pride, and unification, alongside the use of Hogan's brand identity and sponsorship. Bronstein and Cosby, as detailed below, used the trade secrets and confidential information they had acquired at Tyson 2.0 to develop the venture.

**b. Bronstein's Real American Freestyle Venture**

372. On May 24, 2024, Volo officially resigned from Tyson 2.0 to pursue another corporate opportunity.

373. On April 30, 2025, Defendants Bronstein and Volo launched Real American Freestyle, a wrestling league sponsored by Real American Beer. RAF mirrors the "Real American" branding, and uses Hogan's name and likeness to promote the league.

374. Bronstein was and is the chief executive officer of Real American Freestyle.

375. Volo was and is the chief of staff for Real American Freestyle.

376. RAF is Fox Nation's premier wrestling-broadcast league, akin to World Wrestling Entertainment. RAF is a pseudo-wrestling league combined with mixed martial arts. RAF showcases up and coming wrestlers, including notable names like Keelon "Mugzy" Jimison and Kyle Dake.

377. On information and belief, RAF has experienced rapid growth since its initial launch, and continues to have major success.

**c. Bronstein, Cosby, Case, and Volo Stole Tyson 2.0's Trade Secrets**

378. In Defendant Bronstein's and Cosby's Tyson 2.0 Executive Employment Agreements, Bronstein and Cosby explicitly agreed to: (1) hold [any] Confidential Information in the strictest confidence and not directly or indirectly copy, distribute, disclose, divert, or disseminate, or give access to any Confidential Information to any person, firm, corporation, association, or other entity except authorized agents of Tyson 2.0 with a need to know, and other persons, for the benefit of Tyson 2.0 in the course and scope of their employment; and (2) refrain from directly or indirectly using [any] Confidential Information other than as necessary and as

authorized in the course and scope of their employment. Ex. 7, Bronstein's Executive Employment Agreement; Ex. 8, Cosby's Executive Employment Agreement.

379. In these agreements, Confidential Information was broadly defined to include all information, knowledge, and data that was not generally known to the public and included items such as proprietary information, trade secrets, know-how, research, designs, drawings, marketing, finances, forecasts, product plans, business plans, business strategy, and information concerning Tyson 2.0's productions, services, and markets.

380. In Defendant Case's Restricted Stock Purchase Agreement, Case explicitly agreed to be bound to protect and defend Tyson 2.0's Intellectual Property in certain circumstances. Ex. 9, Restricted Stock Purchase Agreement.

381. In this agreement, Intellectual Property is defined broadly to include all trade secrets, ideas, inventions, concepts, technology, software, methods, processes, drawings, illustrations, writings, know-how, show-how, trade names, domain names, web addresses, web sites, and any other intellectual property rights.

382. In Defendant Volo's Non-Competition, Non-Solicitation, Non-Disclosure and Invention Assignment Agreement, Volo explicitly agreed to: (i) hold the Confidential Information in the strictest confidence and not directly or indirectly copy, distribute, disclose, divert, or disseminate, or give access to, in whole or in part, any such Confidential Information to any person, firm, corporation, association or other entity in the course and scope of [his] employment; and (ii) refrain from directly or indirectly using the Confidential Information other than as necessary and as authorized in the course and scope of his employment. Ex. 10, Volo's Non-Competition, Non-Solicitation and Invention Assignment Agreement.

383. In this agreement, Confidential Information was broadly defined to include all information, knowledge, and data that was not generally known to the public and included items such as proprietary information, trade secrets, know-how, research, designs, drawings, marketing, finances, forecasts, product plans, business plans, business strategy, and information concerning Tyson 2.0's productions, services, and markets.

384. In developing renderings for Tyson 2.0's potential beer venture and partnership with Hogan, the designer understood, as part of its normal course of business, that all intellectual property it developed during its relationship with Tyson 2.0 was for the sole benefit, use, and ownership of Tyson 2.0.

385. The designer specifically understood that any disclosure, use, or reappropriation of the designs it created for Tyson 2.0 would be an improper use of property which was developed for, and belonged to, Tyson 2.0.

386. Yet Real American Beer, as it is currently sold on the market, includes these exact themes in its marketing and branding.

387. Real American Beer is currently sold in a red, white, and blue can, with a prominent image of Hogan waving an American flag, adorned with stars and stripes prominently featuring the word "American."

388. The similarities between the two concepts are not coincidental—Bronstein, Cosby, and Volo each had a hand in expending Tyson 2.0's resources to develop the concepts which were eventually stolen and sold, to Tyson 2.0's detriment.

389. Yet before this eventual theft, in or about October 2023, Tyson 2.0 moved forward with plans to release the beer with the Busch Team.

390. Among other conversations, on or about November 2, 2023, Bronstein spoke on the phone with the Busch Team, discussing concrete plans for the Hogan beer partnership, including operating and partnership agreements for the brand, strategies for branding and marketing, and a plan for attracting investors.

391. Tyson 2.0's plans for the concept and business plans for Hogan's "Real American" brand beer were not publicly known.

392. At all times before their departure, Bronstein, Cosby, and Volo had confidential access to ideas and plans related to the "Real American" Hulk Hogan beer initiative.

393. Bronstein, Cosby, and Volo were all intimately involved with the initiative pursuant to their employment at Tyson 2.0. They were responsible for managing potential partnerships, overseeing the business structure of the arrangement, and making plans for marketing and rolling out the beer. They were aware that the beer would encapsulate the concepts of America, patriotism, and Hogan's brand identity.

394. Given their preexisting knowledge of Tyson 2.0's plans for the "Real American" beer venture, Bronstein, Cosby, and Volo decided to move forward and continue discussing their plans for a Real American beer brand, including directly engaging with Hogan and the Busch Team in the months following their departure from Tyson 2.0.

395. Despite not being formally involved with the launch of Real American Beer, Volo continued to use his position within Tyson 2.0 as a mechanism for funneling information regarding the beer venture to Bronstein and Cosby.

396. Using Tyson 2.0's proprietary information, intellectual property, and trade secrets, Bronstein and Cosby, by and through RAHM, officially launched Real American Beer in multiple states, including Colorado, Minnesota, and Missouri, on or about June 13, 2024.

397. Despite knowing that the beer venture was Tyson 2.0's intellectual property, Case knowingly joined the venture alongside of Bronstein, Cosby, and Volo regardless in direct violation of his commitment to defend and protect Tyson 2.0's trade secrets and intellectual property.

398. Tyson 2.0's mock-ups of branding and conceptualization for Tyson 2.0's beer endeavor with Hogan embodied an Americana theme, using a red, white, and blue color palette and classic patriotic motifs. Tyson 2.0's confidential strategy for the brand was to also highlight Hogan's involvement in the brand, including using his likeness and other graphics associated with him, such as his signature bandana and sunglasses. Real American Beer's branding and marketing incorporated these trade secrets that Bronstein, Cosby, and Volo stole from Tyson 2.0.

399. Further, on or about July 29, 2024, RAHM obtained an assignment of the REAL AMERICAN LAGER trademark (U.S. Trademark Registration No. 5356835) from the company controlled by the Busch Team, with whom Tyson 2.0 had met and discussed Tyson 2.0's development of a beer featuring Hogan.

400. Real American Beer quickly expanded its rollout and, on information and belief, is available in dozens of states as of the date of filing.

401. In January 2025, World Wrestling Entertainment ("WWE") and Real American Beer announced a multi-year partnership that will showcase Real American Beer branding during every episode of the WWE program Monday Night Raw.

402. RAHM has filed additional trademark registration applications with the USPTO for different goods and services associated with the same marks:

- Application Serial No. 99/159,560 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN BEER' (filed Apr. 28, 2025);
- Application Serial No. 99/159,702 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN' (filed Apr. 28, 2025);
- Application Serial No. 99/159,795 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN BEER' (filed Apr. 28, 2025);
- Application Serial No. 99/159,830 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN BEER' (filed Apr. 28, 2025);
- Application Serial No. 99/245,645 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN BEER' (filed Jun. 20, 2025);
- Application Serial No. 99/245,656 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN BEER' (filed Jun. 20, 2025);
- Application Serial No. 99/245,665 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN BEER' (filed Jun. 20, 2025);
- Application Serial No. 99/256,675 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN' (filed Jun. 27, 2025); and
- Application Serial No. 99/287,939 (Applicant: RAHM, INC.) for the mark 'REAL AMERICAN' (filed Jul. 16, 2025).

403. Bronstein, Cosby, and Volo continue to market and expand the Real American brand, both through partnerships and sponsorships, as well as by seeking to expand the goods and services associated with the marks.

404. On or around April 2025, Bronstein and Volo, among others, launched Real American Freestyle, a wrestling league sponsored by Real American Beer. Real American Freestyle mirrors the "Real American" branding, and uses Hogan's name and likeness to promote the league.

405. On information and belief, Real American Beer has performed very well since its inception, experiencing rapid growth.

406. Real American Beer's rapid commercial success has been covered extensively in outlets such as Fox Business, Beverage Industry, and Business Wire. The brand claims its goal is to be "as big as Bud Light," a national leader in beer sales, and that they are well on their way.

407. Real American Beer continues to launch new products, including kegs and tap handles, and larger can sizes, signaling a growing brand presence and consumer demand. Relatedly, the brand continues to launch new marketing campaigns and has expanded to large consumer retailers, including Walmart and Albertsons.

408. On information and belief, demand for the beer skyrocketed following Hogan's passing in July 2025 and Real American enjoyed a surge in sales.

## CAUSES OF ACTION

### Count I[9]
### 18 U.S.C. § 1962(c), Racketeer Influenced and Corrupt Organizations Act
### (All Plaintiffs Against Bronstein, Wilks, Cosby, Case, and Volo)

409. Plaintiffs Tyson, Ric Flair, Tyson 2.0, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 408 as if fully set forth herein.

**Culpable Persons**

410. Defendants Bronstein, Wilks, Cosby, Case, and Volo, among others, are persons capable of holding a legal or beneficial interest in property, and therefore each individual is a "person" within the meaning of 18 U.S.C. § 1961(3).

**Enterprise**

411. Defendants Bronstein, Wilks, Cosby, Case, and Volo, among others, including Whistleblower A, formed an enterprise comprising a group of individuals associated in fact (the "Bronstein Enterprise"), within the meaning of 18 U.S.C. § 1961(4), which engaged in, and the activities of which impacted, interstate commerce.

412. In 2019, the Bronstein Enterprise was conceived at Fyllo. During Fyllo's formation, Bronstein recruited the first set of members of the Bronstein Enterprise, including Cosby, Case, and Whistleblower A. As the Bronstein Enterprise expanded into other companies, such as Wesana, Tyson 2.0, RAHM, and RAF, more and more members were recruited, such as Wilks and Volo.

---

[9] Plaintiffs have standing to raise this civil action pursuant to 18 U.S.C. § 1964(c).

413. The Bronstein Enterprise is an association-in-fact enterprise, comprised of an ongoing group of individuals whose members have, and continue to, function as a cohesive unit for the common purpose of maximizing profits, and then subsequently abusing and misusing the funds of various companies.

414. The Bronstein Enterprise had a formulaic scheme: travel from company to company, raise millions of dollars in investor funding, stack the executive board with members, and then abuse and misuse each company's funds. Each defendant understood the primary purpose of the Bronstein Enterprise, and each defendant knew that they had a structural role to fill:

- **Chad Bronstein.** Bronstein was the kingpin. Bronstein's role was to infiltrate new business ventures, and ensure their initial success by raising millions of dollars in investor contributions. Once each venture was initially solidified, Bronstein also recruited additional members to stack the executive boards of the various companies. Bronstein would subsequently devise new schemes, and direct each member accordingly.

- **Adam Wilks.** Wilks was second-in-command, particularly at Tyson 2.0. Wilks assisted Bronstein in devising new schemes, and even created new schemes himself. When the Bronstein Enterprise's fraudulent activities were uncovered, Wilks assumed Bronstein's position, and ensured that the Bronstein Enterprise lived on at Tyson 2.0.

- **Nicole Cosby.** Cosby controlled optics and logistics. Cosby was entrusted and tasked with drafting fraudulent licensing agreements, and to greenlight faulty business deals, at the expense of each company's business partners.

- **Christopher Volo.** Volo controlled celebrity relationships. Volo leveraged his relationships with star-studded celebrities, such as Hogan and Flair, to ensure their allegiance to companies such as Tyson 2.0, RAHM, and RAF. Volo manipulated his celebrity clients by concealing the fraudulent conduct underlying their transactions with the companies, and ensured that the Bronstein Enterprise remained squarely in the space of celebrity licensing and branding.

- **James Case.** Case, initially, was towards the bottom rung of the hierarchy. Bronstein had tasked Case with very simple duties: collect information and report back. As a result, Case has been heavily rewarded with more coveted positions at the Bronstein Enterprise's most recent ventures: RAHM and RAF.

- **Whistleblower A.** Whistleblower A was the lynchpin. Whistleblower A connected each of the defendants to each other by communicating the factual information underlying various schemes back and forth between the defendants. Whistleblower A functioned as the client-facing spokesperson, who effectively muddied his hands for the Bronstein Enterprise. To Bronstein, Whistleblower A was nothing more than his sacrificial lamb.

415. Each defendant operated for the benefit of the Bronstein Enterprise. Each defendant's profitable success relied on sustaining the Bronstein Enterprise as a whole.

416. Each defendant had a separate role in originating, facilitating, approving, or covering up the fraud, misconduct, and abuse of company funds.

417. Bronstein, Cosby, Wilks, Case, and Volo each agreed to conduct and/or participate in the Bronstein Enterprise's affairs, and each defendant knowingly and personally facilitated the activities and affairs of the Bronstein Enterprise.

418. Bronstein, Cosby, Wilks, Case, and Volo each agreed to participate in the commission of at least two predicate actions in furtherance of the Bronstein Enterprise's primary purpose.

419. Each individual knew one another sufficiently well to form relationships among the Bronstein Enterprise, and sufficiently well to effectuate the Bronstein Enterprise's purpose to abuse and misuse company funds.

420. The Enterprise infiltrated Fyllo, Wesana, Tyson 2.0, RAHM, and RAF, and stacked each company's corporate boards with their fellow conspirators and tortfeasors. When a board member that was unrelated to the conspiracy attempted to blow the whistle regarding Defendants' financial misconduct and wrongdoing, Bronstein and the Bronstein Enterprise would ensure that the board member was silenced—either through a "ghost" job or eliminating them from the company entirely.

421. Bronstein, Wilks, Case, Cosby, and Volo directly participated in the conduct of the Bronstein Enterprise. The Defendants not only operated and managed the Enterprise—they created it.

422. Bronstein, Wilks, Case, Cosby, and Volo all played an important role and were essential to the Bronstein Enterprise. Defendants held the C-Suite executive level positions, and infiltrated board positions for each company. Ultimately, Defendants hijacked the companies as vessels to enrich themselves.

423. For the purpose of 18 U.S.C. § 1962(c), and during the periods relevant to this Complaint, Bronstein, Cosby, Wilks, Case, and Volo each had authority within the Bronstein Enterprise, and/or conducted or participated directly in the conduct of the Bronstein Enterprise's affairs via a pattern of racketeering activity.

**Interstate Commerce**

424. The Bronstein Enterprise conducted racketeering activity, in part, by using channels of interstate commerce, including by the use of electronic transfer of funds.

**Predicate Offenses[10]**

425. The Defendants, acting through the Bronstein Enterprise, committed a number of offenses that constitute a pattern of racketeering activity, including violations of 18 U.S.C. § 1956(a)(1)(B)(i), 18 U.S.C. § 1343, 18 U.S.C. § 1951, and 18 U.S.C. § 1832(a)(1) and (5) on numerous occasions.

**Pattern of Racketeering**

426. Defendants have acted, and conspired to act, together to commit the below fraudulent acts with the purpose of enriching themselves financially, and furthering the affairs of the Bronstein Enterprise.

427. The predicate acts described in detail below were related to one another as part of a common scheme.

**Extortion (18 U.S.C. § 1951)**

428. Extortion is a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

---

[10] "A pattern of racketeering activity consists, at the very least, of two predicate acts of racketeering committed within a ten-year period." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 659 (7th Cir. 2015) (citing 18 U.S.C. § 1961(5)).

429. Defendants Bronstein and Case have worked in concert to wrongfully affect the movement of interstate commerce by threatening severe economic losses.

430. In April 2022, Bronstein and Case conspired to induce Sozon Lyras ("Lyras"), Plaintiff LGNDS' CEO, into transferring 10% of his company's equity to Case.

431. Despite having no legal right to such equity, Bronstein and Case demanded Lyras initiate the equity transfer to Case.

432. In exchange for the equity stake, Case did not provide anything in return as consideration for the transaction. Instead, Bronstein extorted Lyras into transferring the equity stake to Case.

433. Bronstein solicited Lyras' consent to initiate the transaction through "fear" of economic loss, as defined in 18 U.S.C. § 1951(b)(2). LGNDS' entire business model, and prosperity thereof, relied on the licensing contracts that LGNDS had signed with Tyson 2.0.

434. Bronstein, knowing that LGNDS would collapse without these contracts, threatened to cancel all of the licensing contracts between Tyson 2.0 and LGNDS, *unless* Lyras transferred the 10% equity stake to Case. Fearing severe economic harm in the form of a threat to his entire business model, Lyras transferred a 10% equity stake in his company to Case. But for Bronstein's threats of severe economic harm, Lyras never would have transferred the equity stake to Case.

435. Together, Bronstein and Case knowingly, and wrongfully, induced Lyras' consent under the "fear" of severe economic collapse.

436. In Summer 2023, after the business relationship and licensing agreements between Tyson 2.0 and LGNDS had been finalized, Bronstein demanded Lyras purchase a $48,000 Gold Rolex Day-Date for him.

437. Despite having no legal right to the luxury watch, Bronstein demanded the gift regardless.

438. In exchange for the watch, Bronstein did not provide anything in return as consideration for the transaction. Instead, Bronstein extorted Lyras into purchasing him the luxury watch.

439. Yet again, Bronstein solicited Lyras' consent to gift him a watch through "fear" of economic loss, as defined in 18 U.S.C. § 1951(b)(2). LGNDS' entire business model, and prosperity thereof, relied on the licensing contracts that LGNDS had signed with Tyson 2.0.

440. Bronstein, knowing that LGNDS would collapse without these contracts, threatened to cancel all of the licensing contracts between Tyson 2.0 and LGNDS, *unless* Lyras gifted him the $48,000 watch. But for Bronstein's threats of severe economic harm, Lyras never would have gifted him the luxury watch.

441. In June 2023, Lyras gave the $48,000 watch to Bronstein at a conference in Miami, Florida.

442. Bronstein knowingly, and wrongfully, induced Lyras into gifting him a luxury watch under the "fear" of severe economic collapse.

**Theft of Trade Secrets (18 U.S.C. § 1832(a)(1) and (5))**

443. Theft of a trade secret is a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

444. Defendants Bronstein, Cosby, and Volo intended to convert a trade secret, which affects interstate commerce, to benefit the Bronstein Enterprise economically, and injure the rightful owner of the trade secret.

445. Together, Bronstein, Cosby, and Volo knowingly appropriated trade secrets from Tyson 2.0 without authorization with the intention of benefiting the Bronstein Enterprise economically, and injuring Tyson 2.0.

446. Bronstein, Cosby, and Volo knew that the Hulk Hogan "Real American Beer" brand was a trade secret which belonged to Tyson 2.0.

447. Bronstein, Cosby, and Volo knew that they were not authorized to appropriate the Hulk Hogan "Real American Beer" brand, as evidenced by the confidentiality provisions that they agreed to in their Executive Employment Agreements.

448. Bronstein, Cosby, and Volo, in stealing the trade secret, have economically benefitted the Enterprise by catapulting Real American Beer into the mainstream beer market at the expense of Tyson 2.0. In doing so, Bronstein, Cosby, and Volo have ensured that RAHM is a viable host for their parasitic Enterprise to thrive indefinitely.

449. Bronstein, Cosby, Volo, and Case knowingly conspired to steal a trade secret together in violation of 18 U.S.C. § 1832(a)(1).

450. After their separation from the company, and their subsequent decision to launch their new beer venture, Bronstein, Cosby, Volo, and Case agreed to take "Real American Beer"

trade secret developed at Tyson 2.0, and appropriated it to launch their new company, RAHM, and produce and manufacture Hulk Hogan's Real American Beer.

451. Bronstein, Cosby, Volo, and Case not only conspired to misappropriate the trade secret, but successfully misappropriated it at the expense of Tyson 2.0. Today, Real American Beer is sold across major retailers, and is a household name for beer.

**Wire Fraud (18 U.S.C. § 1343)**

452. Wire fraud is a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

453. To further the Bronstein Enterprise's primary purpose, Defendants Bronstein, Wilks, Case, and Cosby devised various schemes to defraud Tyson 2.0 via the use of electronic wire transmissions.

454. Defendants knowingly and intentionally defrauded the company through the use of wire transmissions.

455. For example, Defendants engaged in the use of wire transmissions to avoid scrutiny for their actions taken to defraud the company.

456. Bronstein and Case devised a scheme to defraud LGNDS. Case brokered the initial partnership between Tyson 2.0 and LGNDS, wherein Bronstein, by and through Tyson 2.0, fraudulently sold LGNDS licensing rights pursuant to the Tyson 2.0 and Ric Flair Drip brand that Tyson 2.0 did not have the rights to license. As a reward, Bronstein granted Case a $10,000 payment via wire transmission (electronic mail) on May 10, 2022.

457. Bronstein, Wilks, and Cosby devised a scheme to defraud Big League Pillows LLC. In concert with Bronstein and Wilks, Cosby knowingly and intentionally drafted and circulated a licensing agreement to Big League Pillows LLC, which purported to sell the licensee

licensing rights that Tyson 2.0 did not actually own, on June 7 and 8, 2022 via wire transmission (electronic mail).

458. Bronstein and Whistleblower A devised a scheme to defraud Tyson 2.0. On August 5, 2022, Whistleblower A facilitated Bronstein in approving a laundry list of fraudulent reimbursements via wire transmission (electronic mail) with Tyson 2.0's finance department. Pursuant to Whistleblower A's initial transmission, Bronstein unilaterally approved his personal boating expenses that were labeled in a manner designed to mislead the finance department to believe they were hotel expenses pursuant to legitimate business needs:

- Bronstein "Approved" a $1,827.50 reimbursement for the "Tampa Water Street Hotel" on "6/20 & 7/27." Bronstein did not actually stay at the Tampa Water Street Hotel on these nights, and instead used these descriptions as a guise for his boating expenses.

Within the list of reimbursements, Bronstein buried a series of improper reimbursements within the laundry list, which included multiple plane tickets for Bronstein's wife and child:

- Bronstein approved a $460.00 reimbursement for his son, Chase, to fly from Nashville, Tennessee to Chicago, Illinois.

- Bronstein approved a $460.00 reimbursement for his wife, Selina, to fly from Nashville, Tennessee to Chicago, Illinois.

459. Bronstein, Wilks, and Cosby devised a scheme to fraudulently inflate the value of Tyson 2.0. In September 2022, Cosby negotiated and drafted licensing agreements with Green Tank by means of wire transmission (electronic mail); the licensing agreement was one piece of

their overall scheme to inflate the company's value. Cosby, in concert with Bronstein and Wilks knowingly brokered licensing over-grants to inflate the value of Tyson 2.0.

460. On September 12, 2023, Bronstein and Whistleblower A devised a scheme to conceal their racketeering activities after Daniel Carcillo attempted to blow the whistle regarding the Bronstein Enterprise's wrongdoing at Wesana. In concert with his co-conspirators, Bronstein created an advisory position and hired Carcillo to the role so he could collect the money directly from Tyson 2.0's payroll. The position paid Carcillo $100,000 annually. Bronstein instructed Whistleblower A to send the employment offer to Carcillo by means of wire transmission (electronic mail). Bronstein and Carcillo both knew that the transaction was an unlawful use of Tyson 2.0's funds. Bronstein and Carcillo also both understood that Carcillo did not need to perform any work—instead, the position had the sole purpose of concealing the transaction.

**Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i))**

461. Money laundering is a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

462. Defendants knew that they engaged in transactions that involved the proceeds of unlawful activities, in part, by using and/or affecting the channels of interstate commerce, which exceeded $10,000.

463. Defendants subsequently denied the existence of these unlawful transactions in an attempt to conceal the unlawful nature underlying the proceeds.

464. For example, on September 12, 2023, Bronstein knowingly misappropriated company funds to silence Daniel Carcillo as Carcillo was beginning to expose Bronstein for his misconduct. This was an unauthorized and unlawful use of Tyson 2.0's money.

465. Bronstein intentionally concealed the hush money by creating an advisory position and hiring Carcillo to the role so he could collect the money directly from Tyson 2.0's payroll. The position paid Carcillo $100,000 annually. Bronstein and Carcillo both knew that the transaction was an unlawful use of Tyson 2.0's funds. Bronstein and Carcillo also both understood that Carcillo did not need to perform any work—instead, the position had the sole purpose of concealing the transaction.

466. As alleged above, Bronstein and Whistleblower A communicated this "ghost" job via wire transmission (electronic mail). The commission of a predicate offense, as defined by 18 U.S.C. 1961(1), is an "unlawful activity" within the meaning of 18 U.S.C. § 1956(7)(A).

467. Bronstein intentionally concealed the facts underlying this transaction from members of the company, so as to conceal the unlawful nature of the transaction.

**Injury**

468. As a direct and proximate cause of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**Count II[11]**
**18 U.S.C. § 1962(d), Racketeer Influenced and Corrupt Organizations Act**
**(All Plaintiffs Against Bronstein, Wilks, Cosby, Case, and Volo)**

469. Plaintiffs Tyson, Flair, Tyson 2.0, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 468 as if fully set forth herein.

470. Defendants Bronstein, Wilks, Case, Cosby, and Volo, among others, "conspire[d]" within the meaning of 18 U.S.C. § 1962(d).

[11] Plaintiffs have standing to raise this civil action pursuant to 18 U.S.C. § 1964(c).

471. Bronstein, Wilks, Case, Cosby, and Volo each agreed to facilitate in the operation of the Bronstein Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

472. Bronstein, upon his creation of Fyllo, began the Enterprise with the purpose of abusing and misusing company funds for the Bronstein Enterprise's benefit. At Fyllo, Case, and Cosby agreed to join the Bronstein Enterprise with the intent to misappropriate company funds to benefit the Enterprise instead of the companies that they had infiltrated.

473. Wilks had a longstanding relationship with Bronstein, and knew of Bronstein's fraudulent business practices. When he heard of the creation of Fyllo, and the Bronstein Enterprise's future endeavor called Tyson 2.0, he agreed to join the Bronstein Enterprise with the intent to help the Enterprise by enabling Bronstein's ideas for unlawfully directing company funds to the Bronstein Enterprise, and with the additional intent to devise plans of his own to aid the Bronstein Enterprise. Wilks agreed to provide support through approval on boards of directors and as an executive.

474. Volo later joined the Bronstein Enterprise after Tyson 2.0 began its business-relationship with Hogan. Bronstein and Volo began to develop a longstanding relationship, and departed from Tyson 2.0 together with the intention of launching brand new companies: Real American Beer and Real American Freestyle. Volo facilitated Bronstein's connections to various celebrity partners, namely Flair and Hogan, because of his managerial relationship with many celebrities.

475. Case had a longstanding relationship with Bronstein, and facilitated Bronstein's connections to investors and others who enabled the initial success of the companies. In the process of facilitating the launch of the companies, Case agreed to join the Bronstein Enterprise

where Case and Bronstein would personally benefit from money that belonged to the shareholders. When he further saw Bronstein's success in raising capital for companies like Fyllo, Wesana, and Tyson 2.0, Case intended to misuse the capital gains.

476. Cosby had a longstanding relationship with Bronstein from his prior employment. When Bronstein was looking for legal help with facilitating and concealing unlawful transactions, he recruited Cosby. Cosby, with knowledge of Bronstein's fraudulent practices and the intent behind the Bronstein Enterprise he had formed, agreed to aid the Bronstein Enterprise, using her legal expertise for the purpose of directing company funds to the Bronstein Enterprise under the guise of corporate compliance.

477. Bronstein, Cosby, Wilks, Case, and Volo each agreed that some combination of co-conspirators in the Bronstein Enterprise would each commit at least two predicate acts establishing a pattern of racketeering activity.

478. Bronstein, Wilks, Case, Cosby, and Volo were aware of the Enterprise's purpose and its actions to effectuate its purpose. In many instances, Bronstein devised a scheme, but did not carry out the logistics. Wilks, Case, Cosby, and Volo would, in turn, facilitate the unlawful transactions with the knowledge that they would improperly benefit the Bronstein Enterprise as opposed to Tyson 2.0.

479. As a direct and proximate cause of the conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in an amount to be determined at trial.

**Count III**
**Section 10(b) and Rule 10b-5(b), Securities Fraud**
**(Tyson 2.0 Against Bronstein and Wilks)**

480. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 479 as if fully set forth herein.

481. Defendants Bronstein and Wilks used and employed a manipulative device in contravention of 17 CFR § 240.10b-5 and 15 U.S.C. 78j.

482. Bronstein and Wilks made material misstatements and omissions in connection with the purchase and sale of securities.

483. Specifically, in or about August 2022, Bronstein and Wilks misrepresented to Tyson 2.0 during a phone call with other Tyson 2.0 board members that Ric Flair Drip, Inc. was valuated at $10 million. This statement is misleading because after the acquisition occurred and the Tyson 2.0 finance team was able to assess the true valuation of the company, the finance team realized that in fact, Ric Flair Drip, Inc. had negative assets. Tyson 2.0 had to write off $3.8 million dollars in the company's financial statements upon discovery of Ric Flair Drip, Inc.'s false valuation.

484. Bronstein and Wilks omitted material information about how the $10 million valuation was derived.

485. In misstating the true valuation of Ric Flair Drip, Inc. and omitting information about how the $10 million valuation was derived, Bronstein and Wilks acted with the intent to deceive, manipulate, and defraud Tyson 2.0. Wilks and Bronstein had motive to do so. They both previously acquired 16% shares in Ric Flair Drip, Inc. and would therefore receive 1.06% of Tyson

2.0 shares at a much lower price, in addition to their other previously acquired Tyson 2.0 shares. They were also the only two board members of Ric Flair Drip, Inc. at the time of the acquisition.

486. Bronstein and Wilks had knowledge that the true valuation of Ric Flair Drip, Inc. was much lower than $10 million. Bronstein and Wilks were the sole members of the board for Ric Flair Drip, Inc. Yet, they did not conduct any due diligence for Ric Flair Drip, Inc. at any point before the acquisition. It was only after the acquisition that the Tyson 2.0 finance team discovered the truth about the Ric Flair Drip, Inc. valuation. Additionally, Bronstein and Wilks had each taken 16% ownership of Ric Flair Drip, Inc. only a few months before the acquisition occurred.

487. This intentional deception induced Tyson 2.0 to acquire all outstanding capital stock of Ric Flair Drip, Inc. from stockholders including Wilks and Bronstein. Tyson 2.0, believing that this was a lucrative business opportunity that would benefit its valuation and shareholders, agreed to purchase the Ric Flair Drip, Inc. shares.

488. Tyson 2.0 reasonably relied on Bronstein and Wilks to give accurate, non-public information about the valuation of Ric Flair Drip, Inc. The Tyson 2.0 board of directors approved the transaction on September 5, 2022, and the exchange agreement was signed on September 6, 2022.

489. Bronstein and Wilks' misstatements and omissions caused Tyson 2.0 to purchase shares of Ric Flair Drip, Inc. for more than the shares were worth.

490. Bronstein and Wilks' misstatements and omissions further caused Tyson 2.0 to invest in a worthless company and lose Tyson 2.0's full investment.

491. Bronstein and Wilks violated § 10(b) and Rule 10b-5 to the detriment of Tyson 2.0, with the amount of monetary damages to be proven at trial.

492. Additionally, as a result of Bronstein and Wilks's unjust enrichment, Tyson 2.0 is entitled to the equitable remedy of disgorgement.

**Count IV**
**Section 10(b) and Rule 10b-5(a) and (c), Securities Fraud**
**(Tyson 2.0 Against Bronstein and Wilks)**

493. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 492 as if fully set forth herein.

494. Defendants Bronstein and Wilks used and employed a manipulative device in contravention of 17 CFR § 240.10b-5 and 15 U.S.C. 78j.

495. Specifically, Bronstein and Wilks carried out a common plan, scheme, and unlawful course of conduct in relation to the acquisition of Ric Flair Drip, Inc. Their scheme to defraud was intended to, and did, (1) deceive Tyson 2.0 to invest in a worthless company, (2) deceive Tyson 2.0 to give greater ownership in Tyson 2.0 shares to Bronstein and Wilks at a lower price, (3) artificially inflate the price of Ric Flair Drip, Inc. and (4) cause Tyson 2.0 to purchase Ric Flair Drip, Inc. stock at an artificially inflated price.

496. In furtherance of this unlawful plan, scheme, and course of conduct, Bronstein and Wilks employed devices, schemes, and artifices to defraud, and knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit on Tyson 2.0 in connection with their purchase of Ric Flair Drip, Inc. shares, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c)—as evidenced by paragraphs 496 through 501 herein. First, Bronstein and Wilks worked together to create and incorporate Ric Flair Drip,

Inc., and they subsequently appointed themselves as the only members of the company's board of directors. With Bronstein's role as CEO of Ric Flair Drip, Inc., Bronstein and Wilks worked together to manufacture a sale of Ric Flair Drip, Inc. securities to themselves, unbeknownst to Flair. As a result, Bronstein and Wilks diverted equity in Ric Flair Drip, Inc. to themselves as opposed to Tyson 2.0.

497. In furtherance of the scheme, Bronstein and Wilks were the only Tyson 2.0 board members with equity in Ric Flair Drip, Inc. at the time of the acquisition.

498. In furtherance of the scheme, Bronstein and Wilks then engineered an acquisition in which Tyson 2.0 purchased all remaining shares of Ric Flair Drip, Inc., including Bronstein and Wilks' own shares, in exchange for shares of Tyson 2.0. In early September 2022, Bronstein proceeded to sign off on the acquisition on behalf of both companies. Bronstein and Wilks took these deceptive and manipulative actions with the intent to defraud Tyson 2.0 in furtherance of their scheme to acquire equity they would not have otherwise acquired.

499. As signatories for both Ric Flair Drip, Inc. and Tyson 2.0, Bronstein and Wilks knew or were reckless not to know the true valuation of Ric Flair Drip, Inc. before and at the time that Tyson 2.0 acquired Ric Flair Drip, Inc. Nonetheless, on August 4, 2022, in furtherance of the scheme, Whistleblower A, under the direction of Bronstein and Wilks, sent an email to the Tyson 2.0 finance team and outside counsel stating that the Ric Flair Drip, Inc. valuation was $10 million. This was in addition to Bronstein and Wilks' own misrepresentations and omissions regarding the valuation of Ric Flair Drip, Inc. as alleged in Count III above.

500. In furtherance of the scheme, to conceal Bronstein and Wilks' fraudulent conduct, shortly after the acquisition of Ric Flair Drip, Inc., in or about September 2022, during an internal company meeting, the Tyson 2.0 finance team asked Bronstein for authority to conduct a financial

audit of, among other things, the value of Ric Flair Drip, Inc., but Bronstein determined that a financial audit was unnecessary.

501. In furtherance of the scheme, to conceal Bronstein and Wilks' fraudulent conduct, in November 1, 2022, Whistleblower A, under the direction of Bronstein, emailed an external accounting firm, with Bronstein copied, telling the firm that Ric Flair Drip, Inc. was valued at $10 million. When the accounting firm asked for how the valuations were derived, Whistleblower A, copying Bronstein on the email and under the direction of Bronstein, did not provide any further clarity as to how the valuation was derived.

502. Tyson 2.0 reasonably relied on Bronstein and Wilks' deceptive actions and the misleading information they disseminated, ultimately acquiring Ric Flair Drip, Inc. at the inflated $10 million valuation. The Tyson 2.0 board of directors approved the transaction on September 5, 2022, and the exchange agreement was signed on September 6, 2022. Tyson 2.0 was unaware before and at the time of the acquisition of Ric Flair Drip, Inc. that the company had negative assets.

503. Abusing Tyson 2.0's reliance, Bronstein and Wilks personally benefitted in connection with the transfer of Tyson 2.0 shares. Bronstein and Wilks' personal share of Tyson 2.0 increased by approximately 1.06%.

504. Tyson 2.0 incurred loss in this transaction because it purchased a worthless company and, in doing so, paid more for shares of Ric Flair Drip, Inc. than the shares were worth. As a result, Tyson 2.0 purchased Ric Flair Drip, Inc. at an artificially inflated price. But for Bronstein and Wilks' deceptive and manipulative acts, the loss would not have occurred.

505. As a direct and proximate cause of Bronstein and Wilks' securities fraud under § 10(b) and Rule 10b-5(a) and (c), Tyson 2.0 suffered monetary damages in an amount to be proven at trial.

506. Additionally, as a result of Bronstein and Wilks' unjust enrichment, Tyson 2.0 is entitled to the equitable remedy of disgorgement.

**Count V**
**Fraud**
**(Tyson 2.0 Against Bronstein)**

507. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 506 as if fully set forth herein.

508. Defendant Bronstein made a material misstatement of fact. On May 1, 2022, Bronstein formally accepted his position as Tyson 2.0's president and chairman of the board by signing the Executive Employment Agreement. By signing the agreement, Bronstein affirmatively represented that his executive compensation would be limited to his base salary ($350,000), as well as any discretionary bonuses awarded by the Tyson 2.0 Board:

- "Executive will be eligible to receive payment of a discretionary fiscal year bonus up to 100% of Executive's then-current Base Salary … " Ex. 7, Bronstein Executive Employment Agreement, § 3(b).

509. Bronstein's misstatement of fact was material, as it was memorialized in his Executive Employment Agreement, dated May 1, 2022, with Tyson 2.0.

510. Bronstein knew that his material representation was false. At the time of his signature, Bronstein knew that he intended to breach the agreement by unilaterally approving hundreds of thousands of dollars in additional, unauthorized bonuses.

511. Bronstein made this material misrepresentation to induce the company into appointing him as Tyson 2.0's president and chairman of the board, knowing full well that he intended to misuse and abuse company funds once he officially assumed the position.

512. The Tyson 2.0 board relied on Bronstein's material misrepresentation, and consummated their decision to appoint him as Tyson 2.0's president and chairman of the board via the Executive Employment Agreement.

513. Tyson 2.0 relied on this material misrepresentation to its detriment, and was ultimately injured by their reliance. Bronstein repeatedly and secretly paid himself hundreds of thousands of dollars in discretionary bonuses—approximately $900,000 in total by the end of his tenure. As chairman of the board of Tyson 2.0, Bronstein would unilaterally approve his unauthorized bonuses.

514. For example, on May 9, 2022, Bronstein unilaterally approved an additional $100,000 bonus for himself, on top of his annual bonus.

515. On July 27, 2022, Bronstein unilaterally approved an additional $50,000 bonus for himself, on top of his annual bonus.

516. On November 21, 2022, Bronstein unilaterally approved an additional $65,625 bonus for himself, on top of his annual bonus.

517. On January 20, 2023, Bronstein unilaterally approved an additional $87,500 bonus for himself, on top of his annual bonus.

518. Tyson 2.0 was not aware of these secret, discretionary bonuses that he awarded himself, and Tyson 2.0 relied on Bronstein's assertions that everything involving his compensation was above board.

519. As a direct and proximate cause of Bronstein's material misrepresentations, Plaintiff Tyson 2.0 has suffered extensive monetary damages in an amount to be proven at trial.

**Count VI**
**Breach of Contract**
**(Tyson 2.0 Against Bronstein)**

520. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 519 as if fully set forth herein.

521. A valid and enforceable contract existed between Plaintiff Tyson 2.0 and Defendant Bronstein. On May 1, 2022, Bronstein formally accepted his position as Tyson 2.0's president and chairman of the board by signing the Executive Employment Agreement. By signing the agreement, Bronstein entered into a valid and enforceable contract:

- "Executive will be eligible to receive payment of a discretionary fiscal year bonus up to 100% of Executive's then-current Base Salary … " Ex. 7, Executive Employment Agreement, § 3(b).

522. Tyson 2.0 performed pursuant to the contract. Tyson 2.0 consummated their decision to appoint Bronstein as Tyson 2.0's president and chairman of the board through this agreement, and properly paid him the agreed compensation.

523. Bronstein breached the contract by repeatedly and secretly paying himself hundreds of thousands of dollars in discretionary bonuses—approximately $900,000 in total by the end of his tenure. As chairman of the board of Tyson 2.0, Bronstein would unilaterally approve his unauthorized bonuses.

524. For example, on May 9, 2022, Bronstein unilaterally approved an additional $100,000 bonus for himself, on top of his annual bonus.

525. On July 27, 2022, Bronstein unilaterally approved an additional $50,000 bonus for himself, on top of his annual bonus.

526. On November 21, 2022, Bronstein unilaterally approved an additional $65,625 bonus for himself, on top of his annual bonus.

527. On January 20, 2023, Bronstein unilaterally approved an additional $87,500 bonus for himself, on top of his annual bonus.

528. As a direct and proximate cause of Bronstein's breach of contract, Plaintiff Tyson 2.0 has suffered extensive monetary damages in an amount to be proven at trial.

**Count VII**
**Fraud**
**(Tyson 2.0 Against Bronstein)**

529. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 528 as if fully set forth herein.

530. Defendant Bronstein made a material misstatement of fact. On May 1, 2022, Bronstein affirmatively represented that he would comply with the following expenditure and reimbursement policy:

- "The Company will reimburse Executive for the reasonable and necessary business expenses incurred by Executive during employment with the Company, subject to all terms and conditions of the Company's expense reimbursement policies, and practices in effect … " Ex. 7, Executive Employment Agreement, § 3(f).

531. Bronstein's misstatement of fact was material, as it was memorialized in his Executive Employment Agreement, dated May 1, 2022, with Tyson 2.0.

532. Bronstein knew that his material representation was false. At the time of his signature, Bronstein knew that he intended to breach the agreement by submitting fraudulent reimbursements (i.e., luxury goods for himself and friends) under the guise of legitimate business expenses.

533. Bronstein made this material misrepresentation to induce the company into appointing him as Tyson 2.0's president and chairman of the board, knowing full well that he intended to misuse and abuse company funds once he officially assumed the position.

534. The Tyson 2.0 Board relied on Bronstein's material misrepresentation, and consummated their decision to appoint him as Tyson 2.0's president and chairman of the board via the Executive Employment Agreement.

535. Tyson 2.0 relied on this material misrepresentation to its detriment, and was ultimately injured by their reliance.

536. Bronstein routinely expensed frivolous and personal expenses for his own enjoyment, including but not limited to the payment of private jet rides, personal entertainment while both at home and on trips, home enhancement projects, and the purchase of luxury goods and services for personal use.

537. For example, on or about August 5, 2022, Bronstein knowingly and unilaterally approved a list of fraudulent reimbursements. The list of reimbursements included boating expenses that were labeled in a manner designed to mislead the finance department to believe they were hotel expenses:

- Bronstein "Approved" a $1,827.50 reimbursement for the "Tampa Water Street Hotel" on "6/20 & 7/27." Bronstein did not actually stay at the Tampa Water Street

Hotel on these nights, and instead used these descriptions as a guise for his boating expenses.

The list of improper reimbursements included multiple plane tickets for Bronstein's wife and child:

- Bronstein approved a $460.00 reimbursement for his son, Chase, to fly from Nashville, Tennessee to Chicago, Illinois.
- Bronstein approved a $460.00 reimbursement for his wife, Selina, to fly from Nashville, Tennessee to Chicago, Illinois.

538. Tyson 2.0 was not aware of the extent of Bronstein's frivolous expenditure, and Tyson 2.0 relied on Bronstein's assertions that each expenditure was submitted for a legitimate business purpose.

539. As a direct and proximate cause of Bronstein's material misrepresentations, Plaintiff Tyson 2.0 has suffered extensive monetary damages in an amount to be proven at trial.

**Count VIII**
**Breach of Contract**
**(Tyson 2.0 Against Bronstein)**

540. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 539 as if fully set forth herein.

541. A valid and enforceable contract existed between Plaintiff Tyson 2.0 and Defendant Bronstein. On May 1, 2022, Bronstein formally accepted his position as Tyson 2.0's president and chairman of the board by signing the Executive Employment Agreement. By signing the agreement, Bronstein entered into a valid and enforceable contract:

- "The Company will reimburse Executive for the reasonable and necessary business expenses incurred by Executive during employment with the

> Company, subject to all terms and conditions of the Company's expense reimbursement policies, and practices in effect … " Ex. 7, Executive Employment Agreement, § 3(f).

542. Tyson 2.0 performed pursuant to the contract. Tyson 2.0 consummated their decision to appoint Bronstein as Tyson 2.0's president and chairman of the board through this agreement, and reimbursed him for his purported business expenses.

543. Bronstein breached the contract by routinely expensing frivolous and personal expenses for his own enjoyment, including but not limited to the payment of private jet rides, personal entertainment while both at home and on trips, home enhancement projects, and the purchase of luxury goods and services for personal use.

544. For example, on or about August 5, 2022, Bronstein knowingly and unilaterally approved a list of fraudulent reimbursements by means of wire transmission, more specifically electronic mail. The list of reimbursements included boating expenses that were labeled in a manner designed to mislead the finance department to believe they were hotel expenses.

- Bronstein "Approved" a $1,827.50 reimbursement for the "Tampa Water Street Hotel" on "6/20 & 7/27." Bronstein did not actually stay at the Tampa Water Street Hotel on these nights, and instead used these descriptions as a guise for his boating expenses.

The list of improper reimbursements included multiple plane tickets for Bronstein's wife and child:

- Bronstein approved a $460.00 reimbursement for his son, Chase, to fly from Nashville, Tennessee to Chicago, Illinois.

- Bronstein approved a $460.00 reimbursement for his wife, Selina, to fly from Nashville, Tennessee to Chicago, Illinois.

545. These were not reasonable and necessary business expenses, but Bronstein sought and received reimbursement by misleading Tyson 2.0, violating the terms and conditions of the company's expense reimbursement policies and practices.

546. As a direct and proximate cause of Bronstein's breach of contract, Plaintiff Tyson 2.0 has suffered extensive monetary damages in an amount to be proven at trial.

**Count IX**
**Fraud**
**(Tyson 2.0 Against Bronstein)**

547. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 546 as if fully set forth herein.

548. Defendant Bronstein made a material misstatement of fact. In 2022, Daniel Carcillo discovered Bronstein's fraudulent misconduct at Wesana. In an effort to silence him, Bronstein offered Carcillo a job as a consultant. Bronstein affirmatively represented to the Tyson 2.0 Board that Carcillo would be genuinely working as a consultant at Tyson 2.0.

549. Bronstein's misstatement of fact was material, as it was memorialized with Carcillo's subsequent job offer with a yearly salary of $100,000.

550. Bronstein knew that his material representation was false. At the time of the job offer, Bronstein knew that Carcillo would not be performing any genuine substantive or procedural work at Tyson 2.0. Instead, Bronstein fully understood that the position was nothing more than a "ghost job."

551. Bronstein made this material misrepresentation to induce the company into hiring Carcillo as a consultant, so as to silence Carcillo from blowing the whistle on his conduct at Wesana, so that he could continue to misuse and abuse company funds at Tyson 2.0.

552. The Tyson 2.0 board relied on Bronstein's material misrepresentation, and brought Carcillo into the Tyson 2.0 venture.

553. Tyson 2.0 relied on this material misrepresentation to its detriment, and was ultimately injured by such reliance.

554. It was Bronstein's understanding that Carcillo would not be performing any work at Tyson 2.0. Instead, the position was, functionally, a bribe to keep Carcillo from raising concerns about Bronstein's fraudulent conduct at his previous employer, Wesana.

555. Bronstein hired Daniel Carcillo, at the approximate yearly cost to Tyson 2.0 of $100,000, to silence him.

556. Tyson 2.0 was not aware of the salary Carcillo was being paid, or that Carcillo was not performing any work. Tyson 2.0 relied on Defendant Bronstein's assertions that his hiring practices were undertaken solely for Tyson 2.0's benefit.

557. Bronstein represented these falsehoods and omissions to the company for the sole purpose of inducing Tyson 2.0 to pay Carcillo a salary which in reality functioned as a personal bribe solely benefiting Bronstein.

558. As a direct and proximate cause of Bronstein's material misrepresentations, Tyson 2.0 has suffered extensive monetary damages in an amount to be proven at trial.

**Count X**
**Fraud**
**(LGNDS and Flair Against Bronstein and Cosby)**

559. Plaintiffs LGNDS and Flair reassert and incorporate by reference all allegations contained in Paragraphs 1 through 558 as if fully set forth herein.

560. Defendants Bronstein and Cosby made material misrepresentations of fact. Cosby drafted the RFD License Agreement, dated July 7, 2023. Bronstein, by and through Tyson 2.0, used the drafted contract to prove to LGNDS that Tyson 2.0 owned, controlled, and possessed the rights to the brands and trademarks relating to Ric Flair Drip, and that it owned a license to manufacture various products—i.e., hemp products, mushroom products, nicotine products, kava products, smelling salts, beverages, and other merchandise, such as shirts, pants, sweaters, and footwear.

561. Bronstein's and Cosby's misstatements of fact were material, as it was consummated via a licensing agreement worth $400,000.

562. At the time of the RFD License Agreement's execution, Bronstein and Cosby knew that their material representations were false. Bronstein and Cosby fully understood that Tyson 2.0 only owned the license to manufacture *hemp* products pursuant to the Ric Flair Drip brand and trademark, and that they had sold LGNDS rights that Tyson 2.0 did not have the legal authority to license.

563. Bronstein—despite knowing that he did not own a license to manufacture mushroom products, nicotine products, kava products, smelling salts, beverages, and other merchandise, such as shirts, pants, sweaters, and footwear—still represented that Tyson 2.0 owned the licensing rights to all of these products to LGNDS, so as to induce LGNDS to enter into a $400,000 contract.

564. LGNDS relied on Bronstein's and Cosby's material misrepresentations, and signed the RFD License Agreement in exchange for $400,000.

565. LGNDS relied on these material misrepresentations to its detriment, and was ultimately injured by such reliance. LGNDS created Wooooo! Energy, a mushroom based energy drink, and, on behalf of Bronstein, was committed to multi-million dollar sponsorship agreements, including an agreement with All Elite Wrestling ("AEW"). Because the licensing rights were fraudulent, LGNDS defaulted on the contract, and became the subject of an $850,000 lawsuit.

566. As a direct and proximate cause of Bronstein's and Cosby's false representations, LGNDS has suffered monetary damages, including lost profits and settlement costs.

567. Further, as a direct and proximate cause of Bronstein and Cosby's false representations, Flair has suffered damages to his exclusive trademarks, which has resulted in monetary damages.

568. Because of these injuries, Plaintiffs LGNDS and Flair are entitled to damages in an amount to be proven at trial.

**Count XI**
**Fraud**
**(Tyson and LGNDS Against Wilks)**

569. Plaintiffs Tyson and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 568 as if fully set forth herein.

570. Defendant Wilks made a material misrepresentation of fact. Wilks, by and through Tyson 2.0, assured LGNDS that pursuant to the terms of the LGNDS-Tyson 2.0 Agreement, as updated on July 7, 2023, LGNDS held the exclusive right to sublicense Tyson 2.0 mushroom products, and that Tyson 2.0 would not re-license those rights to third party competitors.

571. Wilks' misstatement of fact was material.

572. At the time he made the representation, Wilks knew that his material representation was false. Wilks intended to re-license the licensing rights to a third-party competitor company called Advanced Mycology. And so, Wilks entered into a sub-license agreement with Advanced Mycology to produce mushroom products pursuant to the Tyson 2.0 brand.

573. Wilks issued the sublicense to Advanced Mycology with the intent to induce Tyson and LGNDS to continue doing business with Tyson 2.0, and to allow Wilks to accrue additional profits from secret licensing agreements with Advanced Mycology.

574. LGNDS relied on Wilks' material misrepresentation to its detriment. LGNDS continued to produce, manufacture, and distribute Tyson 2.0 product under the belief that LGNDS had a global, exclusive trademark.

575. As a direct and proximate cause of Wilks' false representations, Tyson and LGNDS have suffered monetary damages, including lost profits, in an amount to be proven at trial.

576. As a direct and proximate cause of Wilks' false representations, Tyson has suffered damages to his exclusive trademarks, which has resulted in monetary damages in an amount to be proven at trial.

**Count XII**
**Fraud**
**(Tyson, Tyson 2.0, and LGNDS Against Wilks)**

577. Plaintiffs Tyson, Tyson 2.0, and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 576 as if fully set forth herein.

578. Defendant Wilks made a material misrepresentation of fact. On October 21, 2024, Wilks confirmed that Sublicensee-Distributor, J Brands, had the proper registrations to operate under federal law. Wilks stated: "Confirming that our licensee has PMTA registration number for nicotine vapes."

579. Wilks' misrepresentation of fact was material.

580. Wilks knew that his representation was false. At the time of the misstatement of material fact, Wilks affirmatively knew that J Brands had failed to file a Premarket Tobacco Product Application ("PMTA") with the Food and Drug Administration ("FDA") in violation of 21 U.S.C. § 387j(b).

581. Wilks made this misrepresentation with the intention of ensuring that Tyson, Tyson 2.0, and LGNDS continued to manufacture the nicotine vapes, despite being in violation of federal law, so that Wilks could continue misappropriating Tyson 2.0's funds.

582. Tyson, Tyson 2.0, and LGNDS relied on Wilks' material misrepresentation to their detriment. Tyson, Tyson 2.0, and LGNDS continued to manufacture nicotine products in violation of federal law, and had to halt production of the nicotine vapes because the nicotine vapes were in violation of federal law, as well as California's flavor ban.

583. As a direct and proximate cause of Wilks' false representations, Tyson, Tyson 2.0, and LGNDS have suffered monetary damages, including lost profits, in an amount to be proven at trial.

584. As a direct and proximate cause of Wilks' false representations, Tyson has suffered damages to his exclusive trademarks, which has resulted in monetary damages in an amount to be proven at trial.

**Count XIII**
**Fraud**
**(Tyson 2.0 and LGNDS Against Wilks and Cosby)**

585. Plaintiffs Tyson 2.0 and LGNDS reassert and incorporate by reference all allegations contained in Paragraphs 1 through 584 as if fully set forth herein.

586. In the EVOL-FTR LGNDS Agreement, Defendant Wilks falsely represented to LGNDS that Tyson 2.0 owned, controlled, and possessed the rights to the trademarks and licensed products relating to the Future-EVOL-Tyson 2.0 Agreement—i.e., hemp-derived products, mushroom-related products, kava and kratom, tobacco-derived products, all Future smoking paraphernalia, and all nicotine-derived products.

587. At the time of the EVOL-FTR LGNDS Agreement's execution, Wilks and Cosby knew that Tyson 2.0 only owned the license to manufacture *cannabis* products using the Future brand and trademark.

588. Wilks—despite knowing that Tyson 2.0 did not own a license to manufacture the non-cannabis or cannabis-related products—still represented that he had the licensing rights for these products to LGNDS, so as to induce LGNDS to enter into the EVOL-FTR LGNDS Agreement.

589. On information and belief, Cosby drafted the EVOL-FTR LGNDS Agreement—knowing that Tyson 2.0 did not have rights to non-cannabis products—so as to induce LGNDS to enter into the EVOL-FTR LGNDS Agreement.

590. LGNDS—relying on Wilks and Cosby's assertion that Tyson 2.0 had the rights to the non-cannabis products—signed the EVOL-FTR LGNDS Agreement.

591. As a direct and proximate cause of Wilks and Cosby's false representations, Tyson 2.0 and LGNDS have suffered monetary damages, including lost profits, in an amount to be determined at trial.

**Count XIV**
**Fraud**
**(Tyson 2.0 Against Wilks)**

592. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 591 as if fully set forth herein.

593. In 2024, Wilks made a misstatement of material fact by representing to Tyson 2.0 that DomPen would cease operations in states that extended beyond the terms of the DomPen Agreements.

594. Wilks knew that this representation was false because, in reality, Wilks was continuing to receive kickbacks from DomPen for unauthorized sales of Tyson 2.0 Licensed Products and EVOL Licensed Products in those states.

595. Wilks knew that the sales outside of those states persisted after that, and withheld that information from Tyson 2.0 so as to induce Tyson 2.0 to continue to remain in those contracts while Wilks profited at Tyson 2.0's expense.

596. Tyson 2.0 relied on Wilks' assertion that DomPen would cease sales outside of the states agreed to by the parties in the DomPen Agreements and remained in those contracts while DomPen and Wilks used those contracts in ways that were not authorized under the agreement.

597. As a direct and proximate cause of Wilks' false representations, Tyson 2.0 has suffered monetary damages, including lost profits, in an amount to be determined at trial.

598. As a result of Wilks' unjust enrichment, Tyson 2.0 is also entitled to the equitable remedy of disgorgement.

**Count XV**
**Fraud**
**(Tyson 2.0 Against Wilks)**

599. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 598 as if fully set forth herein.

600. Defendant Wilks withheld material information from Tyson 2.0 regarding his numerous business ventures, including Northern Emeralds, DomPen, Green Success, and RadarZero. Each instance of his involvement in these ventures conflicted with his position on the Board of Directors for Tyson 2.0.

601. As a favor to Northern Emeralds, Wilks waived Northern Emeralds' debts, totaling more than $1.25 million, and knowingly withheld from Tyson 2.0 that he did so.

602. Wilks received equity in Northern Emeralds and received equity for his sister in Green Success, and knowingly withheld both instances of ownership in those companies from Tyson 2.0.

603. Wilks held board positions at Northern Emeralds, Captor Capital, and DomPen, and he knowingly withheld this information from Tyson 2.0.

604. Wilks knew that waiving Northern Emeralds' debt, gaining equity in companies doing business with Tyson 2.0, and holding other board positions were material information for Tyson 2.0. Yet, he still withheld this information from Tyson 2.0, with the intent to induce Tyson 2.0 into doing business with entities that would benefit Wilks.

605. Tyson 2.0, relying on Wilks' assertion that Northern Emeralds' debts were paid and that he was not receiving significant benefits from other companies involved with Tyson 2.0, continued doing business with Northern Emeralds, DomPen, Green Success, RadarZero, and other companies. As a result, Tyson 2.0 lost hundreds of thousands of dollars from their engagement with those companies.

606. As a direct and proximate cause of Wilks' false representations, Tyson 2.0 has suffered monetary damages, including lost profits, in an amount to be proven at trial.

607. As a result of Wilks' unjust enrichment, Tyson 2.0 is also entitled to the equitable remedy of disgorgement.

**Count XVI**
**Fraud**
**(Tyson Against Wilks)**

608. Plaintiff Tyson reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 607 as if fully set forth herein.

609. On October 15, 2021, Plaintiff Tyson 2.0, by and through Defendant Wilks, entered into a valid and binding Trademark License Agreement with Plaintiff Tyson.

610. The Tyson 2.0 License Agreement specified that Tyson must approve of sublicenses that guarantee his in-person appearances.

611. Wilks misrepresented to Tyson that he would seek his approval prior to entering sublicenses that require his in-person appearance. In fact, Wilks knew that he contractually committed Tyson to appearing in multiple states across the country each year, all without Tyson's prior approval.

612. Wilks made these misrepresentations with the intent to deceive Tyson into entering and maintaining a business relationship with Wilks, through Tyson 2.0.

613. Relying on Wilks' misrepresentations, Tyson signed the agreement and maintained a business relationship with Wilks, through Tyson 2.0. Tyson signed the agreement to his detriment.

614. As a direct and proximate cause of Wilks' fraud, Tyson has suffered monetary damages, including losses in monthly gross revenue.

615. As a direct and proximate cause of Wilks' fraud, Tyson's trademarks and likeness suffered reputational damage and lost profits.

616. Because of these injuries, Tyson is entitled to damages in an amount to be proven at trial.

**Count XVII**
**Breach of Fiduciary Duty**
**(Tyson 2.0 Against Bronstein)**

617. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 616 as if fully set forth herein.

618. Beginning in 2021, Bronstein served as chairman of Tyson 2.0's board of directors. Beginning on May 1, 2022, Bronstein also took the role of President of Tyson 2.0.

619. Due to his role as chairman of the board and president, Defendant Bronstein owed Tyson 2.0 the fiduciary duties of loyalty and care.

620. Bronstein breached these fiduciary duties on multiple occasions, through a pattern of self-dealing and fraudulent behavior.

621. Bronstein conditioned the issuance of a portion of Tyson 2.0's founding shares on an investor purchasing $4 million of Bronstein's shares in another company. These funds went to Bronstein directly, not Tyson 2.0, despite Tyson 2.0 not owing obligations to that investor, for no consideration in exchange. Bronstein diverted part of the consideration for the investment in Tyson 2.0 to himself, unjustly enriching himself to the detriment of Tyson 2.0.

622. Bronstein concocted a scheme forcing Tyson 2.0 to purchase Ric Flair Drip, Inc., a company he controlled as CEO and had an equity interest in, enhancing his equity interest in Tyson 2.0 without disinterested approval from Tyson 2.0's Board of Directors. Bronstein jeopardized a valid and profitable contract between Tyson 2.0 and LGNDS by demanding that the CEO of LGNDS give Bronstein a Rolex brand watch, solely to Bronstein's benefit.

623. Bronstein agreed to professionally represent UFC Fighter Julianna Peña, who he frequently paid sponsorships (of which he would take a cut) issued by Tyson 2.0. This self-dealing was yet another way that Bronstein would pad his own pockets from Tyson 2.0's coffers without benefit to Tyson 2.0.

624. Bronstein overpaid himself beyond what Tyson 2.0's board of directors had approved, routinely giving himself unauthorized bonuses at Tyson 2.0's expense.

625. Bronstein further enriched himself at Tyson 2.0's expense when he reimbursed his personal travel, entertainment, and other expenses using company funds, despite none of those expenses providing any benefit to the company. In many instances, Bronstein provided little to no transparency or receipts regarding those personal expenses and still demanded reimbursement from the company.

626. By acting in his own best interests instead of Tyson 2.0's, in these instances as well as in others, Bronstein breached his fiduciary duty.

627. As a direct and proximate result, Tyson 2.0 was harmed in an amount to be determined at trial.

628. Additionally, as a result of Bronstein's unjust enrichment, Tyson 2.0 is entitled to the equitable remedy of disgorgement.

**Count XVIII**
**Breach of Fiduciary Duty**
**(Tyson 2.0 Against Wilks)**

629. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 628 as if fully set forth herein.

630. Beginning in 2021, Wilks was the chief executive officer for Tyson 2.0. Due to his status as CEO, Wilks owed Tyson 2.0 the fiduciary duties of loyalty and care, acting in Tyson 2.0's best interest.

631. Wilks breached these fiduciary duties on multiple occasions, through a pattern of self-dealing and fraudulent behavior.

632. Wilks was on the board of multiple competitor companies while he served on the board of Tyson 2.0.

633. At the time of Tyson 2.0's inception, Wilks was on the board of competitor company Northern Emeralds. Wilks subsequently waived Northern Emeralds' debts, totaling more than $1.25 million, and knowingly withheld from the company that he did so. Wilks also received equity in Northern Emeralds in exchange for directing Tyson 2.0 to enter the Northern Emeralds Agreement.

634. Wilks used Tyson 2.0 funds to gain equity, expand his personal network, and enrich himself through investments into other business ventures.

635. On October 3, 2024, Wilks, acting as CEO of Tyson 2.0, invested $750,000 in Sona Terra Inc. in exchange for shares, or 25% of Sona Terra, using funds belonging to Tyson 2.0.

636. Tyson 2.0 is not an investment firm, so making an investment is not aligned with Tyson 2.0's business model. Additionally, Sona Terra operates and manages restaurants, which is also unrelated to Tyson 2.0's business.

637. The investment in Sona Terra was not in the best interests of Tyson 2.0. In fact, the investment was to the detriment of Tyson 2.0, as Defendant Wilks diverted $750,000 of Tyson 2.0 funds from legitimate business purposes aligned with Tyson 2.0's business.

638. Wilks made the investment not in Tyson 2.0's interests, but because he wanted to establish a relationship with the chief executive officer of Sona Terra. Wilks used Tyson 2.0 as a vehicle to further his own business network development.

639. In another instance, Wilks used Tyson 2.0's funds to shelter himself from his own personal ill-gotten gains, by gaining substantial investment to demand that Green Success pay his sister personally. As a result, Green Success awarded his sister tens of thousands of dollars in equity.

640. Wilks further used Tyson 2.0's funds to gain equity and enrich himself when, unbeknownst to Tyson 2.0, he took a 5% equity stake in RadarZero in exchange for Tyson 2.0 signing the RadarZero Agreement.

641. Wilks signed the RadarZero Agreement because he himself would receive equity, not because it was in Tyson 2.0's best interests. The RadarZero venture failed to generate revenue or advance Tyson 2.0's interests as a company.

642. Wilks additionally facilitated a scheme forcing Tyson 2.0 to purchase Ric Flair Drip, Inc., a company he personally had an equity interest in, enhancing his equity interest in Tyson 2.0 without disinterested approval from Tyson 2.0's board of directors.

643. Finally, Wilks reviewed, approved, and signed the Bronstein Separation Agreement, Bronstein Stock Redemption Agreement, and Cosby Separation Agreement. When Wilks signed the releases of Defendants Bronstein and Cosby's conduct on behalf of Tyson 2.0, Wilks knew the full extent of Bronstein's fraudulent conduct, including extensive information about Bronstein and Cosby's misconduct unknown to Tyson 2.0. Despite this knowledge, Wilks released Bronstein and Cosby from millions of dollars in liability. In doing so, Wilks signed Bronstein and Cosby's release in the interest of the Bronstein Enterprise and to the detriment of Tyson 2.0.

644. By acting in his own best interests instead of Tyson 2.0's, in these incidents as well as others, Wilks breached his fiduciary duty.

645. As a direct and proximate result of Wilks' breach, Plaintiff Tyson 2.0 was harmed in an amount to be determined at trial.

646. As a result of Wilks' unjust enrichment, Tyson 2.0 is also entitled to the equitable remedy of disgorgement.

**Count XIX**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Tyson 2.0 Against Bronstein)**

647. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 646 as if fully set forth herein.

648. On November 17, 2023, Defendant Bronstein was terminated from Tyson 2.0.

649. On November 24, 2023, Bronstein entered into the Bronstein Separation Agreement and Bronstein Stock Redemption Agreement with Tyson 2.0. The Separation Agreement and Stock Redemption Agreement were reviewed, approved, and signed by Defendant Wilks.

650. As alleged in Count XVIII above, Wilks breached his fiduciary duty to Tyson 2.0 in reviewing, approving, and signing the releases of Bronstein's liability, despite knowing the extent of Bronstein's misconduct during his time on the board of Tyson 2.0. In releasing Bronstein from all liability, Wilks acted in the interest of the Bronstein Enterprise and to Tyson 2.0's detriment.

651. Bronstein actively and knowingly participated in Wilks' disloyal release of his extensive misconduct on the board of Tyson 2.0. Bronstein, as Wilks' former co-board member, understood that Wilks owed a fiduciary duty to Tyson 2.0 when he signed the releases on Tyson 2.0's behalf. Bronstein also knew that signing such an extensive release of his conduct would benefit the Bronstein Enterprise and harm Tyson 2.0, in breach of Wilks' fiduciary duty to Tyson 2.0. Nevertheless, Bronstein took advantage of his co-conspirator Wilks' position on the board in order to shield himself from liability for his misconduct. Bronstein orchestrated a release of all liability and concealed from Tyson 2.0 the extent of the loss that Tyson 2.0 had suffered.

652. Bronstein gave knowing and substantial assistance to Wilks' misconduct. Bronstein demanded that the release provision be added to his Separation Agreement after an initial draft releasing Tyson 2.0's liability was circulated, and he did not disclose the full extent of his misconduct to Tyson 2.0 in doing so. The additional provision releasing Bronstein from both "known and unknown" claims was then added to the Separation Agreement and signed by the parties. Bronstein similarly engineered the Stock Redemption Agreement to his benefit. The initial draft of the Bronstein Stock Redemption Agreement contained a provision concerning Bronstein's compliance with all applicable laws. However, Bronstein revised the draft and demanded that Tyson 2.0 remove this provision. Once Bronstein had workshopped the releases to his advantage, Bronstein's former co-board member and co-conspirator Wilks then reviewed, approved, and signed the releases—despite his full knowledge of and participation in Bronstein's misconduct.

653. As a direct and proximate result of Bronstein's active and knowing participation in Wilks' fiduciary breach, Tyson 2.0 has suffered substantial harm.

654. Tyson 2.0 has suffered damages as a result of the acts and conduct of Bronstein and Wilks alleged herein.

655. As a result of Bronstein's conduct, Tyson 2.0 has been harmed and Bronstein is liable for damages and to disgorge any improper benefits obtained from signing the releases.

**Count XX**
**Breach of Fiduciary Duty**
**(Tyson 2.0 Against Bronstein and Cosby)**

656. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 655 as if fully set forth herein.

657. Beginning in 2021, Defendant Bronstein served as chairman of Tyson 2.0's board of directors. Beginning on May 1, 2022, Bronstein also took the role of president of Tyson 2.0. Due to his role as chairman of the board and president, Bronstein owed Tyson 2.0 the fiduciary duties of loyalty and care.

658. Beginning on June 8, 2022, Defendant Cosby served as Tyson 2.0's chief legal and licensing officer. Due to her role as chief legal and licensing officer, Cosby owed Tyson 2.0 the fiduciary duties of loyalty and care.

659. Bronstein and Cosby breached these fiduciary duties by entering unauthorized sponsorship agreements to the detriment of Tyson 2.0.

660. During their employment, Bronstein and Cosby entered into over six sponsorship agreements, totaling over $5.5 million in Tyson 2.0-funded obligations. These agreements were not within the scope of Bronstein and Cosby's authority. The multimillion dollar obligation to Tyson 2.0 was not within general guidelines and budgets approved by the board.

661. Due to its revenue and business plan, Tyson 2.0 was not in a position to commit to these extensive obligations.

662. Bronstein and Cosby knew the contracts were not in Tyson 2.0's best interests. Instead, they used the contracts as a method of creating personal relationships with celebrities, for the purpose of their own personal brand and connections.

663. Because they put their own interests above Tyson 2.0's, Bronstein and Cosby breached the duty of loyalty they owed the company.

664. As a direct and proximate cause of the breach, Tyson 2.0 suffered monetary and reputational damages, in an amount to be proven at trial.

**Count XXI**
**Breach of Fiduciary Duty**
**(Tyson 2.0 Against Bronstein and Wilks)**

665. Plaintiff Tyson 2.0 reasserts and incorporates by reference all allegations contained in Paragraphs 1 through 664 as if fully set forth herein.

666. Beginning in 2021, Defendant Bronstein served as chairman of Tyson 2.0's board of directors. Beginning on May 1, 2022, Bronstein also took the role of president of Tyson 2.0. Due to his role as chairman of the board and president, Bronstein owed Tyson 2.0 the fiduciary duties of loyalty and care.

667. Beginning in 2021, Defendant Wilks was the chief executive officer for Tyson 2.0. Due to his status as CEO, Wilks owed Tyson 2.0 the fiduciary duties of loyalty and care, acting in Tyson 2.0's best interest.

668. Bronstein and Wilks breached these fiduciary duties by purposely diverting funds from investors in the sale of Tyson 2.0 stocks to their own pockets.

669. Even when the Tyson 2.0 Series A transaction closed on October 31, 2022, Tyson 2.0 had yet to sell millions of dollars in Series A shares when Bronstein and Wilks executed the secondary sales of their own common shares. Bronstein and Wilks were aware that there were hundreds of thousands of shares remaining that could be sold.

670. Bronstein and Wilks misrepresented to investors that the Series A preferred stock was oversubscribed, and redirected investors to purchase directly from their own common shares instead.

671. Bronstein and Wilks pocketed nearly $1.6 million in sales that could have gone to Tyson 2.0 had this misrepresentation that Series A was oversubscribed not been made to investors.

672. Because they put their own interests above Tyson 2.0's, Bronstein and Wilks breached the duty of loyalty they owed the company.

673. As a direct and proximate cause of the breach, Tyson 2.0 suffered monetary and reputational damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court to:

a. Award Plaintiffs a judgment against Defendants in the amount to be proven at trial;

b. Award Plaintiffs treble the actual damages and attorneys' fees, pursuant to 18 U.S.C. § 1964, for Defendants' violations of 18 U.S.C. § 1962;

c. Award equitable relief, including but not limited to disgorging all ill-gotten gains that Defendants obtained by conducting an Enterprise through a Pattern of Racketeering Activity, and disgorging all ill-gotten gains that Defendants obtained through their pattern of fraudulent conduct;

d. Award Plaintiffs prejudgment and post-judgment interest as permitted by any applicable law; and

e. Award Plaintiffs such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury of all triable matters.

Dated: April 13, 2026

*/s/ John Mitchell*

John D. Mitchell
LaRue Robinson
Isabella Sabri
Tara Sohns
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
Tel: (312) 728-9050
Fax: (312) 728-9199
jmitchell2@willkie.com
lrobinson@willkie.com
isabri@willkie.com
tsohns@willkie.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, John Mitchell, certify that the foregoing was filed via the Court's electronic filing system on this thirteenth day of April, 2026, which automatically serves notice on all ECF-registered counsel of record.

*/s/ John Mitchell*

John D. Mitchell
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL 60654-3406
Tel: (312) 728-9050
Fax: (312) 728-9199
jmitchell2@willkie.com